# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF FLORIDA

### Broward Division

**SCOTT THOMAS,**                    CASE NO.: 19-61324-CIV-DIMITROULEAS

Plaintiff,

v.

**BROWARD COUNTY SHERRIFF'S**

**OFFICE,**

Defendant.

_____/

### PLAINTIFF'S AMENDED RESPONSE IN OPPOSITION TO DEFENDANT BROWARD COUNTY SHERRIF'S OFFICE MOTION FOR SUMMARY JUDGEMENT

**COMES NOW,** Plaintiff Scott Thomas, by and through the undersigned counsel, and pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1(a), hereby files his Response in Opposition to Defendant Broward County Sheriff's Office's ("BSO") Motion for Summary Judgment, filed on November 9, 2020, and as grounds therefore states the following:

## I.      STATEMENT OF FACTS

### A.      FACTUAL SUMMARY

After seeing a job posting for Air Rescue Pilots advertised by BSO, Plaintiff submitted an application for employment and a resume for consideration. (Defendant's Statement of Undisputed Facts "Def. SOF" ¶ 9.)  Plaintiff was contacted by BSO and was asked to interview for the position.

Plaintiff's first interview was conducted by Chief Tammy Nugent, Brian Miller, and a BSO Human Resource representative. (Def. SOF ¶18; Plaintiff's Statement of Additional Facts ("SOAF") ¶68.)   During the initial interview, Plaintiff disclosed that he was a retired military aviator, he had worked for the FBI as a contract pilot and had also supported covert operations

for an undisclosed U.S. government agency.  (Def. SOF ¶ 3; Plaintiff's Counterstatement of Material Fact ("CSMF") ¶¶ 13, 22.)

Plaintiff explained to Pilot Miller that his official logbooks and his military flight records were in storage in Virginia.  (CSMF ¶ 16.)  He further disclosed that his official logbooks which were in storage were in a secure location because they contained confidential and privileged information relating to his previous employment.  (*Id.*; SOAF at ¶ 78.)  While these official logbooks could be presented to BSO, doing so would require leave to disclose confidential information from Plaintiff's pervious employers.  (Def. SOF ¶52; CSMF ¶52.)

Thus, Plaintiff maintained an electronic version of his flightlog books.  (Def. SOF ¶¶ 16, 17; CSMF ¶ 17.)   Plaintiff's electronic logbook, which did not disclose certain elements of covert flights, was acceptable in form, proper as per FAA standards, and confirmed that Plaintiff's flight experience was more than sufficient to qualify for employment with BSO as an Air Rescue Pilot.  (CSMF ¶17; SOAF at ¶¶ 74, 89.)  During his interview, Plaintiff showed his electronic logbooks to BSO Pilot Miller, who also confirmed that an electronic logbook was an acceptable alternative to Plaintiff's official flight records.  (SOAF ¶ 69.)

As the interview progressed, BSO Pilot Miller noticed that Plaintiff's electronic logbooks did not have a distinct entry for cross-country hours flown, a requirement listed in BSO's job posting.  (Def. SOF ¶21; CSMF ¶ 22; SOAF at ¶ 72.)  Cross-country hours are defined as flights that originate in one place and terminate at least twenty-five (25) miles from the originating point.  When BSO Pilot Miller raised this issue with Plaintiff, Plaintiff explained that during the seven and one-half years of his military flight service, which included countless combat missions, Plaintiff estimated that he had flown approximately nine hundred (900) hours of cross-country time.  (Def. SOF ¶¶20-21; CSMF ¶ 22; SOAF ¶¶ 72-74.)  The recording of these flights, however, was not labeled as cross-country flights because said nomenclature was not required for correct documentation in military flight records.  (SOAF ¶ 72.)

When this explanation was tendered to BSO Pilot Miller, Miller had zero doubt that Plaintiff had the requisite cross-county hours to qualify for employment with BSO.  (*Id.* at ¶¶72, 73.)  In fact, BSO Pilot Miller suggested that Plaintiff address the concern by making a single

blanket entry in his electronic logbook to document total cross-country hours.  (Def. SOF ¶23; SOAF ¶ 75.)  Both Plaintiff and BSO Pilot Miller decided that five hundred (500) hours would be a conservative estimate of Plaintiff's total cross-country time.  (SOAF ¶ 72.)  Plaintiff made the entry in his electronic logbook in front of Miller at that very moment.[1]  (*Id.* at ¶76.)

Once this entry was made, BSO Pilot Brian Miller agreed that Plaintiff's electronic flight logbook, which understated: (1) his total PIC hours flight hours; and (2) his total cross-country hours; were more than sufficient.  Plaintiff's initial interview was resounding success and Plaintiff was asked to return for a second interview. (*Id.* at ¶ 80.)

During the second interview, Plaintiff was tested on his knowledge of Part 135 regulations.[2]  (Def. SOF ¶24; SOAF ¶ 77.) Plaintiff failed this test because Part 135 training was neither taught, nor required, as part of Plaintiff's military pilot curriculum.  (*Id.*).  Despite failing the Part 135 test, which was not a prerequisite to BSO employment (*id.*), Plaintiff was asked to take a flight test and completed the actual practical portion of his interview with excellence.  (SOAF ¶ 80.)

