IN THE UNITED STATES DISTRICT
COURT FOR THE SOUTHERN DISTRICT
OF FLORIDA

Broward Division

SCOTT THOMAS,                                   CASE NO.: 19-61324-CIV-DIMITROULEAS

        Plaintiff,

        v.

BROWARD COUNTY SHERRIFF'S
OFFICE,
        Defendant.
_____/

# PLAINTIFF'S AMENDED SEPARATE COUNTERSTATEMENT OF DISPUTED AND UNDISPUTED MATERIAL FACTS IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

1. **Undisputed**.

2. **Undisputed**.

3. **Undisputed**.

4. **Undisputed**.

5. **Undisputed**.

6. **Disputed**. At the time Plaintiff was hired, BSO had not decided whether to operate under Part 135 regulations or Part 91 regulations. *See* Ex 1, Pl. Dep. 92:1-9.

7. **Undisputed**.

8. **Undisputed.**

9. **Undisputed.**

10. **Disputed**. While Part 135 experience for the Air Rescue Helicopter Pilot position was preferred, it was not required. Only the Chief Pilot Position and Director of Operations

position were required to have Part 135 experience.  See Def. Ex. CPL Form, filed under seal.

11. **Disputed**. Plaintiff believed that the aircraft hours he listed in his resume came from his logbooks but did not recall which logbooks they came from.  Ex 1, Pl. Dep. 63:23-25.

12. **Undisputed**.

13. **Disputed**. Plaintiff had flown medevac support type positions while in the military, but they did not fall under any federal aviation regulations. Ex 1, Pl. Dep. 59:2-6; 59:12-21. When Plaintiff interviewed with BSO he descried some of the types of missions that he flew for the military which involved evacuating wounded soldiers from the battlefield. There were different terminologies that the military used for this type of mission.  Ex 1, Pl. Dep. 59:12-21.

14. **Undisputed.**

15. **Undisputed.**

16. **Undisputed in part, Disputed in part.**  Plaintiff admits his logbooks were stored in Virginia.  Plaintiff's flight hours were documented in four logbooks which were stored in Virginia.  Plaintiff's military records were another source of official records documenting Plaintiff's flight experience.  Ex. 1, Pl. Dep., 37:9-18. Plaintiff's electronic logbook was also a correct record for official purposes.  Ex 1, Pl. Dep., 78:8-19; 80: 24-81:2.

17. **Disputed**. Plaintiff's electronic logbook was also a correct record for official purposes. Ex 1, Pl. Dep., 78:8-19; 80: 24-81:2.

18. **Undisputed**

19. **Undisputed.**

20. **Undisputed.**

21. **Undisputed.**

22. **Disputed**. Although Plaintiff's electronic flight record did not reflect cross-country time, interviewer Brian Miller acknowledged that Plaintiff had logged in excess of 500 hours of cross-country time and this estimate was conservative based on his total combat experience. Ex 1, Pl. Dep., 74:21-75:22.

23. **Undisputed.**
24. **Undisputed.**
25. **Undisputed.**
26. **Undisputed.**
27. **Undisputed.**
28. **Disputed.** Plaintiff's employment as an Air Rescue Helicopter Pilot was contingent upon his successful completion of the training program so long as BSO did not engage in unlawful discrimination which prevented him from successfully completing same. Ex. 2, Deposition of Tammy Nugent ("TN Dep.") dated for 7/13/2020. 96:23-25. BSO reviewed Plaintiff's record of Flight Experience prior to offering him a position as an Air Rescue Helicopter Pilot. BSO never requested to see Plaintiff's official flight logbooks even though he offered to provide same on multipole occasions. Ex 1, Pl. Dep, 103:24-104:9.
29. **Undisputed.**
30. **Undisputed**
31. **Undisputed.**
32. **Disputed.** Danielle Fuller was promoted to the position of Interim Director of Operations of the Air Rescue Program while Plaintiff was employed with BSO. Def. SOF ¶ 34.
33. **Undisputed.**
34. **Undisputed.**
35. **Undisputed.**
36. **Disputed.** Chief Nugent did not testify that Fuller was responsible for compiling the records of all pilots in the Air Rescue Program. Ex. 2, TN Dep. 80:4-13
37. **Undisputed.**
38. **Undisputed.**
39. **Undisputed.**
40. **Undisputed.**

