# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF
## FLORIDA

**SCOTT THOMAS,**                              CASE NO.: 19-61324-CIV-DIMITROULEAS

     Plaintiff,

           **v.**

**BROWARD COUNTY SHERRIFF'S
OFFICE,**

     Defendant.

_____/

## PLAINTIFF MOTION FOR LEAVE TO EXCEED PAGE LIMIT

The undersigned respectfully requests leave to file a response to Defendant BSO's

Renewed Rule 50b Motion, and as grounds therefor states as follows:

1. Plaintiff made a good faith effort to comply with the page limit requirements of the Court but was unable to do so given the complexity of the issues involved as set forth above.

2. Plaintiff's Opposition to Defendant's Motion for Judgment As a Matter of Law, attached hereto as Exhibit "A" in present form, is expected to exceed the permitted page limit by 7 pages.

3. Plaintiff respectfully requests this Honorable Court allow Plaintiff to exceed the page limit by a total of 8-10 pages, at its sole discretion.

4. In accordance with S.D. Fla. L.R. 7.1.A., counsel for the movant has conferred with all parties who may be affected by the relief sought in the motion but has been unable to resolve the issues without court intervention.  Defendant stated their willingness to allow Plaintiff to go 3 pages over limit, but would not assent to 7.

Dated this 10th day of March 2022.

Respectfully submitted,

By: */s/ Andrew Obeidy*
Andrew Obeidy, Esq.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 10th day of March 2022, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notice of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to received electronically Notices of Electronic Filing.

*/s/ A. Andrew Obeidy*
A. Andrew Obeidy, Esq.

# Exhibit "A"

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

**Broward Division**

SCOTT THOMAS,                                    CASE NO.: 19-61324-CIV-DIMITROULEAS

      Plaintiff,

v.

**BROWARD COUNTY SHERRIFF'S**
**OFFICE,**

      Defendant.

_____/

## PLAINTIFF'S SCOTT THOMAS' OPPOSITION TO DEFENDANT BROWARD COUNTY SHERRIF'S OFFICE MOTION FOR JUDGMENT AS A MATTER OF LAW, OR, ALTERNATIVELY, FOR NEW TRIAL WITH INCORPORATED MEMORANDUM OF LAW

**COMES NOW,** Plaintiff Scott Thomas, by and through undersigned counsel, and pursuant to Fed. R. Civ. P. 50(b) and Rule 59, hereby files his Response in Opposition to Defendant Broward County Sheriff's Office's ("BSO") Motion for Judgment as a Matter of Law, or, alternatively, a new trial, filed on February 21, 2022, and as grounds therefore states:

### A.     SUMMARY OF THE ARGUMENT

Defendant BSO correctly sets forth the heavy burden it bears in bringing its motion.  To obtain judgment as a matter of law under Rule 50(b), Defendant must show that there was no legally sufficient evidentiary basis for a reasonable jury to have found in favor of Plaintiff; in order to succeed in its motion for a new trial under Rule 59(a), the jury's verdict must be shown to be seriously erroneous or a miscarriage of justice.  Defendant BSO has woefully fallen short of bearing either burden.

### B.     STANDARD OF REVIEW

Rule 50 of the Federal Rules of Civil Procedure "governs motions for judgment as a matter of law in jury trials." *Weisgram v. Marley Co.*, 528 U.S. 440, 447 (2000). "It allows the trial court to remove cases or issues from the jury's consideration when the facts are sufficiently clear that the

1

law requires a particular result." *Id.* at 448 (quotations omitted). "[I]n deciding on a Rule 50 motion, a district court's proper analysis is squarely and narrowly focused on the sufficiency of evidence." *Chaney v. City of Orlando*, 483 F.3d 1221, 1227 (11th Cir. 2007); *e.g., Shannon v. Bellsouth Telecommunications, Inc.*, 292 F.3d 712, 715 (11th Cir. 2002) ("The jury's verdict must stand unless 'there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.'" (citing Fed. R. Civ. P. 50(a)(1))). While "considering whether the verdict is supported by sufficient evidence, 'the court must evaluate all the evidence, together with any logical inferences, *in the light most favorable to the non-moving party*." *McGinnis v. Am. Home Mortg. Servicing, Inc.*, 817 F.3d 1241, 1254 (11th Cir. 2016) (quoting *Beckwith v. City of Daytona Beach Shores*, 58 F.3d 1554, 1560 (11th Cir. 1995)) (emphasis added).

A court's evaluation of the evidence does *not* include "credibility determinations"; neither does it include a "weigh[ing]" of the evidence. *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 150 (2000). Indeed, the Eleventh Circuit has repeatedly stressed: "it is the jury's task—not the court's—to weigh conflicting evidence and inferences, and determine the credibility of witnesses." *Shannon*, 292 F.3d at 715 (quoting *Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1186 (11th Cir. 2001)) (alterations adopted). "Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves*, 530 U.S. at 151.

## C. A REASONABLE JURY FOUND DEFENDANT BSO LIABLE FOR DISCRIMINATION IN VIOLATION OF USERRA BASED ON COMPETENT AND SUBSTANTIAL EVIDENCE

On two separate occasions, this Honorable Court has ruled that Plaintiff has established a *prima facie* case of USERRA discrimination, which requires that Plaintiff prove that his protected status was a "motivating factor" in the employment decision at issue.  [*See* DE #54; DE # 87]. Following a four-day trial, a jury found Defendant BSO liable for discrimination in violation of USERRA, 28 U.S.C. § 4311(a).

Defendant now challenges the verdict, alleging for the third time that "Plaintiff has failed to establish *any* factor from which discriminatory motivation could be inferred." DE #103, at 4. Defendant's argument overlooks a record replete with evidence that at least *two* Sheehan factors are irrefutably present—expressed hostility and inconsistencies in the proffered reason and other actions taken by the employer. For reasons unknown, Defendant continues to stress that the remaining factors—proximity in time and disparate treatment—are *not* present, despite the patent reality Scott Thomas did not argue such factors during trial. Defendant's arguments are a false flag, ignore well-established precedent, mischaracterize the record, and in so doing, inadvertently waste judicial resources. *See Coffman v. Chugach Support Servs., Inc.,* 411 F.3d 1231, 1238 (11th Cir. 2005) (it is well settled law that "the aforementioned factors do not all need to be present for a discriminatory motivation to be inferred."). Because Plaintiff's verdict is supported by substantial and competent evidence that Scott Thomas's military service was a motivating factor in the adverse employment actions taken against him, the verdict must be upheld. The jury was in the best position to weigh conflicting evidence, assess credibility, and determine questions of fact; having done so, a jury found Defendant BSO liable.