Based on Plaintiff's successful interview process, BSO tendered an offer of employment to Plaintiff.  Plaintiff accepted and was one of four other military pilots that made up BSO's first Air Rescue Pilot class.  (Def. SOF ¶¶ 29,30.)  The first BSO Air Rescue Pilot class was made up of four military pilots and two civilians pilot, Ms. Danielle Fuller.[3]  (*Id.*)

Initially, Pilot Timothy Larson was appointed to the position of Director of Operations and Chief Pilot of the first Air Rescue Pilot class.  (SOAF ¶83.)  Larson, a decorated military pilot with significant Part 135 experience, was demoted and replaced with civilian pilot Danielle Fuller.  (*Id.*)  The demotion and replacement were authorized by Chief Tammy Nugent.  (*Id.*)

---

[1] After being terminated for alleged discrepancies in his logbook including this night flight entry, the FAA investigated this entry and confirmed that said entry was both lawful and accurate.

[2] BSO's newly assembled Fire Air Rescue team, which did not have any pilots assigned to the team prior to Plaintiff's class, was in the process of determining whether the program was going to abide by Part 135 Regulations or Part 91 Regulations.  Part 135 Regulations refer to Federal regulations governing for profit rotary aircraft flight. BSO did not require part 135 experience for Air Rescue Pilots; BSO required Part 135 experience for the Air Rescue Chief Pilot position and the Air Rescue Director of Operations position neither of which Plaintiff was applying for.

[3] After accepting the position one civilian pilot quit and the initial class was comprised of four military pilots and Danielle Fuller, the only civilian pilot.

Shortly thereafter, BSO appointed Danielle Fuller to the position of Interim Director of Operations. (CSMF ¶ 32.)  In Fuller's roles as both Chief Pilot and Interim Director, all military pilots were required to report directly to Ms. Fuller. (Def. SOF ¶ 33.)  Once in a leadership position, Danielle Fuller began to discriminate against and harass Plaintiff on the basis of his military service described in further detail below.

### B. PROCEDURAL BACKGROUND

Plaintiff filed a Complaint, an Amendment thereto and a Second Amendment Complaint with leave of court.  Defendant filed a Motion to Dismiss the Second Amended Complaint and the Court denied same.  The Parties have engaged in written discovery and the depositions of Plaintiff and Chief Tammy Nugent were taken.  Despite every effort to serve Danielle Fuller with a subpoena, Plaintiff was unable to effectuate service upon Ms. Fuller and was unable to take her deposition.  Likewise, Defendants did not subpoena or depose Ms. Fuller.[4]

## II.     DISPUTED FACTS

Plaintiff's disputed facts are set forth in his Separate Statement of Disputed and Undisputed Facts, which are filed concurrently to these Memorandum of Points and Authorities. ("P. SOF".)

## III.     <u>ARGUMENT</u>

### A.     MOTION FOR SUMMARY JUDGMENT STANDARD

Defendant BSO moves for summary judgment on Plaintiff's federal claims in their entirety pursuant to Federal Rule of Civil Procedure 56.  To succeed of a motion for summary judgment, the movant must show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Thus, Defendant BSO has the burden of proving "the absence of any genuine issue of fact" in order to be entitled to summary judgment.  *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 153 (1970); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  If a reasonable jury could find in favor of the non-moving party, with all inference being viewed in the light most favorable to the non-moving party, then

---

[4] Danielle Fuller was terminated from BSO shortly after Plaintiff.  Fuller was terminated after she was arrested and charged with domestic violence involving the civilian pilot Fuller hired to replace Plaintiff.

the motion **must be denied**.  *See Adickes*, 398 U.S. at 158-59; *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

**B.**   **PLAINTIFF'S CAUSE OF ACTION FOR DISCRIMINATION IN VIOLATION OF USERRA MUST SURVIVE SUMMARY JUDGEMENT BECAUSE THE RECORD EVIDENCE ESTABLISHES PLAINTIFF'S MILITARY SERVICE WAS A MOTIVATING FACTOR IN HIS TERMINATION**

Under the USERRA, a person who is a member of, or who has performed in, a uniformed service shall not be denied "initial employment, reemployment, retention in employment, promotion, or any benefit of employment by an employer on the basis of that membership" or performance of service.  38 U.S.C. § 4311(a).  An employer, therefore, violates the USERRA where "the employee's membership or service in the uniformed services is a **"motivating factor"** in the employer's failure to reemploy or continue to employ, or deny any benefit of employment to the individual."  *Id.; see also* § 4311(c)(1) (emphasis added).

To establish a *prima facie* case of discrimination under the USERRA, the Plaintiff must demonstrate by a "preponderance of the evidence that his military membership or service was a motivating factor" in the employer's decision to deny a Plaintiff a benefit or terminate a Plaintiff's employment.  *See Coffman v. Chugach Support Servs., Inc.,* 411 F.3d 1231, 1238 (11th Cir. 2005).  A motivating factor does not necessarily have to be the sole cause for the employer's decision but is defined as one of the factors that a truthful employer would list as its reasons for its decision. *Id.*

A court can infer a discriminatory motivation from a *variety of considerations*, such as: "(1) the temporal proximity between the Plaintiff's military activity and the adverse employment action; (2) inconsistencies between the proffered reason for the employer's decision and other actions of the employer; (3) an employer's expressed hostility toward members of the protected class combined with its knowledge of the plaintiff's military activity; and (4) disparate treatment of similarly situated employees." *Id.*  Importantly, the aforementioned factors do not all need to be present for discriminatory motivation to be inferred.