41. **Undisputed.**

42. **Undisputed.**

43. **Undisputed.**

44. **Disputed**. Plaintiff's flight experience was irrefutably verifiable by Plaintiff had BSO chosen to ask him about the discrepancies or give him an opportunity to tender his official logbooks. Ex. 1, Pl. Dep. 151:7-19. The discrepancies between Plaintiff's job application, logbook, and pilot experience form were not major. Rather, the majority of the documented information was consistent throughout the three forms. Any inconsistency between the three forms was previously disclosed to BSO prior to its offer of employment and could easily have been explained, and proven, by Plaintiff had he been given the opportunity. Ex 3, Pl. Dec., 47, 60. After investigation the discrepancies reported to the FAA, the FAA verified Plaintiff's flight experience and concluded that Plaintiff's flight logbooks were in compliance the FAA regulations. Ex 3, Pl. Dec., 66

45. **Disputed**. Chief Nugent testified regarding a vague recollection of the review conducted by Fuller. Nugent was equivocal in her recollection and could not recall any input furnished by Madrigal. Ex. 2,TN Dep.113:24-114:12,120:4-24,155:18-156:3,165:22-24. There was only one tail number that was logged incorrectly. The electronic logbook underreported Plaintiff's total rotor hours due to the inability to disclose covert flights, as previously disclosed to BSO. Ex. 1, Pl. Dep., 154: 12-15; Ex. 3, Pl. Dec., 36, 44, 45, 61

46. **Disputed**. Chief Nugent relied solely on Danielle Fuller's recommendation to terminate Plaintiff's employment. Chief Nugent did not conduct her own independent investigation to determine if Plaintiff had failed to meet the probationary standards. Plaintiff's option to resign was given under threat of termination. Ex 2, TN Depo, 114:5-117:17.

47. **Disputed**. Chief Nugent initially told Plaintiff that he was being "let go" because "he was not well suited to the unit". Ex 1, Pl. Dep. 147:5-11.

48. **Disputed**. Multiple discrepancies were neither identified by BSO nor discussed with Plaintiff. Ex 1, Pl. Dep. 148:7-8. The blanket entry for 500 cross-country hours was made in front of Brian Miller at the time of Plaintiff's interview with BSO's express

consent. Ex.1, Pl. Dep., 74:13-75:7. Not only was this entry made in the presence of interviewer Brian Miller with his consent, but Miller described the entry as a "conservative estimate." Ex.1, Pl. Dep., 75:8-17

49. **Disputed**. BSO gave Plaintiff two letters, both of which were prepared by BSO in advance of the meeting. One letter was a resignation letter and the other was a termination letter. BSO told Plaintiff that he would be "better off" signing the resignation letter. It was clear that if Plaintiff did not resign, he was going to be terminated. Plaintiff had less than 5 minutes and was told he would be escorted from the building no matter which decision he made. The presence of Police Deputy Madrigal led Plaintiff to believe that he was being threatened with potential arrest. Ex 1., Pl. Dep. 163:9-165:2.

50. **Disputed**. Plaintiff did not believe he had any other choice but to resign. It was clear that if Plaintiff did not resign, he was going to be terminated. Plaintiff had less than 5 minutes and was told he would be escorted from the building no matter which decision he made. The presence of Police Deputy Madrigal led Plaintiff to believe that he was being threatened with potential arrest. Ex 1., Pl. Dep. 163:9-165:2.

51. **Disputed**. The FAA informed Plaintiff that every pilot has discrepancies' in their logbooks. The FAA further indicated that any logbook that was subjected to scrutiny would reveal multiple discrepancies'. Ex. 1, Pl. Dep. 174: 13-14; 151:20-23; Ex.3, Pl. Dec. 67

52. **Disputed**. Plaintiff was not *aware* of anyone that had the proper security clearance to review his official logbook. Ex. 1, Pl. Dep. 171:18-22.

53. **Undisputed.**

54. **Undisputed.**

55. **Disputed**. Chief Jason Smith was a BSO Employee, responsible for teaching the EMT class conducted at Barry University for BSO Pilots. Ex. 1, Pl. Dep. 133:18-22; Ex. 3, Pl. Dec. 49.