**1.    The jury's verdict is supported by ample evidence that at least two of the Sheehan factors were present, thus, the verdict is supported by competent and sufficient evidence that Plaintiff's military status was a motivating factor in his constructive termination**

To establish a *prima facie* case of discrimination under the USERRA, Scott Thomas was required to prove, by a preponderance of the evidence, that his military status was a "motivating factor" in Defendant BSO's decision to terminate his employment. *See Coffman,* 411 F.3d at 1238. As a general rule, military status is considered a motivating factor if it was "relied on," "considered," or "taken into account" by an employer in reaching an employment decision. *Id.* Federal Courts recognize that "discrimination is seldom open and notorious" and have routinely

allowed employees to meet their burden by submitting evidence from which such a motive may be inferred.  *Id.* ("circumstantial evidence plays a critical role in these cases."). To determine if discriminatory motive can be reasonably inferred, courts often defer to the four, non-exclusive "Sheehan factors", first articulated in the case of *Sheehan v. Dep't of Navy*, 240 F. 3 1009, 1012 (Fed. Cir. 2001) and repeatedly affirmed.

Under well-established precedent, a court can infer a discriminatory motivation from a *variety of considerations*, such as: "(1) the temporal proximity between the Plaintiff's military activity and the adverse employment action; (2) inconsistencies between the proffered reason for the employer's decision and other actions of the employer; (3) an employer's expressed hostility toward members of the protected class combined with its knowledge of the plaintiff's military activity; and (4) disparate treatment of similarly situated employees." *Id.* Importantly, the aforementioned factors do not all need to be present for a discriminatory motive to be inferred. Nor does a motivating factor have to be the sole cause for the employer's decision.  *Id.*

When the employee has met this burden, the burden shifts to the employer to prove the affirmative defense that legitimate reasons, standing alone, would have induced the employer to take the same adverse action.[1]  *See Sheehan v. Department of Navy*, 240 F.3d 1009, 1014 (Fed. Cir. 2001).  The procedural framework and evidentiary burdens set out in § 4311 are *different* from those in discrimination cases under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1), as described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Id.* Thus, in USERRA actions there must be an initial showing by the employee that military status was at

---

[1]     On page 3 of its motion, Defendant inadvertently misleads the Court by stating that USERRA claims follow the burden shifting analysis applicable in Title VII claims by incorrectly paraphrasing Justice Scalia's decision in *Staub* v. *Proctor Hospital*, 562 U.S. 411, 411 (2001).  In *Sheehan v. Dept. of Navy*, the Court specifically states, "[t]he procedural framework and evidentiary burdens set out in § 4311. . . are different from those in discrimination cases under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1), as described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and subsequent decisions. 240 F.3d at 1014.  Critically, and potentially fueled by Defendant's misperception of the burden shifting framework in a USERRA action, during trial <u>Defendant expressly stated that they "were not proceeding with any affirmative defense."</u> Tr. Day 3, 202: 23-24–203:1-6.  Nonetheless, Defendant's still produced ample evidence that they would have taken the same action despite Plaintiff's protected activity, which failed to convince the jury.

least a motivating or substantial factor in the agency action, upon which the agency must prove, by a preponderance of evidence, that the action would have been taken despite the protected status. *Id.*

During a four-day trial, Scott Thomas met this burden and produced substantial and competent evidence that *at least two* of the Sheehan factors were present: (1) expressed hostility towards members of a protected class; and (2) there were inconsistencies between the proffered reason for the employer's decision and other actions of the employer.

**2.    Scott Thomas proved, by a preponderance of evidence, that his military status was a motivating factor in his termination because Danielle Fuller had expressed hostility towards members of his class, with knowledge he was a member of that class.**

In facts strikingly similar to the U.S. Supreme Court case of *Staub v. Proctor Hospital*, Plaintiff has sufficiently alleged, and proved, that his direct supervisor was overtly hostile towards military pilots.  562 U.S. 411, 411 (2001).  Here, exactly as in *Staub*, Plaintiff proved that his supervisor, Danielle Fuller, was "overtly hostile to his training" and "complained openly about it."  *See id.* at 414 (finding a motivating factor in a hostile comments made by Plaintiff's two supervisors which supported the jury verdict). Unlike the cases relied upon by Defendants where expressed hostility was *not* present (*Coffman,* 411 F. 3d 1231and *Loperena v. Scott*, 356 F. App'x 240, 242-43 (11th Cir. 2009)) the record is clear that Danielle Fuller fostered a personal, bias against military pilots which was a motivating factor in the decision to deny Plaintiff retention in employment with BSO.  The evidence of express hostility introduced by Scott Thomas is best understood as two distinct categories: (1) anti-military comments made by Danielle Fuller; and (2) hostile conduct of Danielle Fuller, fueled by her anti-military animus.

### a. *Danielle Fuller expressed hostility through her comments.*

As was sufficiently attested to by four distinct witnesses—Scott Thomas, Brian McDonald, and Timothy Larsen and Danielle Fuller herself—Danielle Fuller engaged in expressed hostility by routinely making disparaging comments to the military pilots she supervised. Defendant nonetheless takes the position that "none of the specific statements Plaintiff attributed to Fuller were based on his military service and cannot form the basis for 'expressed hostility.'" DE # 103, at 7.  To the contrary, Fuller routinely made disparaging comments that Civilian Pilots were <u>more qualified for employment with BSO than military trained pilots</u>. *See, e.g.,* Tr. Day 1, 181: 22-25. Fuller believed that "military pilots didn't know the FAA rules" and thought the training they received was subpar to her own.  Fuller openly complained that military pilots took "good paying jobs out of civilian hands" and openly complained that "military pilots didn't have to pay for their training." Defendant's argument that these comments are *unrelated* to service in the Armed Forces strains logic.

By way of illustration, not exclusion, the evidence of Danielle Fuller's expressed hostility presented to the jury before they found Defendant liable for USERRA discrimination included:

1) "—[D]id Danielle ever express why she felt that civilian pilots were more qualified than military pilots? A. She claimed that she spent thousands of dollars on her civilian training, and she felt that it was unfair that we spent zero money on our training. [Trail Tr. Day 1, 183:13-18] (Testimony of Scott Thomas).

2) "[S]he said multiple times that she felt military pilots were incapable of doing the Part 135 missions…" [Trail Tr. Day 1, 181:22-24] (Testimony of Scott Thomas).

3) "[T]he way she treated us and constantly reminding us that she knew people that she felt were more qualified and better equipped for the unit that she would rather have flying there." [Trail Tr. Day 1, 182:16-19] (Testimony of Scott Thomas).

4) "Did she make any other anti-military comments? MS. RODRIGUEZ: Object to the characterization. THE COURT: Overruled. THE WITNESS: Yes. She was -- her biggest complaint to us was that she was always -- what do you want to call it? -- jealous, envious, mad, whatever the case you want to call it, that we, as military pilots, gained our flight experience in the military, and we didn't have to necessarily paid for it. But how we paid for it was putting our lives on the line and whether we got our qualifications, then we could take those qualifications and apply them to

the civilian world. She thought that was -- that was unfair. And those were her words, not mine. Did you consider that to be an anti-military comment? Yes. Did you consider that to be discrimination? Yes. "[Trial Tr. Day 3, 168:16-24; 169:1-7) (Testimony of Brian McDonald).

5)     "[S]he just -- she didn't like the way we thought. She didn't like the way we did things. She referenced us a couple of times -- what do you call it? -- tongue-in-cheek or whatever the case may be, she goes -- when we were taking a test at one point in time, she called us dumb because we didn't pass." [Trial Tr. Day 3, 169:12-18] (Testimony of Brian McDonald).