The evidence obtained during the discovery process clearly establishes a *prima facie* claim for USERRA discrimination under 38 U.S.C. § 4311(a).  The parties do not dispute that

Plaintiff served in the uniformed armed forces of the United States of America.  (P. SOF ¶ 1.) The record evidence shows that Plaintiff was subjected to several types of adverse actions, including but not limited to (1) a hostile work environment; (2) denial of leave to attend VA appointments; and (3) termination.  BSO disputes that Plaintiff was subjected to these employment actions.  As such, a genuine issue of material fact exists regarding this element of USERRA discrimination.

The other element that BSO disputes is the causation element, *i.e.*, whether or not Defendant BSO's adverse employment actions were motivated in part by Plaintiff's service to the United States as a uniformed military member.  The evidence viewed in a light most favorable to Plaintiff clearly supports a holding that Plaintiff's military service was a motivating factor in the adverse employment actions taken by Defendant.  Plaintiff relies upon three different considerations to establish a discriminatory motive on the part of Defendant BSO. These considerations, viewed in the light most favorable to Plaintiff, clearly demonstrate that Defendant cannot prevail as a matter of law and thus, summary judgment must be denied.

1. **A Reasonable Trier of Fact Will Infer Discriminatory Motive Because of BSO's Expressed Hostility Toward Plaintiff on the Basis of his Military Service**

Almost from the onset of Ms. Fuller's promotion to Chief Pilot, she demonstrated an anti-military bias and directed that bias toward Plaintiff and her other military subordinates. (Def. SOF ¶¶ 57-59, 61, 63; CSMF ¶63; SOAF ¶¶ 100-04).  Danielle Fuller's anti-military bias presented itself in the form of unlawful comments and discriminatory conduct.  (*see id.*)

BSO's new Air Rescue Program was in a state of complete disorganization.  At the time Plaintiff was hired, BSO had not yet determined whether this program would operate under part 135 operations, or in the alternative, Part 91 operations.  (CSMF ¶ 6.)  Part 135 regulations govern "for profit" flight operations.  (Def. SOF at ¶7.)  While civilian pilots may obtain Part 135 experience at great expense, Military pilots *are traditionally exempt* from Part 135 experience because of their military experience. (Pl. SOF ¶¶ 7,8.)  (CSMF ¶¶10, 13; SOAF ¶ 79.)

Danielle Fuller was the only non-military member of the incoming class that had Part 135 experience, and adamantly disapproved of military pilots being hired without the same experience that she was required to obtain in order to become a part 135 licensed pilot.  (Def. SOF ¶62; CSMF ¶ 63; SOAF ¶¶ 85,86.)  Initially, Fuller expressed her anti-military bias by claiming that she did not believe that military pilots were "as qualified" as civilian pilots because they were not required to have Part 135 experience to obtain PIC hours.  (*Id.*)  Ms. Fuller made her opinion known that she believed that "selecting military pilots over civilian pilots was unfair."  (SOAF ¶¶ 85, 86.*)  Ms. Fuller expounded on this statement by stating, "If she would have gone in the military, she would not have been given a position of someone with fifteen years [of experience] – "an equal position of someone with fifteen years being a civilian in the military .…" (*Id.*)

BSO purports "any statements made about lack of part 135 experience are not evidence of expressed hostility based on Plaintiff's former military service as he also lacked part 135 experience outside of military service." (ECF 37, at 7.)  There are several glaring omissions with BSO's argument.  First, BSO did not require Part 135 experience for employment as an Air Rescue Pilot.  (CSMF ¶10.)  As such, Plaintiff's exemption from Part 135 experience and subsequent choice not to obtain same following his honorable discharge is of no effect on his qualifications for employment with BSO.  (*Id.*)  Therefore, any negative statements regarding a lack of Part 135 experience proves an individual bias, that cannot be attributed to BSO.  In this particular circumstance, the individual who is expressing the bias is Plaintiff's direct supervisor; the individual ultimately responsible for recommending Plaintiff's termination (Def. SOF ¶¶44, 46; CSMF ¶46.)

Second, Part 135 experience was not required for Plaintiff to work as a contract pilot for the FBI or in any position held by Plaintiff following his honorable discharge and prior to his employment with BSO.  Regardless of his personal choice not to obtain Part 135 experience, Plaintiff was able to obtain gainful employment as a pilot without 135 experience because he was a military trained pilot.  (Def. SOF ¶¶ 7, 48.)  Danielle Fuller did not have military training

and could not exempt from this onerous and expensive requirement placed on civilian pilots who do not receive military training.

Third, BSO's argument seemingly alleges that Fuller's comments were directed towards Plaintiff's lack of Part 135 experience as a *civilian* pilot in the years following his military service, and not his exemption as a military pilot.  The two simply cannot be logically separated.  Plaintiff was not required to have Part 135 training to be a BSO pilot.  (CSMF ¶ 10.) This exemption is tied specifically to his military training; training that Danielle Fuller did not have and clearly envied and/or resented to the point of disdain.