56. **Undisputed.**

57. **Undisputed.**

58. **Undisputed.**

59. **Undisputed.**

60. **Undisputed.**

61. **Undisputed.**

62. **Disputed**.  Under oath, Chief Nugent recalled "maybe a complaint."  Ex. 2, TN Dep. 104:9-14.  Chief Smith told Plaintiff that he would inform Chief Nugent of Plaintiff's complaints of discrimination and would suggest that she have one-on-one meetings the members of the unit to discuss same.  Ex. 3, Pl. Dec., 52

63. **Disputed**.  At all relevant times, Plaintiff logically believed that Nugent was aware of his Complaint to Chief Smith and "assume[d] that she knew that I met with Chief Smith because Chief Smith is the one that called her up to tell her that she should meet with the class." Ex. 1, Pl. Dep. 144:17-21.   Plaintiff believes that before he complained to Chief Nugent, several "actions" had been taken against him included being called stupid, dumb, incompetent, unqualified, and being deprived of time off to attend a physical at the VA.  Moreover, Plaintiff believed that Ms. Fuller would not only be "subjective in the future" but also continue to discriminate against, demean, harass and retaliate against military pilots employed by BSO.  Ex. 3, Pl. Dec., 53.

64. **Undisputed.**

65. **Undisputed.**

66. **Undisputed.**

**PLAINTIFF'S SEPARATE STATEMENT OF ADDITIONAL MATERIAL FACTS IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

67. At the time that Plaintiff applied, he had spent three thousand dollars to obtain 10 current hours of flight time in anticipation of his interview with BSO. He informed BSO at the time of his interview that he would be willing to obtain the additional 40 hours required if BSO was really interested in him as a candidate. Once BSO confirmed its interest, Plaintiff did obtain the additional 40 hours, paying a total of fifteen thousand dollars out of pocket to meet this qualification. Ex. 1, Pl. Dep. 107:23-108:13.

68. Plaintiff's first interview was conducted by way of four personal panel that included Chief Tammy Nugent, Brian Miller, and a BSO Human Resource representative. Ex 1, Pl. Dep. 68:4-17.

69. BSO did not request candidates to bring their official logbooks to the interview. During the interview process, BSO was satisfied with the electronic record of Plaintiff's flight logbook that he presented. Ex. 3, Declaration of Scott Thomas ("Pl. Dec. 9").

70. Brian Miller did not ask Plaintiff for copies of his electronic logbook(s) or to see his official records. Ex. 1, Pl. Dep. 72:11-14; 80:24-81:3; Ex. 3, Pl. Dec. 19.

71. At the time of his interview, Plaintiff disclosed to BSO Pilot Miller that his resume reflected an estimate, and that in fact, he had flown more than both his resume and electronic flight logs reflected. Ex. 3, Pl. Dec. ¶¶ 37, 38.

72. Although Plaintiff's electronic flight record did not reflect cross-country time because the military does not use said nomenclature, interviewer Brian Miller acknowledged that Plaintiff had logged in excess of 500 hours of cross-country time and this estimate was conservative based on his total combat experience. Ex 1, Pl. Dep., 74:21-75:22. In fact, Plaintiff had flown in excess of 900 combat hours. Ex. 3, Pl. Dec., ¶¶ 14-16

73. Interviewer Brian Miller agreed that a blanket entry estimated 500 hours of cross-country time was appropriate. Ex 1, Pl. Dep., 74:21-75:22.

74. Miller had zero doubt that Plaintiff had the requisite cross-county hours to qualify for employment with BSO. Ex. 3, Pl. Dec. ¶¶ 15, 16.