6)     "On multiple occasions, she called me dumb, stupid, incapable of doing the job, and incompetent." [Trial Tr. Day 1, 177:14-15] (Testimony of Scott Thomas).

7)     "[S]he immediately called me dumb and stupid for not doing it and saying that I needed to fill out the form entirely, and this is why I would [not] sic be competent enough to apply for this unit." [Trail Tr. Day 1, 179:15-18] (Testimony of Scott Thomas).

8)     "She also complained about the fact that she'd been in the Part 135 industry for 15 years, and that none of us had -- that the rest of military pilots had zero or little experience in the Part 135 industry, and that we were pretty much given the same job as her, and we were making the same salary as her. [Trail Tr. Day 1, 183:20-24] (Testimony of Scott Thomas).

9)     "A couple of times she complained about the fact that if she ever entered the military, she would be required to go through the military's entire training process on becoming a pilot, and that with 15 years' experience flying aircraft, she would be given a rank of someone -- the same rank of someone that's just starting out flying aircraft." [Trail Tr. Day 1, 184:2-7] (Testimony of Scott Thomas).

10)    "[S]he was disrespectful. I mean, she would -- during a break, she'd be like, you military guys, you have such a good life. You just go to flight school and it's free and you become pilots and then -- it was offensive cause I picked up dead people on the battlefield or on the -- in a training battlefield -- it's still dead people, right? -- that are friends of mine; people I know." [Trial Tr. Day 2, 76:5-11] (Testimony of Timothy Larsen).

11)    "[S]he had several references that I can recall. One of them was, you know, you military guys all think the same way. . . . [S]he would say, we're not in the military anymore -- you're not in the military anymore. We don't do it that way; we do it in the real world this way." [Trial Tr. Day 3, 168:3-9] (Testimony of Brian McDonald).

12)    "Q. Did you ever hear her call Scott stupid? A. Well, specifically when she was talking about his flight records, like, what is he, stupid? He doesn't know how to fill out his logbook right." [Trial Tr. Day 2, 76:19-22) (Testimony of Timothy Larsen).

13)    "Q. Do you believe that [Danielle Fuller] treated military pilots differently than civilian pilots?  A. Absolutely.  Q.  You believe that she had a problem with you because of your military status?  A. I believe she did."  [Trial Tr. Day 2, Page 77:8-25 – 78:1-2] (Testimony Timothy Larsen).

14)    "Q. You deny ever calling Scott Thomas stupid; correct? A. I don't remember ever calling him stupid for any reason. Q. So the fact that you don't remember doesn't mean that it didn't happen; correct? A. Yeah. Like I said, I don't remember calling him stupid. [Trial Tr. Day 2, 214:1-5] (Testimony of Danielle Fuller).

15)   "[T]here may have been some banter. I don't recall a specific word of stupid or dumb or anything that was in a derogatory fashion." [Trial Tr. Day 2, 214:18-20] (Testimony of Danielle Fuller).

There was additional testimony that Danielle Fuller had tried, but failed, to enlist in the Armed Forces herself. Tr. Day 1, 184:8-10 ("she was unable to because of a heart issue"). Lastly, there was testimony that Danielle Fuller fostered a personal bias stemming from a bitter divorce to a United States military pilot. Tr. Day 2, 77:18-25. As directly articulated by the Supreme Court, "when the company official who makes the decision to take an adverse employment action is personally acting out of hostility to the employee's membership in, or obligation to, a uniformed service, a motivating factor obviously exists." *Staub v. Proctor Hosp*., 562 U.S. 411, 417 (2011) (emphasis added). It was the function of the jury to weigh conflicting evidence and inferences, and to determine the credibility of the witnesses. *See Shannon*, 292 F.3d at 715. Having done so, the jury found that Fuller had expressed hostility and fostered anti-military animus, which they found to be a motivating factor in the adverse action taken against Plaintiff.

### b. *Danielle Fuller expressed hostility through her conduct*

Plaintiff did not rest his case on the plethora of anti-military comments made by Fuller. Plaintiff also introduced evidence that Daniele Fuller engaged in expressed hostility in the form of conduct. Said conduct, included, but not was not limited to: 1) refusing to give plaintiff time off to attend a VA medical appointment,[2] 2) failing to provide Plaintiff a date certain to produce his official flight records that BSO *knew* contained confidential information that could not be readily disclosed,[3] 3) failing to provide Plaintiff with reasonable notice to produce his "official"

---

[2]   Trial Tr. Day 1, 185:4-9 (Testimony of Scott Thomas).
   "I'm required by the VA or Veteran's Administration to do a yearly physical . . . I informed her that this appointment was coming up in February, and that I would like to take a day off in order to do this medical appointment. She told me that I would not be able to do that."

[3]   Trial Tr. Day 1, 157:11-13 (Testimony of Scott Thomas) ("Did anybody from BSO tell you that you had to turn over your official logbook? No sir, they did not."); *see also* Trial Tr. Day 2, 107:4-13] (Testimony of Brian Miller) (Q. Did you tell him exactly when he needed to have those by? A. No. Q. Did you tell him to whom he needed to tender those to? A. No."); Trial Tr. Day 3, 143:21-23] (Testimony of Tammy Nugent) (Q. Do you recall ever telling Scott Thomas that he had to produce his flight records on a certain day? A. No); Trial Tr. Day 3, 144:1-3 (Testimony of Tammy Nugent) ("Was Scott Thomas given a date or a time at which time to produce his flight records? A. Not by me.").

log books, that BSO *knew* were under lock and key in a different state,[4] 4) hyper scrutinizing Plaintiff's flight records with animus and confirmation bias,[5] 5) refusing to ask Plaintiff about the perceived discrepancies in his flight records,[6] 6) refusing to investigate if any of the discrepancies had been previously disclosed, 7) failing and/or refusing to coach Plaintiff,[7]  8) recommending Plaintiff's termination based on false pretenses (including a false claim that he did not provide proof of R-22 currency hours),[8] and 9) maliciously reporting plaintiff to the FAA for conduct that was not violative of any FAA regulations.[9]

It should be noted that many of the facts that give rise to hostile conduct also evidence inconsistencies in the proffered reason for the termination and other actions taken by the employer.  However, it has always been the position of Scott Thomas that "had it not been for the personal animus of Danielle Fuller" BSO and Danielle Fuller could have *easily* verified his flight records.  Scott Thomas believed—and produced ample evidence during trial—that Danielle Fuller's review of his records was tainted with discriminatory animus and confirmation bias.  Said differently, Scott Thomas produced evidence that Fuller interpreted the information that she received in a way that confirmed her existing belief: Scott Thomas was unfit for employment with BSO, based in part on his military service.  Taking a few examples listed above, Scott Thomas produced evidence that allowed a reasonably jury to reasonably infer:

---

[4]     *See* Tr. Day 2, 21:22-25–22:1.

[5]     Tr. Day 2, 223:6;18 (Testimony of Danielle Fuller) ("Q. [F]rom you being released at three o'clock until the time that you sent this document at 6:19, you were able to review his application; correct? A. Yes. Q. You were able to review his pilot experience form; correct? A. Yes. Q. And you were able to review his flight records; correct?" A. Yes.")