In early December 2018, according the unrefuted testimony of Plaintiff, Fuller escalated her anti-military comments by falsely accusing retired military pilot Timothy Larson of "lying on his resume and lying on his background."  (SOAF ¶ 84.)  Fuller argued that Larson "probably shouldn't be employed" at BSO.  (*Id.*)[5]

Throughout the month of December 2018, and specifically on December 26, 2018, Interim Director of Operations Fuller made several statements that expressed outward hostility in the form of anti-military comments.  (Def. SOF ¶ 58, 61; SOAF ¶100-02.)  Specifically, Ms. Fuller stated to Plaintiff that "military pilots were stupid," "military pilots were not competent enough to do the job," and "military pilots should not be working for BSO."  (Def. SOF ¶61, SOAF ¶102.)  Ms. Fuller maligned Plaintiff by calling him both stupid and dumb on multiple occasions, while simultaneously comparing his performance to non-military pilots.  (Def. SOF ¶58; SOAF ¶¶100, 101.)   BSO's claim that Danielle Fuller's comments were a benign discussion of Plaintiff's job qualifications cannot be reconciled with her derogatory anti-military rhetoric.

Throughout the month of January 2019, Ms. Fuller continued to degrade and belittle her military subordinates, including Plaintiff.  (Def. SOF ¶ 57; SOAF ¶ 103-06.)   She again accused Plaintiff of being stupid, albeit for failing an EMT test, and not for being a military trained pilot.  (Def. SOF ¶ 57.)  In fact, every member of the group (all of whom were military

---

[5]  Fuller's complaints about Larson to Nugent ultimately resulted in Larson being demoted and Fuller replaced Larson as Chief Pilot.  Fuller's anti-military bias is revealed in her systematic efforts to rid her unit of military personnel that she felt were "unqualified to serve in her unit."

trained pilots) had failed at least one EMT test.   (SOAF at ¶ 97.)  Shockingly, Fuller, the only individual in the group who did not fail an EMT test, was observed cheating on the test when her cell phone inadvertently vocalized a response to a question on an un-proctored exam.  (*Id.*)

Again, in January of 2019, Fuller discriminated against Plaintiff on the basis of his military status by refusing to allow him to request time off for the stated purpose of going to the Veterans Administration ("VA") Hospital for an annual checkup.  (Def. SOF ¶ 59; SOAF ¶¶101, 102.)  Not only was the refusal discriminatory, but the words used to deny Plaintiff access to the VA were disparaging and patronizing.

Specifically, Fuller told Plaintiff, "…[He] was the child in the relationship and that she was the mother and that children do not ask for permission from their parents on certain occasions and this was one of those occasions where the parent -- or the children -- shouldn't be asking their parent what's going on, for permission to do certain things."  (Def. SOF ¶59.) In essence, Fuller was demanding that plaintiff follow her instructions, not to attend his annual physical at the VA, and not ask any questions about why he was being refused the right to attend same.

Not only is the above testimony completely unrefuted by BSO, it is corroborated by retired Navy Commander Brian McDonald.  Brian McDonald was employed with BSO as an Air Rescue Helicopter Pilot and worked with both Plaintiff and Danielle Fuller (SOAF ¶ 111.) In Commander McDonald's unrefuted affidavit in support, he confirms "it is clear to me through direct observation that Interim Director Fuller has a substantial bias against Scott Thomas based on his military background.  (*Id.* at ¶112.)  The anti-military bias… manifested itself through both comments and conduct."  (*Id.*)  Commander McDonald details Fuller's expressions of anti-military bias based on the difference in experiential requirements between military and non-military aviators.  (*Id.* at ¶ 113.)

Danielle Fuller's anti-military comments and discriminatory conduct, when viewed in a light most favorable to the Plaintiff, clearly supports an inference that Plaintiff's military service was a motivating factor in denying Plaintiff a benefit of employment including, but not limited

to, a  harassment free environment and unhindered access to the VA.   As such, Defendant cannot prevail as a matter of law and thus, summary judgment must be denied.

### 2.   A Reasonable Trier of Fact Will Infer Discriminatory Motive Because of the Inconsistencies in the Proffered Reason for the Employer's Decision to Terminate Plaintiff

Defendants argue that they had a legitimate business purpose for terminating Plaintiff's employment as their counternarrative to Plaintiff's allegation of USERRA discrimination. Defendant's stated legitimate purpose for terminating Plaintiff's employment, as indicated in Defendant's Motion for Summary Judgment, is "[P]laintiff was found to have discrepancies in his documentation and determined not to meet probationary standards of the position based on same." (ECF 37, at 6.)  The evidence does not support a legitimate business purpose defense.

Defendants claim Plaintiff had "major discrepancies" in his electronic flight logbook, as the reason justifying his termination.  Defendants deliberately omit the details describing the discrepancies upon which they rely to justify Plaintiff's termination.

In fact, the discrepancies in Plaintiff's logbooks can be categorizes as four different types.  They are: (1) an estimate of PIC hours on Plaintiff's resume; (2) total cross-country hours reported as a single entry; (3) total flight hours that differ from flight hours listed on unofficial forms administered at different time intervals; and  (4) a single error in entering an aircraft's tail number is Plaintiff's flight logbook.  All of the above were either disclosed during Plaintiff's initial interview or are so insignificant and inconsequential that they cannot possibly be relied upon to justify Plaintiff's termination.   Viewed in the light most favorable to the Plaintiff, the previous disclosures and innocent nature of any inadvertent error demonstrate clear inconsistencies in BSO's proffered justification for termination

### a.   Plaintiff disclosed to BSO that the actual PIC flight hours he flew while in the Army exceeded the PIC hours stated on his resume.