75. Miller directed Plaintiff to make the blanket entry in his logbook during that very interview. Ex 3., Pl. Dec. ¶ 15.
76. Under Miller's direction, Plaintiff made the blanket entry in his logbook in the presence of Brian Miller. Ex. 3, Pl. Dec. ¶¶ 14,15.
77. The FAA approved the blanket entry ex post facto. Ex 1, Pl. Dep., 75:8-15; Ex. 4, FAA Email.
78. The test administered to Plaintiff during his interview largely consisted of Part 135 questions. Part 135 experience was not mandatory for Plaintiff's position. Plaintiff was hired by BSO regardless of his poor test score because Part 135 experience was not a requirement for his position. Def. Ex., CPL Form filed under seal; Ex. 1, Pl. Dep. 181:15-21.
79. Military pilots are traditionally exempt from obtaining Part 135 experience. Ex 1, Pl. Dep 110:15-19; 112:13-14.
80. Following his written test Plaintiff was asked to take a flight test, which he passed with flying colors. Ex 1., Pl. Dep. 68:5-10.
81. Probationary pilots are not allowed to be discriminated against on the basis of their military status in violation of USERRA. Ex. 2, TN Dep. 96:23-25.
82. At all times that Plaintiff was employed by BSO, he was in compliance with FAA regulations. Ex. 1, Pl. Dep. 36:5-12; 75:1-17; 169:2-170:11; Ex. 3, Pl. Dec. 59; Ex. 4, Email from FAA.
83. Initially, Timothy Larson was appointed to the position of Director of Operations. Ex 1 Pl. Dep. 109:8-12. Larson was demoted and replaced with Danielle Fuller. *Id.* at 138:4-5. The replacement was authorized by Chief Nugent. *Id.* at 138:7-13.
84. This demotion followed complaints made by Fuller about Larson that he "lied on his resume and about his background." Ex 1, Pl. Dep., 110:4-8. Fuller said that Larson "probably shouldn't be employed at BSO." Ex 1, Pl. Dep. 110:4-8.
85. Fuller did not believe that military pilots were "as qualified as civilian pilots because of their lack of part 135 experience. Ex. 1, Pl. Dep. 131:12-17; 143:19-25.

86. Fuller believed that hiring military pilots over civilian pilots was "unfair." Ex. 1, Pl. Dep 112:13-24.

87. Danielle Fuller did not adequately investigate alleged discrepancies she perceived in Plaintiff's electronic logbook. Had she done so, she would have understood that the only discrepancy that was not disclosed to, and approved by, BSO was a singular scriveners' error on an aircraft tail number entry. Ex. 3, Pl. Dec., 48; Ex. 4, Email from FAA.

88. BSO was made aware of the discrepancies in Plaintiff's electronic logbook prior to Plaintiff being hired. Plaintiff offered to provide his official logbooks for review. Nugent and Miller indicated that this offer was not necessary. Therefore, Plaintiff logically relied on the logbook that was approved by BSO when he filled out the Pilot Experience Form. Ex. 3, Pl. Dec. 9; Ex. 1, Pl. Dep., 34:19-35:6; 73:1-10; 103:24-104:9.

89. Plaintiff's resume listed hours for covert flights in accordance with his official logbooks. Plaintiff did not include these covert flights in his electronic logbooks as the additional details required for an entry of same would require the disclosure of classified information. The discrepancy between Plaintiff's resume and his electronic logbooks was disclosed at the time of his interview to Brian Miller. Ex 3, Pl. Dec. 12; Ex 1, Pl. Dep., 74:6-20.

90. The request to bring in logbooks for review was made on the morning of January 10, 2019, when Mr. Thomas had already arrived to work. The only records in Mr. Thomas's possession were his electronic logbook. Thomas informed Fuller that his official logbooks were in a storage unit in Virginia. BSO was previously aware that Plaintiff's logbooks were in his storage unit in Virginia. Ex. 3, Pl. Dec.10, 40, 41; Ex. 1, Pl. Dep., 103:24-104:9.

91. BSO was aware of all of the discrepancies in Plaintiff's records except for a mislabeled tail number that Fuller discovered during her review of Plaintiff's flight logs. Ex 1, Pl. Dep, 153:8-10; Ex 3, Pl. Dec. 44, 45, 46,47,48.

92. Plaintiff admitted that he inadvertently mixed up one of the six numbers of the tail number in inadvertent error. Ex. 1, Pl. Dep. 153:2-7.