[6]     Trial Tr. Day 3, 18:9-12 (Testimony of Chief Pilot Danielle Fuller) ("Prior to making that decision and sending the e-mail, did you discuss any of the discrepancies that you found in the flight logbooks with Scott? A. No.")

[7]     Trial Tr. Day 3, 15:21-23 (Testimony of Chief Pilot Danielle Fuller) ("I was not his supervisor to help coach him or correct errors that he made with records coming into the program.").

[8]     *See* Tr. Day 3, 57:7-11.

[9]     Trial Tr. Day 2, 179:2-25–180:1-4 (Testimony of Danielle Fuller)
          "Q. [What] specifically did you bring to the attention of the FAA? A. The concerning one was the tail number of the R22 that was a glider, and the flight to New Jersey. Those types of entries are not accurate; therefore, it classifies as falsification . . . . Q. What happened next? A. The FAA advised me that in order to take any action against Mr. Thomas, he would have to falsify a record for an application for a pilot certificate to the FAA. The falsification has to come to the FAA, and I was told that by releasing him from BSO, that's the only jurisdiction or the only applicability there."

1)  Absent Danielle Fuller's hostility, Plaintiff would have been given a date certain to produce his flight records; BSO's failure to provide Plaintiff with this information allowed for a jury to reasonably infer that the lack of notice demonstrated hostility (and inconsistencies).

2)  Absent Danielle Fuller's hostility, Plaintiff would have been given more than three hours to produce his flight records; Danielle Fuller's failure to provide reasonable notice allowed a jury to reasonably infer that Danielle Fuller wanted and expected Plaintiff to fail, constituting hostility (and inconsistencies).

3)  Absent Danielle Fuller's hostility, Fuller would have reasonably inquired if any discrepancy she found had been previously disclosed to BSO before recommending Plaintiff for termination; Fuller's failure to do so allowed a jury to reasonably infer that the lack of investigation constituted hostility (and inconsistencies).

4)  Absent Danielle Fuller's hostility, Fuller would have spent more than 3 hours and 19 minutes reviewing Plaintiff's flight records; Fuller's fleeting review allowed a jury to reasonably infer that Fuller failed to conduct a thorough and neutral review and quit when she "found what she needed" to effectuate his termination, which constituted hostility (and inconsistencies).

5)  Absent Danielle Fuller's hostility, Fuller would have asked Plaintiff about the discrepancies she found, if she undertook a through and neutral investigation, before recommending him for termination; a jury reasonably believed Fuller's failure to do so constituted hostility (and inconsistences).

These facts allowed a jury to reasonably infer that Danielle Fuller engaged in the aforementioned conduct with the intent, or at least partial motive, to effectuate Plaintiff's termination. *See Staub,* 562 U.S. at 417 (Intentional torts . . . generally require that the actor intended 'the consequences' of an act, not simply the act itself."). Plaintiff carried this burden, and a jury found Danielle Fuller had the scienter required to be liable under USERRA. *See id*. at 419. While the issue of successor liability will be addressed in full below, the Supreme Court has stated unequivocally,

> So long as the agent intends, for discriminatory reasons, that the adverse action occur, he has the scienter required to be liable under USERRA. . . . So long as the agent intends, for discriminatory reasons, that the adverse action occur, he has the scienter required to be liable under USERRA. And it is axiomatic under tort law that the exercise of judgment by the decisionmaker does not prevent the earlier agent's action (and hence the earlier agent's discriminatory animus) from being the proximate cause of the harm. Proximate cause requires only "some direct relation between the injury asserted and the injurious conduct alleged.

*Id.* at 419.

When the jury had doubts as to whether they could hold BSO liable for the expressed hostility they readily recognized in Danielle Fuller, the question was rightfully decided by this Court based on the aforementioned precedent.   Thus, Scott Thomas's jury verdict is supported by sufficient evidence that expressed hostility was present and must be upheld.  See *e.g., Shannon*,

292 F.3d at 715 ("The jury's verdict must stand unless 'there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.'").

> **3. Scott Thomas proved, by a preponderance of evidence, that his military status was a motivating factor in his termination because of the inconsistencies in the reasons used to justify his termination by BSO.**

Plaintiff also elicited substantial testimony that there were inconsistencies in the proffered reason for denying Plaintiff retention in employment, and other actions taken by Defendant BSO. Defendant's stated reasons to release Plaintiff from employment are: 1) Plaintiff presented "no verifiable flight experience," and 2) Plaintiff had *major* discrepancies between his application, personal official electronic logbook and his Pilot Experience form. During trial, Scott Thomas produced ample evidence to the contrary. In addition to proving inconsistencies, the evidence simultaneously supports the conclusion that Defendant's proffered reason is a clear pre-text, despite the reality that Plaintiff had no burden to prove same under USERRA. *See supra* n. 1.

> **a.     *BSO's claim that Plaintiff had "no verifiable flight experience" is inconsistent with other actions taken by Fuller and BSO***

Defendant BSO largely rests its claim that Plaintiff had 'no verifiable flight experience,' on the fact that Plaintiff never provided his "official" logbooks to BSO. Defendant claims Plaintiff was on notice that he would need to provide his "official" logbooks at the time of his interview, despite never being told when, where, and to whom, he needed to produce same. Defendant purports that Plaintiff's failure to produce his "official logbooks"—with no more than a few hours of notice—somehow proves that Plaintiff's flight experience was *unverifiable*. During Trial, Plaintiff produced ample evidence to the contrary, demonstrating inconsistencies and pretext. Specifically, Plaintiff produced sufficient evidence that (1) BSO sufficiently verified his flight experience at the time Plaintiff was hired; (2) Plaintiff's flight experience was verifiable through his electronic logbook, which was acceptable to the FAA and *official* for all intents and

11

purposes; and (3) Plaintiff's flight experience was verifiable through his "official" logbook *if* Plaintiff was only given reasonable time to produce same for review by BSO personnel with appropriate clearance.

i.   <u>BSO sufficiently verified Plaintiff's flight experience at the time he was hired, which is inconsistent with BSO's claim Plaintiff's flight experience "could not be verified."</u>

To believe Defendant's argument—that Plaintiff's experience "could not be verified"—is to believe the Defendant BSO was physically unable to verify Plaintiff's flight experience before offering him a job to fly helicopter rescue missions.  Moreover, it would mean that Defendant allowed Plaintiff to work for BSO in excess of a month, without verifying that he had the requirements to lawfully fly.  Such a position simply cannot be reconciled with the facts on record.

The trial record is clear that Plaintiff tendered his electronic logbook during the interview process, sufficient to secure an offer of employment.  *See* Tr. Day 1 129:16-19; Tr. Day 3 144:1-6.  Both Plaintiff and Timothy Larsen testified that their electronic logbooks were sufficient to establish their respective flight times, and secure employment with BSO. Tr. Day 1, 157:16-25, 158:9-11, Tr. Day 2 69:5-8.  Timothy Larsen also tendered electronic flight records using an I-pad during his interview which BSO took no issue with.  Tr. Day 2, 68:13-16. These facts are inconsistent with the position of Brian Miller who testified "I don't accept electronic logbooks. It's not anything [t]hat I consider official . . ."  Tr. Day 3, 93: 18-24.  Brian Miller's testimony is not only inconsistent with that of Scott Thomas and Timothy Larsen; Miller's testimony is inconsistent with the undisputed fact that both pilots were irrefutably hired BSO.