During the interview process with BSO, Plaintiff discussed his military flight experience with BSO Pilot Brian Miller.  Plaintiff disclosed to BSO Pilot Brian Miller that his Pilot in Command Hours ("PIC") were actually more than the 1,433 hours listed in his electronic flight logbook.  (SOAF ¶71.)  Furthermore, while BSO Pilot Miller reviewed Plaintiff's resume and

flight logbook, BSO Pilot Miller acknowledged that there was difference of about 57 PIC hours listed between Plaintiff's resume and his electronic flight book.  (*Id.*)  BSO Pilot Miller was not concerned that Plaintiff had rounded up his PIC hours on his resume because he understood that Plaintiff had under recorded his military PIC.  (*Id.*)  Moreover, BSO Pilot Brian Miller was confident that Plaintiff's PIC time listed in his flight logbook exceeded the minimum requirement of one thousand (1,000) hours for PIC flight time listed as a job requirement.  (*Id.* at ¶¶72-76.)

Brian Miller, acting on behalf of BSO as an interviewer, accepted the Plaintiff's resume and the electronic logbook tendered by Mr. Thomas with a solid understanding that there was a discrepancies.  (SOAF ¶¶ 71-76.)  Miller did so with knowing full well that neither PIC time listed accurately represent the larger number of total PIC hours Plaintiff had flown in his military career (*Id.*)

Brian Miller was: (1) fully informed of the nature of this discrepancy; (2) accepted the explanation articulated by Mr. Thomas; (3) did not require Mr. Thomas to turn over his official logbooks; and (4) chose to advance Mr. Thomas along the interview process in spite of the articulated "discrepancy."   In light of the foregoing, it would be illogical for BSO to claim that this disclosed discrepancy was legitimate grounds for terminating Plaintiff's employment.

Viewed in the light most favorable to the Plaintiff, the decision to terminate Plaintiff employment based on a discrepancy which was disclosed prior to hiring Plaintiff is evidence of pretext allowing a reasonable trier of fact to infer a discriminatory motive to justify Plaintiff's termination. As such the Court should deny Defendant's Motion for Summary Judgment.

### b.   *Plaintiff's Total Cross-Country Flight Hours were Reported as a Single Entry with BSO's Knowledge and Consent*

Cross-country hours are defined as flights that originate in one place and terminate at least twenty-five (25) miles from the originating point.  Prior to Plaintiff's first interview with BSO, Plaintiff had never logged any cross-country flights in either his official or electronic logbook because the military did not use such nomenclature.  (Def. SOF ¶¶ 22, 23; SOAF ¶ 72.)

Miller explained that BSO had a minimum requirement of fifty (50) cross-country hours to qualify for employment.  (Def. SOF 21.)  Plaintiff explained to BSO Pilot Miller that during

the seven and one-half years of his military flight service, which included countless combat missions, Plaintiff estimated that he had flown approximately nine hundred (900) hours of cross-country time (*Id.*)  Miller agreed that Plaintiff's combat flight could be reasonably categorized as cross-country flight hours.  (*Id.* at ¶¶ 73,74.)  Under Brian Miller's explicit direction, and with Mr. Miller's expressed consent, Plaintiff logged his total cross-country time as a single entry in his electronic logbook ***during the interview***.[6] (*Id.* at ¶¶ 75-76.)  The FAA later confirmed that Miller's direction was sound, and a blanket entry was in compliance with FAA regulation. (*Id.* at ¶ 77.)

At all times relevant hereto BSO: (1) was aware of the nature of this discrepancy; (2) chose to advance Mr. Thomas along the interview process in spite of same; and (3) themselves recommended Plaintiff take the action that Fuller later used to justify his termination.  In light of the foregoing, it would be illogical for BSO to claim that this disclosed discrepancy was legitimate grounds for terminating Plaintiff's employment.

Again, viewed in the light most favorable to the Plaintiff, the decision to terminate Plaintiff employment based on a discrepancy which was disclosed prior to hiring Plaintiff is evidence of pretext allowing a reasonable trier of fact to infer a discriminatory motive to justify Plaintiff's termination. As such the Court should deny Defendant's Motion for Summary Judgment.

> c. ***BSO's Position That There Were "Major Discrepancies" between Plaintiff's Application, Logbooks, and Pilot Experience Form is Without Merit and Clear Evidence of Pretext***

In support of her recommendation that Mr. Thomas be terminated, Interim Director of Operations Fuller stated that there were "major discrepancies between Plaintiff's application, logbooks and Pilot Experience form."  (Def. SOF ¶¶ 44-46; CSMF ¶44; SOAF ¶ 107.)  The Defendants have presented zero evidence detailing "the major discrepancies" between these documents used to justify Plaintiff's pretextual termination.  In fact, the record evidence shows that Fuller's statement, made on behalf of BSO, is not accurate.

---

[6] Although the entry recorded more than 500 hours of night flight time as a single recording, the FAA later confirmed that a single entry documenting actual flight time is permissible under its regulations.