93. Plaintiff was not given an opportunity to explain or correct this minor scriveners' error. Ex. 1, Pl. Dep., 150:23-151:19; Ex. 3, Pl. Dec. 60, 61.
94. The blanket entry for 500 cross-country hours was made in front of Brian Miller at the time of Plaintiff's interview with BSO's express consent. Ex.1, Pl. Dep., 74:13-75:7.
95. Not only was this entry made in the presence of interviewer Brian Miller with his consent, but Miller described the entry as a "conservative estimate." Ex.1, Pl. Dep., 75:8-17.
96. Plaintiff was never asked to provide his official logbook despite offering to produce same on several occasions. Ex. 1, Pl. Dep. 30:22-24.
97. Plaintiff also supplied his electronic logbook to the FAA for review. Ex. 1, Pl. Dep. 173:12-16.
98. The FAA told Plaintiff that this error did not mean he was in violation of any FAA regulations and that any logbook subject to scrutiny would reveal a similar discrepancy. Ex. 1, Pl. Dep. 174:13-14; Ex. 4, FAA Letter.
99. Every pilot except for Danielle Fuller failed at least one EMT test. Danielle Fuller however was observed cheating on her EMT test. Ex. 1, Pl. Dep. 128:7-129:17; 185:16-24.
100. Both Plaintiff and Commander McDonald complained to Chief Smith about Danielle Fuller's expressed hostility toward military pilots on January 17, 2019. Ex. 1, Pl. Dep. 129: 14-17;136:5-13; 138:18-139:2; Ex. 5, B.M. Aff. ¶ 9.
101. Plaintiff also testified that Danielle Fuller called Plaintiff stupid on multiple occasions. Ex. 1, Pl. Dep., 113:2-4.
102. Plaintiff also testified that Fuller said that "military pilots were not competent enough to do the job" and "military pilots should not be working for BSO." Ex 1, Pl. Dep., 111:21-25; 112:1-25; 113:1-4; 114:5-18.
103. The time off was to attend a VA annual checkup. Fuller was aware of the reason for the requested time off and told Plaintiff he was not entitled to same. Ex. 1., Pl. Dep. 116:5-21; Ex. 3, Pl. Dec., 32.

104. After being told that his request for time off to visit the VA for his annual checkup was being denied, Plaintiff did not circumvent Fuller's authority by requesting official time off. Ex. 1., Pl. Dep. 116:5-21; Ex. 3, Pl. Dec., 32.

105. Plaintiff complained to Fuller about her denial of time off to attend his VA appointment and her inappropriate categorization of military pilots as stupid. Ex. 3, Pl. Dec. ¶ 29-31.

106. During the January 18, 2019 meeting, Plaintiff "spoke up about Ms. Fuller and how [he] felt it was [anti-]military bias and Chief Nugent pretty much dismissed it and hope that we could 'get along.'" Ex.1, Pl. Dep. 141:8-11.

107. The email that Fuller sent recommending Plaintiff's termination cited "Major Discrepancies." Def. Ex. 12.

108. After Plaintiff was told that it would be hard to find a job if he was terminated, Plaintiff was given all but 5 minutes to pick which document to sign, and his request to consult with legal counsel before making the request was denied. Ex. 1, Pl. Dep. 161:22-165:6,165:25-166:13.

109. Plaintiff believes that BSO ratified Fuller's discriminatory comments because BSO chose to do nothing about them after he complained to Smith and Nugent, other than terminate Plaintiff's employment. Ex. 3, Pl. Dec., 57.

110. Immediately following Plaintiff's termination, Danielle Fuller replaced Plaintiff with a civilian pilot named Dennis McColl. Ex. 3, T.N., 98:24-25; 99:1-2.

111. Retired Navy Commander Brian McDonald worked with both plaintiff and Danielle Fuller. Ex. 5, B.M. Aff. ¶ 5.

112. Under oath, McDonald stated that he observed Danielle Fuller's bias against Scott Thomas on the basis of Plaintiff's military status. Ex. 5, B.M. Aff. ¶¶ 6-7.

113. McDonald observed Fuller's anti-military bias through conduct and comments which he believed were fueled by service members' exemption of Part 135. Ex. 5, B.M. Aff. ¶¶ 7-8.

114. McDonald believes that Fuller targeted Plaintiff for termination as a result of his complaints and heavily scrutinized his performance to that end. Ex. 5, B.M. Aff. ¶10, 11.

Dated this 1st day of December 2020.

          Respectfully submitted,
          OBEIDY & ASSOCIATES, P.A.

          By:  */s/ A. Andrew OBeidy*
          A. Andrew OBeidy, Esquire
          **Attorney for Scott Thomas**

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and accurate copy of the foregoing was electronically filed with EM/ECF and furnished to counsel for Defendant's BSO, Carmen Rodriguez, Esquire, via same, on this 1st day of December 2020.

          By:  */s/ A. Andrew OBeidy*
          A. Andrew OBeidy, Esquire