In addition to producing his electronic logbook, Plaintiff provided BSO with a pilot certificate, a medical certificate, and a valid photo ID.  *See* Trial Tr. Day 1 103:8-12.  Miller corroborated that Plaintiff submitted *some document*, which he "did not recall," that was sufficient to confirm Plaintiff had 1000 hours of PIC time, 500 Hours of rotorcraft helicopter turbine hours,

250 hours of night flight time, 100 hundred hours of cross-country time, and 50 hours of rotor craft helicopter time within the previous 12 months. *See* Trial Tr. Day 3 104:12-25; 105:1-3; 94-6-8 ("Obviously, he had something because I did check that he had those house; so whatever he showed me, those hours were there."). Moreover, Defendant's own Exhibit [Def. Ex. 9, Plaintiff's Check Pilot Form] confirms that these flight times were verified by BSO, evidenced by Miller's check mark on each requirement after it was confirmed.

Interestingly, Miller testified that whatever Plaintiff presented was sufficient to verify his flight experience "for the purpose of the flight test, yes; for the job, no." Tr. Day 3, 93:6-10. According to Brian Miller, he made that clear to Plaintiff. Defendant overlooks the counter implication that according to Miller, *this was clear to BSO*. Again, if BSO is to be believed, BSO *must admit* that they allowed Plaintiff to work a dangerous and skillful job—that BSO believed "he was unfit to hold"—in excess of five weeks. Based on the above facts, a jury reasonably inferred that there were inconsistencies in Defendant's story; a jury reasonably inferred that Defendant's proffered reason was a clear pretext.

These evidentiary facts are sufficient to support the jury's verdict, "even if it is possible to draw a contrary conclusion from the same evidence." *E.g.*, *Johnson v. Paradise Valley Unified School Dist.*, 251 F. 3d at 1222, 1227 (2001). As the Eleventh Circuit has repeatedly opined, "it is the jury's task—not the court's—to weigh conflicting evidence and inferences and determine the credibility of witnesses." *Shannon*, 292 F.3d at 715. After the conflicting evidence was presented to a jury, the jury was unconvinced by Defendant's witnesses and found Defendant liable for violating USERRA based, at least in part, on inconsistencies in Defendant's employment decision and other actions taken by Defendant.

ii. <u>At all relevant times, Plaintiff's flight experience was verifiable through his electronic logbooks, which is inconsistent with BSO's claim Plaintiff's flight experience "could not be verified"</u>

There was a lot of testimony as to whether an electronic logbook was "official" for the purpose of flight time verification.  BSO claims that Plaintiff's electronic logbook was an insufficient substitute to a paper logbook and for that reason, Plaintiff's flight experience "could not be verified."  [ADD SUPPORT].  During Trial, Scott Thomas produced ample evidence to the contrary, demonstrating inconsistencies and pre-text.

Two decorated military pilots with *decades* of helicopter flight experience amongst them—Scott Thomas and Timothy Larsen—both gave similar testimony that an <u>electronic logbook met FAA standards and contained verifiable flight experience</u>.  According to Scott Thomas, an electronic logbook is an official logbook.  Tr. Day 2, 42:4-8. ("I called my paper logbooks my official logbook, but official logbooks can also mean an electronic logbook.").  He further explained, "there are no [FAA] requirements for logging flight times."  Tr. Day 1, 157:19-25.  It was his understanding, after flying helicopters for more than 14 years, that "a logbook is only used to show currency in an aircraft," and was readily able to explain the FAA requirements surrounding same. *See id.*

According to Timothy Larsen, an electronic logbook is an official logbook.  *Id.* at 69:5-8.  Timothy Larsen has 26 years of helicopter flight experience and has served as an instructor at Flight Safety International for several years.  *Id.* at 65:21-23; 64:1-2.  Timothy Larsen testified that he hasn't carried a paper logbook for many years, and "a lot of pilots do that."  *Id.* at 69:6-8.  According to Mr. Larsen, "the FAA is very vague about how you fill out your logbook" and that "making a mistake in there would not be the end of the world."  *Id.* at 76:23-25.  After the conflicting evidence was presented to a jury, the jury was unconvinced by Defendant's witnesses and found Defendant liable for violating USERRA, at least in part, based on inconsistencies in Defendant's employment decision and other actions taken by Defendant.

  iii. <u>Plaintiff's flight experience was verifiable through his "official logbook,"</u>
<u>which Scott Thomas was *never* asked to produce, which is inconsistent</u>
<u>with BSO's claim that Plaintiff's flight experience "could not be verified"</u>

Defendant rested its defense, in large part, on Plaintiff's purported 'failure to obtain' his official records following his interview.  During trial, Defendant insinuated Plaintiff "sat around" instead of acting proactively to obtain a record he knew BSO needed him to produce, *eventually*. Defendant's argument overlooks the reality that <u>Plaintiff's "official" logbook could not have been</u> <u>turned over to just anyone at BSO; the reviewer needed a certain level of security clearance</u>.

The reason that Plaintiff kept a separate electronic flight logbook was to protect the covert missions that Plaintiff flew. Trial TR. Day 1, 128:4-10.  Plaintiff disclosed this at the time of his interview and gave BSO notice that his "official" logbook was stored in a secure facility in Virginia.  Tr. Day 3:6-21.  Having notice that Plaintiff's "official" log contained confidential information, needed special clearance to be reviewed, and that it was kept in a different state, it is reasonable that BSO should have provided Plaintiff advance notice as to when, where, and to whom, he was expected to produce same.[10]   Absent said notice, Plaintiff was *physically unable* to produce his "official" records to BSO; doing so would risk national security and violate the terms of his confidentiality agreement.  Defendant knew this.

BSO stressed that Plaintiff had notice he would need to produce same "at some [ambiguous and undetermined] point in time in the future."   <u>The record is undisputed that such</u> <u>"future date" did not occur till January 10, 2021.</u>  Trial Tr. Day 1 187:4-10; Trial Tr. Day 2 15:11-14; *id.* at 21:15-21.  On that "future date," the record is undisputed that Plaintiff was given no more than a few hours of advance notice.  Trial TR. Day 2:15-21.  On that "future date," the record is undisputed that Plaintiff was already at work when he received the request.  *Id.*  On that

---

[10] Both Brian Miller and Chief Nugent testified under oath that they did not tell Plaintiff when, where, or to whom he would need to produce his flight records to, either at the time of his interview or any time thereafter.  Trial TR Day 3 107:1-13, 143:18-23.

"future date," the record is undisputed that Plaintiff told Fuller what he had already told BSO: his "official" logbook was in Virginia, but he was happy to obtain same.  Trial TR. Day 2:15-21. Lastly, the record details that Fuller <u>did not ask Scott Thomas to obtain same and made no objection to the electronic form of his tendered records.</u>  In fact, she told him "it would not be necessary" [Trial Tr. Day 2 21:22-25, 22:1] then used same to justify his termination.