At the onset of Plaintiff's employment, he submitted a resume which included total hours flown. (Def. SOF ¶11.) The total number of hours flown listed on Plaintiff's resume was two thousand and eighty hours (2,080). (CSMF ¶11.) Plaintiff's resume also listed fifteen hundred (1,500) hours of total Pilot in Command hours flown. (Def. SOF ¶11.)

In order to apply for BSO's Pilot position, one of the requirements Plaintiff needed to meet was fifty (50) hours of current flight time in the year that he was applying. (Def. SOF ¶15; SOAF ¶67.) During the application process, Plaintiff flew an additional fifty-one (51) hours, increasing his total flight time from 2080 to 2131. (SOAF ¶67.) An updated resume including the fifty (50) hours of current flight time was neither required by, nor submitted to, BSO.

During the interview process, Plaintiff showed his electronic flight logbook to Brian Miller. (Def. SOF ¶ 20.) The electronic flight logbook also listed Plaintiff's total number of hours flown as two thousand one hundred and thirty-one (2131). (ECF 38-10, at 32.) Importantly, the electronic flight logbook listed Plaintiff's total Pilot in Command hours as one thousand four hundred and thirty-three (1,433) hours flown. (*Id.*)

The evidence, which is not refuted by BSO, reflects that Plaintiff Thomas informed BSO of the discrepancy between the PIC times listed in his resume and logbooks at the time of his interview. (CSMF ¶ 45; SOAF ¶ 71,88.) BSO, by way of interviewer Brian Miller, allowed Plaintiff's candidacy to move forward regardless of this disclosed discrepancy.

On or about January 2, 2019, Plaintiff was asked to complete a Pilot Experience form. (Def. SOF ¶37.) On that form Plaintiff listed his total hours flown as two thousand one hundred and thirty-one (2,131) total hours flown. (ECF 38-9.) Plaintiff also listed his Pilot in Command hours flown as one thousand four hundred and thirty-one (1,431) hours. (*Id.*) The pilot in command hours listed on the Pilot Experience form was completely consistent with Plaintiff's electronic logbook, and the disclosures made to Brian Miller at the time of his interview. (SOAF ¶¶ 71,88.)

The evidence is irrefutable that in all three documents, Plaintiff's total hours flown are consistent. The only inconsistency listed between Plaintiff's resume, logbook, and Pilot

Experience Form, is sixty-nine hours of Pilot in Command Time which Plaintiff disclosed to BSO during his interview.

Above all things, the documented minimum requirement for an Air Rescue Helicopter Pilot at BSO is *one thousand (1,000) flight hours as pilot in command rotorcraft-helicopter hours flown*.  (ECF 38-3.)  Therefore, on Plaintiff's *worst day*, he was four hundred and thirty-three hours over BSO's minimum requirement of PIC hours.  The only issue therefore is not whether Plaintiff was qualified, but rather whether he intentionally misstated his PIC hours.  Notwithstanding the clear lack of motive Plaintiff would have to lie given his overqualification, BSO has failed to produce any evidence that supports a claim that Plaintiff intentionally fabricated his hours flown.[7]

The lack of "major discrepancies" in Plaintiff's flight documentation, the fact that all discrepancies were disclosed to Brian Miller, and the lack of any motive supporting the need to lie, all raise a genuine dispute as to whether or not the stated reason for Plaintiff's termination is true or a pretext.  Therefore, it is incumbent upon the court to allow a reasonable trier of fact the opportunity to determine the veracity of BSO's proffered justification for Plaintiff's termination.

### d.    *Defendant's Rely on an Insignificant Scriveners' Error in Plaintiff's Electronic Logbook to Justify his Discriminatory Termination*

When recording the details of a flight in one's flight logbook, a pilot is required to include the tail number of the aircraft flown as part of the entry. (*See* ECF 38-10.)  Tail numbers are typically six digits which begin with the letter N and are followed by six numbers or a combination of numbers and letters.

On January 28, 2019, at the time of Plaintiff's termination, Plaintiff was informed that one of the entries in his logbook included an inaccurate tail number. (Def. SOF ¶¶47-48.) Plaintiff admitted making the mistake during his deposition and explained that he probably changed one

---

[7] It is worth noting that Defendants deliberately chose not to depose Brian Miller in order to obtain testimony which contradicts the disclosures made by Plaintiff during the interview process.  Had they chosen to do so and had Brian Miller disputed the disclosures made by Plaintiff regarding the discrepancies in his logbooks, there would be a genuine issue of material fact.  Without said testimony, the Court must accept as true Plaintiff's testimony wherein he states under penalty of perjury that these disclosures were made to interviewer Brian Miller.

of the six digits in error, causing the program to populate the aircraft as a glider and not a helicopter.  *(SOF ¶ 92.)*

There are multiple reasons which demonstrate why this error *de minimus* in nature.   First, Plaintiff has flown in excess of two thousand hours during the fifteen plus years he has been an aviator.  One erroneous entry, that represents less than one tenth of one percent of his total flight time, cannot seriously be construed as significant enough to justify his termination.  Second, the amount of scrutiny required to find an erroneous tail number in the multiple pages of flight logbooks he submitted, demonstrates an intent to find errors to justify his termination.  Third, Defendant's chose to ambush Plaintiff by informing him of the incorrect tail number as he was being terminated.   Despite Plaintiff pleading for the opportunity to correct the record, Defendants' refused to allow him any time to provide them with the accurate information.