During Trial, Plaintiff produced sufficient evidence that if BSO wanted to verify his hours, he would have either (1) been given advance notice of when to produce same; or (2) been told that his electronic records were an insufficient substitute and asked to produce his "official" logs. If *either* of those two events happened, BSO could have easily verified Plaintiff's hours, which is inconsistent with their claim that Plaintiff was terminated because his flight hours "could not be verified."  After the conflicting evidence was presented to a jury, the jury was unconvinced by Defendant's witnesses and found Defendant liable for violating USERRA, at least in part, based on inconsistencies in Defendant's employment decision and other actions taken by Defendant.

### b.  *BSO's claim that Plaintiff had "major" discrepancies in his flight documentation is inconsistent with other actions of BSO*

At all relevant times, BSO has alleged that Plaintiff had "*major* discrepancies" between his application (resume), his pilot experience form, and his flight logbook that justify his termination.  See Tr. Day 2 170:8, 223:19-21; Tr. Day 3 33:24-25, 34:1. After a jury verdict in Plaintiff's favor, Defendant BSO has moved the goal post and now claims that Plaintiff only had "discrepancies" amongst and between same.  *See* DE #103, at 5.   During trial, Plaintiff produced sufficient evidence that <u>no major discrepancies existed between these documents</u>, evidencing inconsistencies in BSO's proffered reason and demonstrating pretext.[11] Tr. Day 1 194:22-23, 198:18-20.

---

[11]      *See* Pl. Tr. Ex. 4 (Pl. Resume) *but see* Pl. Tr. Ex. 9 (Pl. Pilot Experience Form) *and* Pl. Tr. Ex. 10 (Pl. Electronic Logbook). During Trial, Plaintiff demonstrated that the numbers listed on Plaintiff's Resume, Pilot Experience Form, and Electronic Logbook

After Plaintiff's counsel walked through each of the three documents in admittedly pain-staking detail, it became clear that Fuller's only plausibly argument of a discrepancy revolved around Plaintiff's Pilot in Command Time, otherwise known as "PIC" hours.  Plaintiff's resume, pilot experience form, and logbook listed Plaintiff's PIC hours as 1500, 1433, and 1431 respectively. Trial Tr. Day 3:10-16. At all relevant times, Fuller believed that this was an intentional falsification of Plaintiff's flight records.[12]  Trial Tr. Day 3:18-19.  At Trial, Scott Thomas produced ample evidence to the contrary.

Specifically, Plaintiff disputed Fuller's assertions by proving that the PIC hours he had listed on his flight records were substantially under reported; logic follows that if his logbook was underreported (1431)— relied on in completing his pilot experience form (1433)— then his actual PIC time would align with the number listed on his resume (1500).  Trial Tr. Day 3: 8-14

Plaintiff produced *several* facts that demonstrated his PIC hours had been understandably under reported.  It came out during Fuller's cross examination that Plaintiff did not include the PIC times on simulator line entries, which caused his logbook PIC time to be under reported. Trial Tr. Day 3: 8-14.  Had Plaintiff correctly included same, his total PIC time would have been 1,481.  *See* Pl. Tr. Ex. 10. Thus, the actual differential between the PIC time reported on his flight documentation would have been 19 hours and not 69.  *See id.* Plaintiff would have been happy to explain same to Fuller or to BSO, had he only been asked to justify the discrepancy at any point before his termination.

---

are close to identical, casting doubt on Fuller's recommendation based on "major discrepancies" between same.  Plaintiff's resume, pilot experience form, and logbook list Plaintiff's total flight times as 2080, 2081, and 2080.8 respectively; they list his total night vision google times as 530, 531, and 530.9 respectively.  Plaintiff's resume and logbook list total combat hours as 950 and 957 respectively.  Plaintiff's pilot experience form and logbook list turbine times as 2029 and 2029.5 respectively; they list actual instrument times as 17; they list cross country times as 1610 and 1606.7 respectively; they list cross country hours as 411 and 411.2 respectively.  Under the weight of cross-examination, Fuller admitted that these numbers do not constitute major discrepancies.

[12]      Fuller explained in her testimony that a falsification was an intentional act and that she believed Mr. Thomas was intentionally lying on his resume by inflating his PIC hours. Fuller additionally claimed that by falsifying his resume, Plaintiff prevented other more qualified candidates from potentially being hired.  *See* Trial Tr. Day 3:18-19.

To illustrate this point, Plaintiff used Fuller's *own internal notes* to demonstrate that his PIC hours were underreported.  Remarkably, it was Fuller herself who discovered that Plaintiff's flight logbooks undercounted his PIC time; Fuller made this discovery *before* she recommended Plaintiff for termination without asking him about same.  Fuller used a red pen to circle each time Plaintiff failed to log a PIC hour on his electronic logbook.  Pl. Ex. 12.  Plaintiff's counsel went line by line through several of the simulator times Fuller had circled, demonstrating an underreporting of 50 PIC hours.  Fuller could have easily asked Plaintiff to add the additional PIC time, not initially included, to bridge the gap and resolve the issue in Plaintiff's favor. Tr. Day 3 Page 50:5-14. Instead of using the mistake as a shield to defend Mr. Thomas, she used it as a sworn to justify her recommendation for Plaintiff's termination. Fuller's failure to ask Plaintiff about this discrepancy, investigate the issue further, or resolve the inference in Plaintiff's favor, which allowed a jury to infer that her actions were fueled by discriminatory or retaliatory animus.

Plaintiff additionally proved that Fuller's inability (and/or refusal) to understand how PIC hours are logged in the military, fueled her misperception that Plaintiff had "falsified" his hours. Tr. Day 1: 147:16-25, 148:12-19.  PIC hours are calculated differently in the military and civilian worlds.  Tr. Day 1: 148:12-19.  Plaintiff, Larsen, and McDonald all testified that military <u>PIC time is calculated much more conservatively than in civilian flight documentation</u>.[13]  Tr. Day 2 66:10-18. Plaintiff, Larsen, and McDonald all testified that the PIC time listed in Plaintiff's electronic logbook was a conservative estimate based on military standards and underreported. Tr. Day 2 66:10-18.  Fuller admitted, under oath, that she did not know how the military calculated PIC.  Day 3 54:7-9 More importantly, Fuller never took the time to learn the difference.

---

[13]      Civilian pilots are allowed to include taxi time, the time a helicopter moves while on the ground, as part of PIC time.  The military definition of PIC time uses the time that the helicopter is in flight as PIC time.  [ADD SUPPORT].

Fuller's failure to undertake efforts to *understand* Plaintiff's flight records is inconsistent with her unwavering assertion that Plaintiff had "falsified" his flight records.  The fact that Fuller did not know, and did not care, how military PIC time was logged, is further proof of her discriminatory animus.   These facts allowed a jury to reasonably infer that there were inconsistencies in Fuller's assertion Plaintiff had "major discrepancies" in his flight records, and that Defendant's proffered reason was pretextual.