The decision to terminate Plaintiff employment based on a single typographical error in his logbook is unjustifiable given the sacrifices Plaintiff made for this country while wearing its cloth for more than 7 years.  Such an insignificant reason to terminate Plaintiff given can only be construed as a pretext justify Plaintiff's discriminatory termination.  A reasonable trier of fact can easily infer pretext and a discriminatory motive to justify Plaintiff's termination. As such the Court should deny Defendant's Motion for Summary Judgment.

### 3. A Reasonable Trier of Fact Will Infer Discriminatory Motive Because Danielle Fuller Recommended Plaintiff be Replaced by a Civilian Trained Pilot

Danielle Fuller's discriminatory motive is further evidenced by her decision to replace Plaintiff with a civilian trained pilot immediately following Plaintiff's termination.[8] (SOAF ¶109.)  Fuller's decision to fire a military pilot and hire a civilian trained pilot, mirrors her stated animosity towards military pilots and corroborates her belief that civilian pilots are better qualified and should be hired over military pilots.   BSO allowed Fuller to act upon her expressed, unlawful anti-military biases by replacing Scott Thomas with civilian trained pilot, Dennis McColl.  (*Id.*)  Former BSO Chief Tammy Nugent acknowledged under oath that both

(1) it was Ms. Fuller's decision to terminate Plaintiff's employment (CSMF ¶ 46); and (2) it was Fuller's decision to replace him with a civilian pilot.  (SOAF ¶109.)

## 4. DANIELLE FULLER'S RECOMMENDATION WAS FUELD BY ANTI-MILITARY ANIMUS AND DIRECTLY RESULTED IN PLAINTIFF'S TERMINATION

The Supreme Court of the United States has held "if a supervisor performs an act motivated by antimilitary animus that is intended by the supervisor to cause adverse employment action, and if that act is the proximate cause of the ultimate employment action, then the employer is liable under USERRA." *Staub v. Proctor Hosp*., 562, U.S. 411, 422 (2011).  A trier of fact can reasonably infer a discriminary animus held by Danielle Fuller from the record evidence and undisputed facts, which show that Fuller repeatedly expressed her animus through hostile anti-military comments and discriminatory conduct.  A reasonable trier of fact can also infer that the animus held by Fuller was a motivating factor in the adverse employment actions taken against Plaintiff because (1) she expressed outwards hostility towards members of the uniformed services; and (2) inconsistencies between BSO's proffered reason for termination; and (3) Fuller immediately replaced Plaintiff with a civilian trained pilot.

Nonetheless, Defendant argues that "[w]hile Fuller made a recommendation for Plaintiff to be released from probation based on discrepancies in his logbook and flight records, Plaintiff cannot show that a discriminary animus behind the recommendation was the actual base of BSO's decision."  This argument simply cannot be reconciled with the facts of this case and pertinent legal authority.  *See* ECF 37, at 8, *but see Staub*, 562 at 421 ("The employer is at fault because one of its agents committed an action based on discriminatory animus that was intended to cause, and did in fact cause, an adverse employment decision.").

Fuller's recommendation irrefutably formed the basis of BSO's decision to terminate, as sworn under oath by Chief Tammy Nugent (CSMF ¶ 46.)  The record evidence demonstrates that Ms. Fuller's recommendation was predicated, at least in part, on a discriminatory over-scrutinization of Plaintiff's logbook solely because Plaintiff (1) was a member of the military; (2) that membership exempted him from requirements Fuller had to undertake to the point of disdain and hostility; and (3) Plaintiff issued lawful complaints about Fuller's hostility.

Had BSO conducted an independent investigation, separate and aside from any input of Danielle Fuller, they would have readily determined that the "major discrepancies" cited by Fuller were either previously disclosed or wholly insignificant.  *Staub*, 562 U.S. at 421.  Notwithstanding BSO's refusal to conduct a thorough and neutral investigation, Fuller's recommendation would nonetheless remain a casual factor in the adverse employment action.  *Id.* (a "supervisors biased report may remain a causal factor if the independent investigation takes it into account without determining that the adverse action was, apart from the supervisor's recommendation,                      entirely                      justified.").

Proximate cause require only "some direct relation between the injury asserted and the injurious conduct alleged" and excludes only those 'links that are too remote, purely contingent, or indirect.'"  *Id.* at 419 (citations omitted).  Not only is proximate cause easily satisfied here, but Chief Nugent's reliance on Fuller's recommendation is foreseeable given Nugent's complete lack of aviation knowledge and experience.  Thus, Nugent's actions—as the ultimate decisionmaker—would not break the chain of causation and Fuller's antimilitary animus would remain a proximate cause.  *Id.* at 419-20.  ("We do not think that the ultimate decisionmaker's exercise of judgment automatically renders the link to the supervisor's bias "remote" or "purely contingent." The decisionmaker's exercise of judgment is *also* a proximate cause of the employment decision, but it is common for injuries to have multiple proximate causes. Nor can the ultimate decisionmaker's judgment be deemed a superseding cause of the harm.") (citations omitted).

**C.    A REASONABLE JURY COULD FIND THAT BSO RETALIATED AGAINST PLAINTIFF SCOTT THOMAS IN VIOLATION OF USERRA**

To establish a prima facie claim for retaliation under USERRA, a Plaintiff must demonstrate "(1) he engaged in a protected activity (2) he suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action."  *Holt v. Hydraulic Hose of Hillsborough, LLC*, No. 8:18-CV-2082-T-33CPT, 2018 WL 7457682, at *2 (M.D. Fla. Nov. 9, 2018); 38 U.S.C. § 4311(b).