When a thorough review of Plaintiff's three flight documents produced no clear discrepancies—and could not justify Plaintiff's termination—BSO argued that Plaintiff's logbook had an incorrect tail number.  Plaintiff produced ample evidence as to why this proffered reason was also inconsistent and pretextual.  Namely, Plaintiff produced evidence that the mistake was *intentional*.  As attested to by FAA Attorney Carol Might, Plaintiff's inversion of the Tail number was a deliberate tactic, technique and procedure (TTPs), used by the FBI to protect the hostage rescue squadron.  Trial Tr. Day 2 116:8-19. Ms. Might confirmed that Plaintiff's flight records employed TTPs deliberately and correctly.  Tr. Day 2 117:2-4.

During cross, Fuller admitted that she did not know what TTPs were.  Tr. Day 3, 46:19-24.  Instead of investigating the cause of the discrepancy, Fuller incorrectly assumed that the inversion—employed by Plaintiff to protect national security—was an error that constituted "falsification."  *Id.* at 51:1-4. Again, Fuller's failure to undertake efforts to understand Plaintiff's flight records is inconsistent with her unwavering assertion that Plaintiff had "falsified" his records.  At all relevant times, Fuller could have asked Plaintiff about the discrepancy and would have readily been told what a TTP was.  By all means, Fuller could have proactively verified same with the FAA; instead, BSO learned what a TTP was during trial when Carol Might testified that Plaintiff's logbook accurately listed same.

Based on the above evidence, a jury was able to reasonably infer that there were inconsistencies in BSO's story, namely, that Plaintiff had "major discrepancies" in his flight documentation. Because the jury's verdict is supported by substantial and competent evidence, it must be upheld.

### 4. The issue of Successor Liability was Rightfully Decided and Submitted to the Jury

Jury deliberations paused for a brief moment to answer the following legal question: "if Danielle Fuller is discriminatory, does that make BSO Discriminatory?"  [*See* DE #91, Jury Notes].  After hearing argument, this Honorable Court properly submitted the answer to the jury: "[y]es, if you find that either (1) Danielle Fuller was the decision maker; or (2) the decision maker rubber-stamped the decision."  This question was rightfully decided and properly submitted, and Defendant has failed to raise any objectional grounds as to this holding.  Moreover, the record is supported by competent and sufficient evidence that Danielle Fuller was *either* the decision maker, or, that Tammy Nugent blindly "rubber-stamped" the decision.

There was sufficient evidence that Danielle Fuller was the decision maker in relation to Scott Thomas's employment.  In fact, Defendant's own counsel repeatedly referred to Danielle Fuller as "the boss" when she was cross examining Brian McDonald.  In attempting to justify Fuller's refusal to take her military subordinate's opinions under advisement *because of her position of authority*, BSO Counsel asked:

| | |
|---|---|
| Q: | So she, [Danielle Fuller], was the boss; wasn't she? |
| A: | Initially, no, but then she was promoted to chief pilot, yes. |
| Q: | And as the boss, it was her discretion to determine what methods and procedures were going to be followed with regard to the implementation of the Part 135, correct? |
| A: | Yes, ma'am. |
| W: | And she didn't have to take your recommendations or advice, did she? |
| A: | No, ma'am. |

Tr. Day 3, 190:14-25.  While an attorney's question are not evidence, McDonald's answers are.

The record is replete with additional evidence that Danielle Fuller was the decision maker in relation to her unit.  Chief Tammy Nugent, Danielle Fuller's direct supervisor, testified about the discretion and autonomy of Interim Director Fuller.  Specifically, Nugent testified that Fuller was empowered to set BSO standards as to what type of logbooks needed to be produced during probationary employment.  *Id*. at 143:3-17.  In relation to these types of decisions, Nugent expressly said it was "whatever the chief pilot or the director of operations advised."  *Id*.

The record is clear that Danielle Fuller was empowered to pick the date she asked her subordinates to bring in their "official" logbooks; Danielle Fuller was the one who gave no more than a few hours of advance notice; Danielle Fuller was the one who decided it was unacceptable Plaintiff could not produce same in that time frame; Danielle Fuller was the one who conducted the review of Plaintiff's records; Danielle Fuller was the one who determined Plaintiff "falsified his flight records"; Danielle Fuller was the one who recommended Plaintiff for termination; Danielle Fuller was the one who reported Plaintiff to the FAA.

There is equal evidence to support a finding that Tammy Nugent rubber-stamped Danielle Fuller's discriminatory decisions.  When asked about her role in the day-to-day supervision of the pilot class, Nugent testified that she "relied on [her] chief pilot" which at that time was chief pilot and interim director Danielle Fuller.  Tr. Day 3, 125:17-25 (emphasis added).  Nugent further testified that "she would have to go by [her] recommendations."  *Id*.  In fact, Chief Nugent was essentially *forced* to rely on the opinion of Danielle Fuller because she was not a pilot.  *Id*. at 145:11-14.  Later, Nugent reiterated that "I have to rely on my experts to say [what's] not right in the world of aviation."  *Id*. at 148:16-18.  While Nugent feigned equal reliance on Brian Miller and Jesse Madrigal, later testimony cast doubt on the veracity of that statement.  *See id*. at 145:12-17.  Nugent later "could not recall" if Miller had any involvement regarding Scott Thomas's employment following Plaintiff's interview [*id*. at 145:19-23]; Nugent also confirmed that

21

Sergeant Madrigal worked on the law enforcement side of BSO and had minimal daily supervision of the chief pilot.  *Id*. at 145:24-25–146:1. More importantly, Madrigal did not testify.

Defendant nonetheless purports that "Nugent did not delegate fact-finding to Fuller. Instead, she fully reviewed the record with Madrigal to ensure . . . the decision was entirely justified, apart from Fuller's recommendation."  DE # 103, at 9.  Defendant's argument is incongruent with Nugent's sworn testimony that states:

> Q:    Could you have taken the time to figure out on your own why it was that those discrepancies were there?
> A:    I could have, but I wouldn't know what I was looking at or for.

Tr. Day 3, 148:19-23.  Assuming arguendo that Defendant's undertook a through and independent investigation, which they did not, this fact alone cannot absolve Defendant of liability.  As the Supreme Court has directly opined, "[n]or do we think the independent investigation somehow relieves the employer of 'fault.' The employer is at fault because one of its agents committed an action based on discriminatory animus that was intended to cause, and did in fact cause, an adverse employment decision."  *Staub*, 462 U.S. at 421.  As additionally opined, "it is axiomatic under tort law that the decisionmaker's exercise of judgment [here, Nugent and Madrigal] does not prevent the earlier agent's action from being the proximate cause of the harm."  *Id*. Thus it matters not if Defendant's argument is believed—namely that BSO engaged in an independent investigation— because it is devoid of legal effect.  *See id*.