**1.    Plaintiff Engaged in a Protected Activity**

Throughout the course of Plaintiff's employment, Plaintiff issued several complaints about the unlawful discrimination that he was subjected to on the basis of his military status. (Def. SOF ¶¶ 57,63; CSMF ¶¶ 45,63; SOAF ¶¶ 105-106.) Plaintiff's complaints were made at different times and to different BSO personnel. Specifically, Plaintiff complained to: Interim Director of Operations Danielle Fuller (SOAF ¶ 105); Chief Smith (CSMF ¶63); Chief Nugent (CSMF ¶62); the Broward County Sheriff; and the County Attorney. As a product of the military, Plaintiff issued his complaints in the aforementioned order in accordance with BSO's organizational structure and the pertinent "chain of command."

Initially, Plaintiff complained to Fuller about her inappropriate characterization of military pilots as "stupid" and told Fuller he found her comments disrespectful and insulting at the time they were made. (SOAF ¶105.) Thus, the first protected activity that Plaintiff engaged in was his direct protests made to Fuller about what he reasonably perceived to be discriminatory and unlawful anti-military comments. (*Id.*) Fullers comments created a hostile environment and denied Plaintiff the benefit of employment free from discrimination on the basis of his military status. Plaintiff's complaints about these comments and the hostile work environment they subsequently created, full upon deaf ears.

When it became clear that his direct supervisor was not going to stop expressing her anti-military bias despite Plaintiff's complaints of same, Plaintiff engaged in another protected activity by informing Chief Smith of the unlawful conduct on January 17, 2019. (Def. SOF ¶ 57.) The record evidence and undisputed facts show that Plaintiff and Commander McDonald informed Chief Smith about Interim Director Fuller's anti-military comments and discriminatory conduct. (*Id.*)

Defendant argues that Fuller had already recommended Plaintiff for termination on January 10, 2019. (Def. SOF ¶44.) As such, Defendant claims that there can be no retaliation because the protected activity took place after the recommendation to terminate was already made. (*Id.*) This argument strains logic and wholly ignores the multitude of complaints Plaintiff made to Fuller directly; all of which preceded Fuller's recommendation to terminate Plaintiff's employment without just cause.

As a direct result of these complaints, Fuller began to scrutinize Plaintiff's work performance and otherwise target him for termination.  (SOAF ¶114.)  The heightened scrutiny Fuller subjected Plaintiff to was attested to, and observed by, Commander Brain McDonald.  (*Id*.)  Defendants do not refute this testimony with any evidence.

The record evidence confirms that after Plaintiff complained about Fuller's discriminatory animus towards military personnel to Fuller herself (SOAF ¶ 105) and later Chief Smith (*Id.* at ¶ 57), Plaintiff then complained to Chief Nugent.  (CSMF ¶62.)  Chief Nugent recalls a conversation that occurred wherein Plaintiff and retired Commander McDonald publicly complained but does not recall any of the details.  (CSMF ¶ 62.)  Plaintiff and Commander McDonald, however, specifically recall informing Chief Smith of Fuller's anti-military bias and unlawful conduct on January 17, 2019.  (SOAF ¶ 100.)  This third protected activity took place eleven days prior to Plaintiff's termination.

On January 28, 2019, Defendant BSO presented Plaintiff with the option of resigning of being terminated.  (CSMF ¶ 49.)  Defendants argue that because Plaintiff chose to resign, in lieu of being terminated, BSO did not engage in any (additional) adverse employment actions against Plaintiff.  The ultimatum to quit or be fired can only be construed as a termination given the totality of the circumstances.  *See Hargray v. City of Hallandale*, 57 F.3d 1560, 1568 (11th Cir. 1995).  Plaintiff's termination is just the last, of several, adverse employment actions he was subjected to as a direct result of engaging in protected activities as affirmed by the record evidence.

The clear progression of events, affirmed in the record evidence, are: (1) unlawful and discriminatory conduct by Fuller; (2) complaints of same by Plaintiff; (3) adverse employment actions by Fuller (including scrutinizing Plaintiff's employment efforts in an effort to find cause to terminate Plaintiff) (4) escalation of complaints by Plaintiff to Chief Smith; (5) detailing of complaints to Chief Nugent; (6) termination of Plaintiff's employment.

## IV.    CONCLUSION

In light of the foregoing, the undersigned respectfully requests this Honorable Court deny Defendant's Motion for Summary Judgment.

Dated this 1st day of December 2020.

Respectfully submitted,
OBEIDY & ASSOCIATES, P.A.

By:   */s/ A. Andrew OBeidy*
A. Andrew OBeidy, Esquire
**Attorney for Scott Thomas**

*Thomas v. Broward County Sheriff's Office*
Plaintiff's Amended Opposition to Defendant's Motion for Summary Judgment

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that a true and accurate copy of the foregoing was electronically filed with EMECF, and furnished to Defendant's counsel, Carmen Rodriguez, Esquire, via same, on this 1st day of December 2020.

By: <u>*/s/ A. Andrew OBeidy*</u>
A. Andrew OBeidy, Esquire