### D.    A REASONABLE JURY FOUND DEFENDANT BSO LIABLE FOR RETALIATION IN VIOLATION OF USERRA BASED ON COMPETENT AND SUBSTANTIAL EVIDENCE

Based on substantial and competent evidence, a jury found Defendant BSO liable for USERRA Retaliation, 38 U.S.C. 4311(b), which makes it unlawful for an employer to take an adverse employment action against an employee who has taken action to enforce a protection under USERRA, as follows:

22

> (b)  An employer may not discriminate in employment against or take any adverse employment action against any person because such person (1) has taken an action to enforce a protection afforded any person under this chapter, (2) has testified or otherwise made a statement in or in connection with any proceeding under this chapter, (3) has assisted or otherwise participated in an investigation. Under this chapter, or (4) has exercised a right provided for in this chapter.  The prohibition in this subsection shall apply with respect to a person regardless of whether that person has performed service in the uniformed services.

38 U.S.C. 4311 (B).  *See Hayden v. Dep't of the Air Force*, 812 F.3d 1351, 1362-63 (Fed. Cir. 2016); Coffman, 411 F.3d at 1234-35.

To establish a *prima facie* case under the anti-retaliation provision of USERRA, Scott Thomas was required to prove, by a preponderance of the evidence, that: "(1) he engaged in a protected activity; (2) he suffered an adverse employment action; (3) there was a casual connection between the protected activity and the adverse employment action." *Holt v. Hydraulic Hose of Hillsborough, LLC*, No. 8:18-CV-2082-T-33CPT, 2018 WL 7457682, at *2 (M.D. Fla. Nov. 9, 2018).  As stated by this Honorable Court in denying Defendant BSO's Motion for Summary Judgment, "Defendant will have the opportunity at trial to attempt to meet its burden of proving that 'it would have taken the same action in the absence of the employee's protected action.'"  *See Jones*, 703 F. App'x at 980.  During the course of a four-day trial, Defendant failed to meet that burden, and a jury found Defendant liable for retaliation in violation of USERRA. Defendant now challenges that verdict, alleging that "Plaintiff's testimony failed to establish that he engaged in any action to enforce a protection afforded under USERRA."  *See* DE #103, at 13. Defendant additionally argues that "even if Plaintiff could show that he engaged in a protected activity, he still failed to show that the protected activity was a motivating factor in BSO's decision that he did not meet probationary standards."  *Id.* Both of Defendant's arguments are without merit, overlooks the sworn testimony of Timothy Larsen, Brian McDonald, Tammy Nugent, and Jason Smith, and improperly asks this Court to invade the province of the jury.

1.   **The Jury Verdict is Supported by Sufficient Evidence that Plaintiff Engaged in a Protected Activity.**

Scott Thomas engaged in protected activity when he made multiple complaints of anti-military-bias to Chief Pilot Fuller, Chief Smith, and Chief Nugent. Plaintiff complained to Daniele Fuller about being called stupid, dumb, incompetent, incapable and objected to other anti-military comments. *See* Tr. Day 1 181:9-20, 185, Trial Tr. Day 2 80:2-6. Trial Day 3 168:3-9. Plaintiff complained to Fuller about being denied time off to attend a VA medical appointment.  Tr. Day 185:4-16. Trial Tr. Day 2 80:11-14. Plaintiff complained to Fuller about her statement that she knew better qualified civilian pilots that could replace the military pilots.  Trial Tr. Day 1 185:20-22, 186:12-14. The complaints were witnessed by both Tim Larsen and Brian McDonald.  Trial Tr. Day 2 79:15-25, Trial Tr. Day 2 81:2-6, Trial Day 3 171:2-14.  Thomas, Larsen, and McDonald all specifically testified that they believed Scott Thomas was retaliated against for complaining about unlawful military discrimination by Daniele Fuller.  Tr. Day 2 83:1-12 Trial Tr. Day 3 177:6-11.

Plaintiff escalated his complaints to Battalion Chief Smith when his complaints of anti-military bias to Fuller did not yield any result.  Trial Tr. Day 1 200:22-25, 201:14-20.  Plaintiff specifically complained about Fuller engaging in Anti-Military discrimination and said complaint was made in the presence of Brian McDonald.  rial Tr. Day 3 173:17-19.  Importantly, Chief Smith admitted during the weight of cross examination that he did not recall a complaint being made and that his recollection of the conversation was murky. Tr. Day 4 16:8-12, 18:12-14.

Chief Smith suggested to Chief Nugent that she meet with the team.  Tr. Day 3 130:11-174 13:6-7  Chief Nugent met with the pilots on January 18, 2019, the very next day after Plaintiff and McDonald met with Chief Smith. Tr. Day 1 202:23-25.  During the meeting Plaintiff detailed his complaints of military discrimination by Danielle Fuller to Chief Nugent, including her refusal

to allow Plaintiff to attend his VA medical appointment. Trial Tr. Day 1 204:5-9.   Tr. Day 2 80:11-14, 82:23-25, 83:1-7.

The plethora of complaints made are clear evidence that Plaintiff engaged in statutory protected activity.  The jury heard said testimony and made the specific finding that Plaintiff did in fact engage in an activity protected by USERRA.   The verdict must stand here because there was a sufficient evidentiary basis for a reasonable jury to find for that party on that issue.

**2.  The jury verdict is supported by sufficient evidence that Scott Thomas suffered an adverse employment action**

This element is not in dispute and in its 50(b) Motion, Defendant does not argue that Plaintiff failed to suffer an adverse employment action.  As is well established, "materially adverse actions include termination, demotion accompanied by a decrease in pay, or a material loss of benefits or responsibilities, but do not include everything that makes an employee unhappy. There is no reason to understand "adverse employment action" differently in the USERRA context" *Violetto v. Vill. of Tinley Park,* 130 F. Supp. 3d 1179, 1185 (N.D. Ill. 2015).

**3.  The jury verdict is supported by sufficient evidence that there was a casual connection between the protected activity and the adverse employment action.**

The record evidence allowed the jury to reasonably infer a causal connection between Plaintiff's complaints of military discrimination and his constructive termination.  The jury was able to consider facts that supported the causation nexus including: 1) Proximity in time between the complaint and the constructive termination, and 2) inconsistencies in the reason for termination.

The record evidence is clear that Plaintiff was called into a meeting 10 days after his last public complaint about Danielle Fuller's discrimination and told to resign, or he would be fired.

Trial Tr. Day 205:7-9. The proximity in time between Plaintiff's complaints and his constructive termination is sufficient to establish the causation element of USERRA Retaliation.

**E.    CONCLUSION**

For the reasons stated herein consistent with the record evidence, a jury verdict consisted with the Rule 50b motion standard, and applicable law, Plaintiff respectfully requests that this Honorable Court deny Defendant's Motion for Judgment as a matter of law in its entirety and its Motion for a New Trial.

Dated this 10th day of March 2022.

Respectfully submitted,
*/s/ A. Andrew OBeidy*
A.  ANDREW OBEIDY, ESQ. (FBN 0910341)
**OBEIDY & ASSOCIATES, P.A.**
2755 Oakland Park Blvd. Suite 225
Fort Lauderdale, FL 33305
Telephone: (305) 892-5454
andrew@obdlegal.com

**CERTIFICATE OF SERVICE**

WE HEREBY CERTIFY that on this 10th day of March 2022, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notice of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By:***/s/ Andrew Obeidy***
Andrew Obeidy, Esq.

26