**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

**Broward Division**

**SCOTT THOMAS,**                                     CASE NO.: 19-61324-CIV-DIMITROULEAS

                    Plaintiff,
                    v.
**BROWARD COUNTY SHERRIFF'S**
**OFFICE,**
                    Defendant.
_____/

<u>**PLAINTIFF'S SCOTT THOMAS' OPPOSITION TO DEFENDANT BROWARD**</u>
<u>**COUNTY SHERRIF'S OFFICE MOTION FOR JUDGMENT AS A MATTER OF LAW,**</u>
<u>**OR, ALTERNATIVELY, FOR NEW TRIAL WITH INCORPORATED**</u>
<u>**MEMORANDUM OF LAW**</u>

    **COMES NOW,** Plaintiff Scott Thomas, by and through undersigned counsel, and

pursuant to Fed. R. Civ. P. 50(b) and Rule 59, hereby files his Response in Opposition to

Defendant Broward County Sheriff's Office's ("BSO") Motion for Judgment as a Matter of Law,

or, alternatively, a new trial, filed on February 21, 2022, and as grounds therefore states:

    **A.**    **SUMMARY OF THE ARGUMENT**

    Defendant BSO correctly sets forth the heavy burden it bears in bringing its motion.  To obtain

judgment as a matter of law under Rule 50(b), Defendant must show that there was no legally

sufficient evidentiary basis for a reasonable jury to have found in favor of Plaintiff; in order to

succeed in its motion for a new trial under Rule 59(a), the jury's verdict must be shown to be

seriously erroneous or a miscarriage of justice.  Defendant BSO has woefully fallen short of

bearing either burden.

    **B.**    **STANDARD OF REVIEW**

    Rule 50 of the Federal Rules of Civil Procedure "governs motions for judgment as a matter of

law in jury trials." *Weisgram v. Marley Co.*, 528 U.S. 440, 447 (2000). "It allows the trial court to

remove cases or issues from the jury's consideration when the facts are sufficiently clear that the

1

law requires a particular result." *Id.* at 448 (quotations omitted). "[I]n deciding on a Rule 50 motion, a district court's proper analysis is squarely and narrowly focused on the sufficiency of evidence." *Chaney v. City of Orlando*, 483 F.3d 1221, 1227 (11th Cir. 2007); *e.g., Shannon v. Bellsouth Telecommunications, Inc.*, 292 F.3d 712, 715 (11th Cir. 2002) ("The jury's verdict must stand unless 'there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.'" (citing Fed. R. Civ. P. 50(a)(1))). While "considering whether the verdict is supported by sufficient evidence, 'the court must evaluate all the evidence, together with any logical inferences, *in the light most favorable to the non-moving party*." *McGinnis v. Am. Home Mortg. Servicing, Inc.*, 817 F.3d 1241, 1254 (11th Cir. 2016) (quoting *Beckwith v. City of Daytona Beach Shores*, 58 F.3d 1554, 1560 (11th Cir. 1995)) (emphasis added).

A court's evaluation of the evidence does *not* include "credibility determinations"; neither does it include a "weigh[ing]" of the evidence. *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 150 (2000). Indeed, the Eleventh Circuit has repeatedly stressed: "it is the jury's task—not the court's—to weigh conflicting evidence and inferences, and determine the credibility of witnesses." *Shannon*, 292 F.3d at 715 (quoting *Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1186 (11th Cir. 2001)) (alterations adopted). "Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves*, 530 U.S. at 151.

## C. A REASONABLE JURY FOUND DEFENDANT BSO LIABLE FOR DISCRIMINATION IN VIOLATION OF USERRA BASED ON COMPETENT AND SUBSTANTIAL EVIDENCE

On two separate occasions, this Honorable Court has ruled that Plaintiff has established a *prima facie* case of USERRA discrimination, which requires that Plaintiff prove that his protected status was a "motivating factor" in the employment decision at issue. [*See* DE #54; DE # 87]. Following a four-day trial, a jury found Defendant BSO liable for discrimination in violation of USERRA, 28 U.S.C. § 4311(a). Defendant now challenges the verdict, alleging for the third time

that "Plaintiff has failed to establish *any* factor from which discriminatory motivation could be inferred." DE #103, at 4.

Defendant's argument overlooks a record replete with evidence that at least *two* Sheehan factors are irrefutably present—expressed hostility and inconsistencies in the proffered reason and other actions taken by the employer. For reasons unknown, Defendant continues to stress that the remaining factors—proximity in time and disparate treatment—are *not* present, despite the reality Scott Thomas did not argue such factors during trial. Defendant's arguments are a false flag, ignore well-established precedent, mischaracterize the record, and in so doing, inadvertently waste judicial resources. *See Coffman v. Chugach Support Servs., Inc.,* 411 F.3d 1231, 1238 (11th Cir. 2005) (it is well settled law that "the aforementioned factors do not all need to be present for a discriminatory motivation to be inferred."). Because Plaintiff's verdict is supported by substantial and competent evidence that Scott Thomas's military service was a motivating factor in the adverse employment actions taken against him, the verdict must be upheld. The jury was in the best position to weigh conflicting evidence, assess credibility, and determine questions of fact; having done so, a jury found Defendant BSO liable for USERRA discrimination.

1.   **The jury's verdict is supported by ample evidence that at least two of the Sheehan factors were present, thus, the verdict is supported by competent and sufficient evidence that Plaintiff's military status was a motivating factor in his constructive termination.**

To establish a *prima facie* case of discrimination under the USERRA, Scott Thomas was required to prove, by a preponderance of the evidence, that his military status was a "motivating factor" in Defendant BSO's decision to terminate his employment. *Coffman,* 411 F.3d at 1238. Military status is considered a motivating factor if it was "relied on," "considered," or "taken into account" by an employer in reaching an employment decision. *Id.* Federal Courts recognize that "discrimination is seldom open and notorious" and have routinely allowed employees to meet their burden by submitting evidence from which such a motive may be inferred. *Id.*

3

("circumstantial evidence plays a critical role."). To determine if discriminatory motive can be inferred, courts often defer to the four, non-exclusive "Sheehan factors", first articulated in the case of *Sheehan v. Dep't of Navy*, 240 F. 3 1009, 1012 (Fed. Cir. 2001) and repeatedly affirmed.

Under well-established precedent, a court can infer a discriminatory motivation from a *variety of considerations*, such as: "(1) the temporal proximity between the Plaintiff's military activity and the adverse employment action; (2) inconsistencies between the proffered reason for the employer's decision and other actions of the employer; (3) an employer's expressed hostility toward members of the protected class combined with its knowledge of the plaintiff's military activity; and (4) disparate treatment of similarly situated employees." *Id.* Importantly, the aforementioned factors do not all need to be present for a discriminatory motive to be inferred. Nor does a motivating factor have to be the sole cause for the employer's decision. *Id.*

When the employee has met this burden, the burden shifts to the employer to prove the affirmative defense that legitimate reasons, standing alone, would have induced the employer to take the same adverse action.[1] *Sheehan v. Department of Navy*, 240 F.3d 1009, 1014 (Fed. Cir. 2001). Importantly, the procedural framework and evidentiary burdens set out in § 4311 are *different* from those in discrimination cases under Title VII, 42 U.S.C. § 2000e-2(a)(1), as described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), despite much overlap. *Id.* Thus, in USERRA actions, there must be an initial showing by the employee that military status was at least a motivating (or substantial) factor in the agency action, upon which the agency must

---

[1]    On page 3 of its motion, Defendant inadvertently misleads the Court by stating that USERRA claims follow the burden shifting analysis applicable in Title VII claims by incorrectly paraphrasing Justice Scalia's decision in *Staub* v. *Proctor Hospital*, 562 U.S. 411, 411 (2001). In *Sheehan* v. *Dept. of Navy*, the Court specifically states, "[t]he procedural framework and evidentiary burdens set out in § 4311. . . are different from those in discrimination cases under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1), as described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and subsequent decisions. 240 F.3d at 1014. Critically, and potentially fueled by Defendant's misperception of the burden shifting framework in a USERRA action, during trial Defendant expressly stated that they "were not proceeding with any affirmative defense." Tr. Day 3, 202: 23-24–203:1-6.  Nonetheless, Defendant's still produced ample evidence that they would have taken the same action despite Plaintiff's protected activity, which failed to convince the jury.

prove, by a preponderance of evidence, that the action would have been taken despite the protected status. *Id.*

Scott Thomas met this burden and produced substantial and competent evidence that *at least two* of the Sheehan factors were present: (1) expressed hostility towards members of a protected class; and (2) there were inconsistencies between the proffered reason for the employer's decision and other actions of the employer.

**2.      Scott Thomas proved, by a preponderance of evidence, that his military status was a motivating factor in his termination because Danielle Fuller had expressed hostility towards members of his class, with knowledge he was a member of that class.**

In facts strikingly similar to the U.S. Supreme Court case of *Staub v. Proctor Hospital*, Plaintiff has sufficiently proved that his direct supervisor was overtly hostile towards military pilots.  562 U.S. 411, 411 (2001).  Here, exactly as in *Staub*, Plaintiff demonstrated that his supervisor, Danielle Fuller, was "overtly hostile to his training" and "complained openly about it."  *See id.* at 414 (finding a motivating factor in a hostile comments made by Plaintiff's two supervisors).  Unlike the cases relied upon by Defendants where expressed hostility was completely absent (*Coffman,* 411 F. 3d 1231and *Loperena v. Scott*, 356 F. App'x 240, 242-43 (11th Cir. 2009)) the record is clear that Danielle Fuller fostered a strong, personal bias against military pilots which a jury found to be a motivating factor in the decision to deny Plaintiff retention in employment.  The evidence of express hostility introduced by Scott Thomas is best understood as two distinct categories: (1) anti-military comments made by Danielle Fuller; and (2) hostile conduct of Danielle Fuller, fueled by her anti-military animus.

### a.   Danielle Fuller expressed hostility through her comments.

As was sufficiently attested to by four distinct witnesses—Scott Thomas, Brian McDonald, and Timothy Larsen and Danielle Fuller herself—Fuller engaged in expressed hostility by routinely making disparaging comments to the military pilots she supervised.

Defendant nonetheless takes the position that "none of the specific statements Plaintiff attributed to Fuller were based on his military service and cannot form the basis for 'expressed hostility.'" DE # 103, at 7.  To the contrary, Fuller routinely made disparaging comments that Civilian Pilots were <u>more qualified for employment with BSO than military trained pilots</u>. *See, e.g.,* Tr. Day 1, 181: 22-25. Fuller believed that "military pilots didn't know the FAA rules" and thought the training they received was subpar to her own.  Fuller openly complained that military pilots took "good paying jobs out of civilian hands" and "military pilots didn't pay for their training." Defendant's argument that these comments are *unrelated* to service in the military strains logic.

By way of illustration, not exclusion, the evidence of Danielle Fuller's expressed hostility presented to the jury before they found Defendant liable for USERRA discrimination included:

1) "—[D]id Danielle ever express why she felt that civilian pilots were more qualified than military pilots? A. She claimed that she spent thousands of dollars on her civilian training, and she felt that it was unfair that we spent zero money on our training. [Trail Tr. Day 1, 183:13-18] (Testimony of Scott Thomas).

2) "[S]he said multiple times that she felt military pilots were incapable of doing the Part 135 missions…" [Trail Tr. Day 1, 181:22-24] (Testimony of Scott Thomas).

3) "[T]he way she treated us and constantly reminding us that she knew people that she felt were more qualified and better equipped for the unit that she would rather have flying there." [Trail Tr. Day 1, 182:16-19] (Testimony of Scott Thomas).

4) "Did she make any other anti-military comments? MS. RODRIGUEZ: Object to the characterization. THE COURT: Overruled. THE WITNESS: Yes. She was -- her biggest complaint to us was that she was always -- what do you want to call it? -- jealous, envious, mad, whatever the case you want to call it, that we, as military pilots, gained our flight experience in the military, and we didn't have to necessarily paid for it. But how we paid for it was putting our lives on the line  and whether we got our qualifications, then we could take those qualifications and apply them to the civilian world. She thought that was -- that was unfair. And those were her words, not mine. Did you consider that to be an anti-military comment? Yes. Did you consider that to be discrimination? Yes. "[Trial Tr. Day 3, 168:16-24; 169:1-7] (Testimony of Brian McDonald).

5) "[S]he just -- she didn't like the way we thought. She didn't like the way we did things. She referenced us a couple of times -- what do you call it? -- tongue-in-cheek or whatever the case may be, she goes -- when we were taking a test at one point in time, she called us dumb because we didn't pass." [Trial Tr. Day 3, 169:12-18] (Testimony of Brian McDonald).

6) "On multiple occasions, she called me dumb, stupid, incapable of doing the job, and incompetent." [Trial Tr. Day 1, 177:14-15] (Testimony of Scott Thomas).

7) "[S]he immediately called me dumb and stupid for not doing it and saying that I needed to fill out the form entirely, and this is why I would [not] sic be competent enough to apply for this unit." [Trail Tr. Day 1, 179:15-18] (Testimony of Scott Thomas).

8) "She also complained about the fact that she'd been in the Part 135 industry for 15 years, and that none of us had -- that the rest of military pilots had zero or little experience in the Part 135 industry, and that we were

pretty much given the same job as her, and we were making the same salary as her. [Trail Tr. Day 1, 183:20-24] (Testimony of Scott Thomas).

9) "A couple of times she complained about the fact that if she ever entered the military, she would be required to go through the military's entire training process on becoming a pilot, and that with 15 years' experience flying aircraft, she would be given a rank of someone -- the same rank of someone that's just starting out flying aircraft." [Trail Tr. Day 1, 184:2-7] (Testimony of Scott Thomas).

10) "[S]he was disrespectful. I mean, she would -- during a break, she'd be like, you military guys, you have such a good life. You just go to flight school and it's free and you become pilots and then -- it was offensive cause I picked up dead people on the battlefield or on the -- in a training battlefield -- it's still dead people, right? -- that are friends of mine; people I know." [Trial Tr. Day 2, 76:5-11] (Testimony of Timothy Larsen).

11) "[S]he had several references that I can recall. One of them was, you know, you military guys all think the same way. . . . [S]he would say, we're not in the military anymore -- you're not in the military anymore. We don't do it that way; we do it in the real world this way." [Trial Tr. Day 3, 168:3-9] (Testimony of Brian McDonald).

12) "Q. Did you ever hear her call Scott stupid? A. Well, specifically when she was talking about his flight records, like, what is he, stupid? He doesn't know how to fill out his logbook right." [Trial Tr. Day 2, 76:19-22] (Testimony of Timothy Larsen).

13) "Q. Do you believe that [Danielle Fuller] treated military pilots differently than civilian pilots? A. Absolutely. Q. You believe that she had a problem with you because of your military status? A. I believe she did." [Trial Tr. Day 2, Page 77:8-25 – 78:1-2] (Testimony Timothy Larsen).

14) "Q. You deny ever calling Scott Thomas stupid; correct? A. I don't remember ever calling him stupid for any reason. Q. So the fact that you don't remember doesn't mean that it didn't happen; correct? A. Yeah. Like I said, I don't remember calling him stupid. [Trial Tr. Day 2, 214:1-5] (Testimony of Danielle Fuller).

15) "[T]here may have been some banter. I don't recall a specific word of stupid or dumb or anything that was in a derogatory fashion." [Trial Tr. Day 2, 214:18-20] (Testimony of Danielle Fuller).

There was additional testimony that Fuller had tried to enlist in the Armed Forces herself. Tr. Day 1, 184:8-10 ("she was unable to because of a heart issue"). Lastly, there was testimony that Fuller fostered a personal bias stemming from a divorce to a military pilot. Tr. Day 2, 77:18-25. As directly articulated by the Supreme Court, "when the company official who makes the decision to take an adverse employment action is personally acting out of hostility to the employee's membership in, or obligation to, a uniformed service, a motivating factor obviously exists." *Staub v. Proctor Hosp.*, 562 U.S. at 417 (emphasis added). It was the function of the jury to weigh conflicting evidence and inferences, and to determine the credibility of the witnesses. *See Shannon*, 292 F.3d at 715. Having done so, the jury found that Fuller had expressed hostility and fostered anti-military animus, which they found to be a motivating factor in the adverse action taken against Plaintiff.

### b.  *Danielle Fuller expressed hostility through her conduct*

Plaintiff did not rest his case on the plethora of anti-military comments made by Fuller. Plaintiff also introduced evidence that Fuller engaged in expressed hostility in the form of conduct. Said conduct, included, but not was not limited to: 1) refusing to give plaintiff time off to attend a VA medical appointment,[2] 2) failing to provide Plaintiff a date certain to produce his official flight records that BSO *knew* contained confidential information,[3] 3) failing to provide Plaintiff with reasonable notice to produce his "official" log books, that BSO *knew* were in a different state,[4] 4) hyper scrutinizing Plaintiff's flight records with discriminatory animus and confirmation bias,[5] 5) refusing to ask Plaintiff about the perceived discrepancies in his flight records,[6] 6) refusing to investigate if any of the discrepancies had been previously disclosed, 7) failing and/or refusing to coach Plaintiff,[7] 8) recommending Plaintiff's termination based on false pretenses (including a false claim that he did not provide proof of R-22 currency hours),[8] and 9) maliciously reporting plaintiff to the FAA.[9]

---

[2]     Trial Tr. Day 1, 185:4-9 (Testimony of Scott Thomas).
    "I'm required by the VA or Veteran's Administration to do a yearly physical . . . I informed her that this appointment was coming up in February, and that I would like to take a day off in order to do this medical appointment. She told me that I would not be able to do that."

[3]      Trial Tr. Day 1, 157:11-13 (Testimony of Scott Thomas) ("Did anybody from BSO tell you that you had to turn over your official logbook? No sir, they did not."); *see also* Trial Tr. Day 2, 107:4-13] (Testimony of Brian Miller) (Q. Did you tell him exactly when he needed to have those by? A. No. Q. Did you tell him to whom he needed to tender those to? A. No."); Trial Tr. Day 3, 143:21-23] (Testimony of Tammy Nugent) (Q. Do you recall ever telling Scott Thomas that he had to produce his flight records on a certain day? A. No); Trial Tr. Day 3, 144:1-3 (Testimony of Tammy Nugent) ("Was Scott Thomas given a date or a time at which time to produce his flight records? A. Not by me.").

[4]     *See* Tr. Day 2, 21:22-25–22:1.

[5]     Tr. Day 2, 223:6;18 (Testimony of Danielle Fuller) ("Q. [F]rom you being released at three o'clock until the time that you sent this document at 6:19, you were able to review his application; correct? A. Yes. Q. You were able to review his pilot experience form; correct? A. Yes. Q. And you were able to review his flight records; correct?" A. Yes.")

[6]     Trial Tr. Day 3, 18:9-12 (Testimony of Chief Pilot Danielle Fuller) ("Prior to making that decision and sending the e-mail, did you discuss any of the discrepancies that you found in the flight logbooks with Scott? A. No.")

[7]     Trial Tr. Day 3, 15:21-23 (Testimony of Chief Pilot Danielle Fuller) ("I was not his supervisor to help coach him or correct errors that he made with records coming into the program.").

[8]     *See* Tr. Day 3, 57:7-11.

[9]     Trial Tr. Day 2, 179:2-25–180:1-4 (Testimony of Danielle Fuller)
    "Q. [What] specifically did you bring to the attention of the FAA? A. The concerning one was the tail number of the R22 that was a glider, and the flight to New Jersey. Those types of entries are not accurate; therefore, it classifies as falsification . . . . Q. What happened next? A. The FAA advised me that in order to take any action against Mr. Thomas, he would have to falsify a record for an application for a pilot certificate to the FAA. The falsification has to come to the FAA, and I was told that by releasing him from BSO, that's the only jurisdiction or the only applicability there."

It should be noted that many of the facts that give rise to hostile conduct also evidence inconsistencies in the proffered reason for the termination and other actions taken by the employer. However, it has always been the position of Plaintiff that "had it not been for the personal animus of Danielle Fuller" BSO could have *easily* verified his flight records.  Scott Thomas produced ample evidence that Fuller's review of his records was tainted with animus and confirmation bias.  Said differently, Scott Thomas produced evidence that Fuller interpreted the information in a way that confirmed her existing belief: Scott Thomas was unfit for employment with BSO, based at least in part, on his military service.  Taking a few examples listed above, Scott Thomas produced evidence that allowed a reasonably jury to reasonably infer:

1) Absent Danielle Fuller's hostility, Plaintiff would have been given a date certain to produce his flight records; BSO's failure to provide Plaintiff with this information allowed for a jury to reasonably infer that the lack of notice demonstrated hostility (and inconsistencies).

2) Absent Danielle Fuller's hostility, Plaintiff would have been given more than three hours to produce his flight records; Danielle Fuller's failure to provide reasonable notice allowed a jury to reasonably infer that Danielle Fuller wanted and expected Plaintiff to fail, constituting hostility (and inconsistencies).

3) Absent Danielle Fuller's hostility, Fuller would have reasonably inquired if any discrepancy she found had been previously disclosed to BSO before recommending Plaintiff for termination; Fuller's failure to do so allowed a jury to reasonably infer that the lack of investigation constituted hostility (and inconsistencies).

4) Absent Danielle Fuller's hostility, Fuller would have spent more than 3 hours and 19 minutes reviewing Plaintiff's flight records; Fuller's fleeting review allowed a jury to reasonably infer that Fuller failed to conduct a thorough and neutral review and quit when she "found what she needed" to effectuate his termination, which constituted hostility (and inconsistencies).

5) Absent Danielle Fuller's hostility, Fuller would have asked Plaintiff about the discrepancies she found, if she undertook a through and neutral investigation, before recommending him for termination; a jury reasonably believed Fuller's failure to do so constituted hostility (and inconsistences).

These facts allowed a jury to infer that Danielle Fuller engaged in the aforementioned conduct with the intent, or at least partial motive, to effectuate Plaintiff's termination.  *See Staub,* 562 U.S. at 417 (Intentional torts . . . generally require that the actor intended 'the consequences' of an act, not simply the act itself."). Plaintiff carried this burden, and a jury found Danielle Fuller had the scienter required to be liable under USERRA.  *See id*. at 419.  While the issue of successor liability will be addressed in full below, the Supreme Court has stated unequivocally,

So long as the agent intends, for discriminatory reasons, that the adverse action occur, he has the scienter required to be liable under USERRA. . . .  So long as the agent intends, for discriminatory

> reasons, that the adverse action occur, he has the scienter required to be liable under USERRA. And it is axiomatic under tort law that the exercise of judgment by the decisionmaker does not prevent the earlier agent's action (and hence the earlier agent's discriminatory animus) from being the proximate cause of the harm. Proximate cause requires only "some direct relation between the injury asserted and the injurious conduct alleged.

*Id.* at 419.  When the jury had doubts as to whether they could hold BSO liable for the expressed hostility they readily recognized in Danielle Fuller, the question was rightfully decided by this Court based on the aforementioned precedent.   Thus, Scott Thomas's jury verdict is supported by sufficient evidence that expressed hostility was present and must be upheld.  *See, e.g., Shannon*, 292 F.3d at 715 ("The jury's verdict must stand unless 'there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.'").

> **3.** **Scott Thomas proved, by a preponderance of evidence, that his military status was a motivating factor in his termination because of the inconsistencies in the reasons used to justify his termination by BSO.**

Plaintiff also elicited substantial testimony that there were inconsistencies in the proffered reason for denying Plaintiff retention in employment, and other actions taken by Defendant BSO. Defendant's stated reasons to release Plaintiff from employment are: (1) Plaintiff presented "no verifiable flight experience," and (2) Plaintiff had *major* discrepancies between his application, pilot experience form, and electronic logbook.   During trial, Scott Thomas produced ample evidence to the contrary. In addition to proving inconsistencies, the evidence simultaneously supports the conclusion that Defendant's proffered reason is a clear pre-text, despite the lack of burden imposed on Plaintiff to prove same under USERRA.  *See supra* n. 1.

> **a.** ***BSO's claim that Plaintiff had "no verifiable flight experience" is inconsistent with other actions taken by Fuller and BSO***

BSO largely rests its claim that Plaintiff had 'no verifiable flight experience,' on the fact that Plaintiff never provided his "official" logbooks to BSO.  Defendant claims Plaintiff was on notice that he would need to provide his "official" logbooks during his interview, despite never being told when, where, and to whom, he needed to produce same. Defendant purports that Plaintiff's failure to produce same—with no more than a few hours of notice—somehow proves

that Plaintiff's flight experience was *unverifiable*. During Trial, Plaintiff produced ample evidence to the contrary, demonstrating inconsistencies and pretext. Specifically, Plaintiff produced evidence that (1) BSO verified his flight experience at the time he was hired; (2) Plaintiff's flight experience was verifiable through his electronic logbook, which was acceptable to the FAA and *official* for all intents and purposes; and (3) Plaintiff's flight experience was verifiable through his "official" logbook *if* Plaintiff was only given reasonable time to produce same for review by BSO personnel with appropriate clearance.

i.    <u>BSO sufficiently verified Plaintiff's flight experience at the time he was hired, which is inconsistent with BSO's claim Plaintiff's flight experience "could not be verified."</u>

To believe Defendant's argument—that Plaintiff's experience "could not be verified"—is to believe the Defendant BSO was *unable* to verify Plaintiff's flight experience before offering him a job to fly helicopters.  It would also mean that BSO allowed Plaintiff to work in excess of a month, without verifying that he had the requirements to lawfully fly.  Such a position simply cannot be reconciled with the facts on record.

The trial record is clear that Plaintiff tendered his electronic logbook during the interview process, sufficient to secure an offer of employment.  *See* Tr. Day 1 129:16-19; Tr. Day 3 144:1-6.  Both Plaintiff and Larsen testified that their electronic logbooks were sufficient to establish their respective flight times, and secure employment. Tr. Day 1, 157:16-25, 158:9-11, Tr. Day 2 69:5-8.  Larsen also tendered electronic flight records using an I-pad during his interview which BSO took no issue with.  Tr. Day 2, 68:13-16. These facts are inconsistent with the position of Brian Miller who testified "I don't accept electronic logbooks.  It's not anything [t]hat I consider official," Tr. Day 3, 93:18-24. Miller's testimony is not only inconsistent with that of Scott Thomas and Timothy Larsen; Miller's testimony is inconsistent with the undisputed fact that both pilots were irrefutably hired by Defendant BSO.

In addition to producing his electronic logbook, Plaintiff provided BSO with a pilot certificate, a medical certificate, and a valid photo ID. *See* Tr. Day 1, 103:8-12. Miller corroborated that Plaintiff submitted *some document*, which he "did not recall," that was sufficient to confirm Plaintiff had 1000 hours of PIC time, 500 Hours of rotorcraft helicopter turbine hours, 250 hours of night flight time, 100 hundred hours of cross-country time, and 50 hours of rotor craft helicopter time within the previous 12 months.  *See* Tr. Day 3, 104:12-25; 105:1-3; 94:6-8 ("Obviously, he had something because I did check that he had those house; so whatever he showed me, those hours were there."). Moreover, Defendant's own Exhibit [Def. Ex. 9] confirms that these times were verified by BSO, evidenced by Miller's check mark on each requirement.

Interestingly, Miller testified that whatever Plaintiff presented was sufficient to verify his flight experience "for the purpose of the flight test, yes; for the job, no." Tr. Day 3, 93:6-10. According to Miller, he made that clear to Plaintiff. Defendant overlooks the counter implication that according to Miller, *this was clear to BSO*.  Again, if BSO is to be believed, BSO *must admit* that they allowed Plaintiff to work a dangerous and skilled job—that BSO believed he was *unfit to hold*—in excess of five weeks.   Based on the above, a jury inferred that there were inconsistencies in BSO's story; a jury inferred that Defendant's proffered reason was a pretext.

These facts are sufficient to support the jury's verdict, "even if it is possible to draw a contrary conclusion from the same evidence."  *E.g.*, *Johnson v. Paradise Valley Unified School Dist.*, 251 F. 3d at 1222, 1227 (2001).  As the Eleventh Circuit has repeatedly opined, "it is the jury's task—not the court's—to weigh conflicting evidence and inferences and determine the credibility of witnesses." *Shannon*, 292 F.3d at 715.  After the conflicting evidence was presented to a jury, the jury was unconvinced by Defendant's witnesses and found Defendant liable, based, at least in part, on inconsistencies in Defendant's employment decision and other actions taken.

        ii.      <u>At all relevant times, Plaintiff's flight experience was verifiable through his electronic logbooks, which is inconsistent with BSO's claim Plaintiff's flight experience "could not be verified"</u>

There was a lot of testimony as to whether an electronic logbook was "official" for the purpose of flight time verification.  BSO claims that Plaintiff's electronic logbook was an insufficient substitute to a paper logbook and for that reason, Plaintiff's flight experience "could not be verified."  Tr. Day 3, 93:18-24 ("I don't really consider the logbooks sufficient. . . it needs to be the actual logbook with the signatures.").  During Trial, Scott Thomas produced ample evidence to the contrary, demonstrating inconsistencies and pretext.

Two decorated military pilots with *decades* of helicopter flight experience amongst them—Thomas and Larsen—both testified that an <u>electronic logbook met FAA standards and contained verifiable flight experience</u>.  According to Scott Thomas, an electronic logbook is an official logbook.  Tr. Day 2, 42:4-8. ("I called my paper logbooks my official logbook, but official logbooks can also mean an electronic logbook.").  He further explained, "there are no [FAA] requirements for logging flight times."  Tr. Day 1, 157:19-25.  It was his understanding, after flying helicopters for more than 14 years, that "a logbook is only used to show currency in an aircraft," and was readily able to explain the relevant FAA rules to the jury.  *See id.*

According to Timothy Larsen, an electronic logbook is an official logbook.  *Id.* at 69:5-8.  Larsen has 26 years of helicopter flight experience and has served as an instructor at Flight Safety International for several years.  *Id.* at 65:21-23; 64:1-2.  Larsen testified that he hasn't carried a paper logbook for many years, and "a lot of pilots do that." *Id.* at 69:6-8.  According to Mr. Larsen, "the FAA is very vague about how you fill out your logbook" and that "making a mistake in there would not be the end of the world." *Id.* at 76:23-25. After the conflicting evidence was presented to a jury, the jury found Defendant liable for violating USERRA, at least in part, based on inconsistencies in Defendant's employment decision and other actions taken by Defendant.

      iii.    Plaintiff's flight experience was verifiable through his "official logbook," which Scott Thomas was *never* asked to produce, which is inconsistent with BSO's claim that Plaintiff's flight experience "could not be verified"

Defendant rested its defense, in large part, on Plaintiff's purported 'failure to obtain' his official records following his interview.  During trial, Defendant insinuated Plaintiff "sat around" instead of acting proactively to obtain a record he knew BSO needed him to produce, *eventually*. Defendant's argument overlooks the reality that <u>Plaintiff's "official" logbook could not have been turned over to just anyone at BSO; the reviewer needed a certain level of security clearance</u>.

The reason that Plaintiff kept a separate electronic flight logbook was to protect the covert missions that Plaintiff flew. Tr. Day 1, 128:4-10. Plaintiff disclosed this at the time of his interview and gave BSO notice that his "official" logbook was stored in a secure facility in Virginia.  *Id.* at 157:1-10. Having notice that Plaintiff's "official" log contained confidential information, needed special clearance to be reviewed, and that it was kept in a different state, it was reasonable for Plaintiff to expect he be given advance notice as to when, where, and to whom, he should produce same. [10] Absent said notice, Plaintiff was *physically unable* to produce his "official" records to BSO; doing so would risk national security and violate the terms of his confidentiality agreement. Tr. Day 1, 128:18-21, 130:9-13. Defendant knew this.

BSO emphasized that Plaintiff had notice he would need to produce same at *some* ambiguous point in time in the future. However, <u>the record is undisputed that such "future date" did not occur till January 10, 2021.</u> Tr. Day 1, 187:4-10; Tr. Day 2. 15:11-14, 21:15-21.  On that future date, the record is undisputed that Plaintiff was given no more than a few hours of advance notice. Tr. Day 2, 76:23-25–77:1-5. On that future date, the record is undisputed that Plaintiff was already at work when he received the request. *Id.* On that future date, the record is undisputed that Plaintiff told Fuller what he had already told BSO: his "official" logbook was in VA, but he was happy to obtain same.  Tr. Day 2, 21:22-25–22:1. Lastly, the record details that Fuller <u>did</u>

---

[10]     Both Brian Miller and Chief Nugent testified under oath that they did not tell Plaintiff when, where, or to whom he would need to produce his flight records to, either at the time of his interview or any time thereafter.  Trial TR Day 3 107:1-13, 143:18-23.

14

not ask Scott Thomas to obtain same and made no objection to the electronic form of his records. In fact, she told him "it would not be necessary" then used same to justify his termination. Tr. Day 2, 21:22-25, 22:1.

During Trial, Plaintiff produced sufficient evidence that if BSO wanted to verify his hours, BSO would have either (1) given advance notice; or (2) told Plaintiff that his electronic records were insufficient and asked him to produce his "official" logs.  If *either* of those two events happened, BSO could have *easily* verified Plaintiff's hours, which is inconsistent with their claim that Plaintiff was fired because his flight hours "could not be verified."  After the conflicting evidence was presented to a jury, the jury was unconvinced by Defendant's proffered reason and found Defendant liable for violating USERRA, at least in part, based on inconsistencies in Defendant's employment decision and other actions taken by Defendant.

### b. BSO's claim that Plaintiff had "major" discrepancies in his flight documentation is inconsistent with other actions of BSO

At all relevant times, BSO has alleged that Plaintiff had "*major* discrepancies" between his application (resume), his pilot experience form, and his flight logbook that justified his termination.  Tr. Day 2, 170:8, 223:19-21; Tr. Day 3, 33:24-25, 34:1. After a verdict in Plaintiff's favor, Defendant has moved the goal post and now claims that Plaintiff only had "discrepancies" amongst and between same.  *See* DE #103, at 5.   During trial, Plaintiff produced sufficient evidence that no major discrepancies existed, evidencing inconsistencies in BSO's proffered reason and demonstrating pretext.[11] Tr. Day 1, 194:22-23, 198:18-20.

---

[11]        *See* Pl. Tr. Ex. 4 (Pl. Resume) *but see* Pl. Tr. Ex. 9 (Pl. Pilot Experience Form) *and* Pl. Tr. Ex. 10 (Pl. Electronic Logbook). During Trial, Plaintiff demonstrated that the numbers listed on Plaintiff's Resume, Pilot Experience Form, and Electronic Logbook are close to identical, casting doubt on Fuller's recommendation based on "major discrepancies" between same.  Plaintiff's resume, pilot experience form, and logbook list Plaintiff's total flight times as 2080, 2081, and 2080.8 respectively; they list his total night vision google times as 530, 531, and 530.9 respectively.  Plaintiff's resume and logbook list total combat hours as 950 and 957 respectively.  Plaintiff's pilot experience form and logbook list turbine times as 2029 and 2029.5 respectively; they list actual instrument times as 17; they list cross country times as 1610 and 1606.7 respectively; they list cross country hours as 411 and 411.2 respectively.  Under the weight of cross-examination, Fuller admitted that these numbers do not constitute major discrepancies.

After Plaintiff's counsel walked through each document in admittedly pain-staking detail, it became clear that Fuller's only plausibly argument of a discrepancy revolved around Plaintiff's Pilot in Command Time, or "PIC" hours.  Plaintiff's resume, pilot experience form, and logbook listed Plaintiff's PIC hours as 1500, 1433, and 1431 respectively. At all relevant times, Fuller believed that this was an intentional falsification of Plaintiff's flight records.[12] Tr. Day 3, 11:18-19.  During Trial, Thomas produced ample evidence to the contrary.

Plaintiff produced *several* facts that demonstrated his PIC hours had been understandably under reported.  Specifically, Plaintiff disputed Fuller's assertions by proving that the PIC hours he had listed on his flight records were substantially under reported; logic follows that if his logbook was underreported (1431)— relied on in completing his pilot experience form (1433)— then his actual PIC time would align with the number listed on his resume (1500).  Tr. Day 3, 53:6-13.  It came out during Fuller's cross that Plaintiff did not include the PIC times on simulator line entries, which caused his logbook PIC time to be *justifiably* under reported. *See id.* Had Plaintiff included same, his PIC time would have been 1,481.  *Id.*; *see also* Pl. Tr. Ex. 10. Thus, the actual differential between the PIC time reported on his flight documentation would have been 19 hours and not 69.  *See id.* Plaintiff would have been happy to explain same to Fuller, or to BSO, had he only been asked to justify the discrepancy at any point before his termination.

To illustrate, Plaintiff used Fuller's *own notes* to demonstrate his PIC hours were understandably underreported.  Remarkably, it was Fuller herself who discovered that Plaintiff's logbooks undercounted his PIC hours; Fuller made this discovery *before* she recommended Plaintiff for termination based on same. Fuller used a red pen to circle each time Plaintiff failed to log a PIC hour.  *See* Pl. Ex. 12. Plaintiff's counsel went line by line through each hour Fuller

---

[12]     Fuller explained in her testimony that a falsification was an intentional act and that she believed Mr. Thomas was intentionally lying on his resume by inflating his PIC hours. Fuller additionally claimed that by falsifying his resume, Plaintiff prevented other more qualified candidates from potentially being hired.  *See* Trial Tr. Day 3, 11:18-19.

had circled, demonstrating an underreporting of 50 PIC hours. Fuller could have easily asked Plaintiff to add the additional PIC time, not initially included, to bridge the gap and resolve the issue in Plaintiff's favor. Tr. Day 3, 50:5-14. Instead of using the mistake as a shield to defend Mr. Thomas, she used it as a sworn to justify her recommendation for his termination. Fuller's refusal to ask Plaintiff about his PIC, investigate further, or resolve the inference in Plaintiff's favor, allowed a jury to infer that Fuller's actions were fueled by discriminatory or retaliatory animus.

Plaintiff additionally proved that Fuller's inability (or refusal) to understand how PIC hours are logged in the military, fueled her misperception that Plaintiff had "falsified" his hours. Tr. Day 1, 147:16-25, 148:12-19. PIC hours are calculated differently in the military and civilian worlds. *Id.* at 148:12-19; Tr. Day 2, 66:10-25, 67:1-2. Plaintiff and Larsen both testified that military <u>PIC time is calculated much more conservatively</u>. Tr. Day 1, 150:20-25; Tr. Day 2, 66:10-18. Thus, the PIC time listed in Plaintiff's electronic logbook was a conservative estimate based on military standards that was understandably, and unintentionally, underreported.

Importantly, Fuller admitted, under oath, that she did not know how the military calculated PIC.  Tr. 3, 54:7-9 More importantly, Fuller never took the time to learn the difference.  Fuller's failure to undertake efforts to *understand* Plaintiff's flight records is inconsistent with her unwavering assertion that Plaintiff had "falsified" his flight records.  The fact that Fuller did not know, and did not care, how military PIC time was logged, is further proof of her discriminatory animus.  These facts allowed a jury to reasonably infer that there were inconsistencies in Fuller's assertion Plaintiff had "major discrepancies" in his flight records.

When a thorough review of Plaintiff's three flight documents yielded no clear discrepancies—and could not justify Plaintiff's termination—BSO argued that Plaintiff's logbook had an incorrect tail number. Plaintiff produced ample evidence as to why this proffered reason was also inconsistent and pretextual. Namely, Plaintiff produced evidence that the mistake was

*intentional*. As attested to by FAA Attorney Carol Might, Plaintiff's inversion of the Tail number was a deliberate tactic, technique and procedure (TTPs), used by the FBI to protect the hostage rescue squadron. Tr. Day 2, 116:8-19. Ms. Might confirmed that Plaintiff's flight records employed TTPs deliberately and correctly. Tr. Day 2 117:2-4.

During cross, Fuller admitted that she did not know what TTPs were. Tr. Day 3, 46:19-24. Instead of investigating the cause of the discrepancy, Fuller incorrectly assumed that the inversion—employed by Plaintiff to protect national security—was an error that constituted "falsification." *Id.* at 51:1-4. Again, Fuller's failure to undertake efforts to understand Plaintiff's flight records is inconsistent with her unwavering assertion that Plaintiff had "falsified" his records. At all relevant times, Fuller could have asked Plaintiff about the discrepancy and would have readily been told what a TTP was. Fuller could have proactively verified same with the FAA; instead, BSO learned what a TTP was when Carol Might testified that Plaintiff's logbook had accurately listed same. Based on the above evidence, a jury was able to reasonably infer that there were inconsistencies in BSO's story, namely, that Plaintiff had "major discrepancies" in his flight documentation. Because the jury's verdict is supported by substantial and competent evidence, it must be upheld.

### 4. The issue of Successor Liability was Rightfully Decided and Submitted to the Jury

Jury deliberations paused for a brief moment to answer the following legal question: "if Danielle Fuller is discriminatory, does that make BSO Discriminatory?" [*See* DE #91]. After hearing argument of both counsel, this Honorable Court properly submitted the answer to the jury: "[y]es, if you find that either (1) Danielle Fuller was the decision maker; or (2) the decision maker rubber-stamped the decision." This question was rightfully decided, properly submitted, and Defendant has failed to raise any objectional grounds as to this holding. Moreover, the record

is supported by competent and sufficient evidence that Danielle Fuller was *either* the decision maker, or, that Tammy Nugent blindly "rubber-stamped" the decision.

There was sufficient evidence that Danielle Fuller was the decision maker in relation to Scott Thomas's employment. In fact, Defendant's own counsel repeatedly referred to Danielle Fuller as "the boss" when she was cross examining McDonald. In attempting to justify Fuller's refusal to take her military subordinate's opinions under advisement *because of her position of authority*, BSO Counsel asked:

> Q:    So she, [Danielle Fuller], was the boss; wasn't she?
> A:    Initially, no, but then she was promoted to chief pilot, yes.
> Q:    And as the boss, it was her discretion to determine what methods and procedures were going to be followed with regard to the implementation of the Part 135, correct?
> A:    Yes, ma'am.
> W:    And she didn't have to take your recommendations or advice, did she?
> A:    No, ma'am.

Tr. Day 3, 190:14-25. While an attorney's question are not evidence, McDonald's answers are.

The record is also replete with evidence that Danielle Fuller was the decision maker in relation to her unit. Chief Tammy Nugent, Danielle Fuller's direct supervisor, testified that Fuller was had the discretion and autonomy to set BSO standards as to what type of logbooks needed to be produced during probationary employment. *Id*. at 143:3-17. In relation to these types of decisions, Nugent expressly said it was "whatever the chief pilot or the director of operations advised." *Id*. The record is clear that Fuller was empowered to pick the date she asked her subordinates to bring in their "official" logbooks; Fuller was the one who gave no more than a few hours of advance notice; Fuller was the one who decided it was unacceptable Plaintiff could not produce same in that time frame; Fuller was the one who conducted the review; Fuller was the one who determined Plaintiff "falsified his flight records"; Fuller was the one who recommended Plaintiff for termination; Fuller was the one who reported Plaintiff to the FAA.

There is equal evidence to support a finding that Tammy Nugent rubber-stamped Danielle Fuller's discriminatory decisions. When asked about her role in the day-to-day supervision of the

19

pilot class, Nugent testified that she "relied on [her] chief pilot" which at that time was Danielle

Fuller.  Tr. Day 3, 125:17-25 (emphasis added).  In fact, Chief Nugent was essentially *forced* to

rely on the opinion of Danielle Fuller because she was not a pilot.  *Id*. at 145:11-14.  Later, Nugent

reiterated that "I have to rely on my experts to say [what's] not right in the world of aviation."  *Id*.

at 148:16-18.  While Nugent feigned equal reliance on Miller and Madrigal, later testimony cast

doubt on that statement.  *See id*. at 145:12-17.  Nugent later "could not recall" if Miller had any

involvement regarding Scott Thomas's employment following Plaintiff's interview [*id*. at 145:19-

23]; Nugent also confirmed that Sergeant Madrigal worked on the law enforcement side of BSO

and had minimal daily supervision of the chief pilot.  *Id*. at 145:24-25–146:1. More importantly,

Madrigal did not testify to refute same despite his interest in continued employment with BSO.

Defendant nonetheless purports that "Nugent did not delegate fact-finding to Fuller.

Instead, she fully reviewed the record with Madrigal to ensure . . . the decision was entirely

justified, apart from Fuller's recommendation." DE #103, at 9. Defendant's argument is

incongruent with Nugent's sworn testimony that states:

> Q:    Could you have taken the time to figure out on your own why it was that those discrepancies were
>       there?
> A:    I could have, but I wouldn't know what I was looking at or for.

Tr. Day 3, 148:19-23. Assuming Defendant's undertook a through and independent investigation,

which they did not, this fact alone cannot absolve Defendant of liability. As the Supreme Court

has directly opined, "we [do not] think [an] independent investigation somehow relieves the

employer of 'fault.' The employer is at fault because one of its agents committed an action based

on discriminatory animus that was intended to cause, and did in fact cause, an adverse employment

decision."  *Staub*, 462 U.S. at 421. As additionally opined, "the decisionmaker's exercise of

judgment [here, Nugent and Madrigal] does not prevent the earlier agent's action from being the

proximate cause of the harm." *Id*. Thus it matters not if Defendant's argument is believed—namely

that BSO engaged in an independent investigation—because it is devoid of legal effect. *See id*.

D.    A REASONABLE JURY FOUND DEFENDANT BSO LIABLE FOR RETALIATION IN VIOLATION OF USERRA BASED ON COMPETENT AND SUBSTANTIAL EVIDENCE

Based on substantial and competent evidence, a jury found Defendant BSO liable for USERRA Retaliation, 38 U.S.C. 4311(b), which makes it unlawful for an employer to take an adverse employment action against an employee who has taken action to enforce a protection under USERRA, as follows:

> (b)  An employer may not discriminate in employment against or take any adverse employment action against any person because such person (1) has taken an action to enforce a protection afforded any person under this chapter, (2) has testified or otherwise made a statement in or in connection with any proceeding under this chapter, (3) has assisted or otherwise participated in an investigation. Under this chapter, or (4) has exercised a right provided for in this chapter.  The prohibition in this subsection shall apply with respect to a person regardless of whether that person has performed service in the uniformed services.

38 U.S.C. 4311 (b); *Coffman*, 411 F.3d at 1234-35. To establish a *prima facie* case under the anti-retaliation provision of USERRA, Scott Thomas was required to prove, by a preponderance of the evidence, that: "(1) he engaged in a protected activity; (2) he suffered an adverse employment action; (3) there was a casual connection between the protected activity and the adverse employment action."  *Holt v. Hydraulic Hose of Hillsborough, LLC*, No. 8:18-CV-2082-T-33CPT, 2018 WL 7457682, at *2 (M.D. Fla. Nov. 9, 2018).

As stated by this Honorable Court in denying Defendant's Motion for Summary Judgment, "Defendant will have the opportunity at trial to attempt to meet its burden of proving that 'it would have taken the same action in the absence of the employee's protected action.'" DE #54 (quoting *Jones*, 703 F. App'x at 980.) During trial, Defendant failed to carry that burden, and a jury found Defendant liable USERRA retaliation. Defendant now challenges that verdict, alleging that "Plaintiff's testimony failed to establish that he engaged in any action to enforce a protection afforded under USERRA."  DE #103, at 13. Moreover, Defendant argues that "even if Plaintiff could show that he engaged in a protected activity, he still failed to show that the protected activity was a motivating factor in BSO's decision that he did not meet probationary

standards." *Id.* Both of Defendant's arguments are without merit, overlook the sworn testimony of Timothy Larsen, Brian McDonald, Tammy Nugent, and Jason Smith, and improperly asks this Court to invade the province of the jury. Because Plaintiff's verdict is supported be substantial and competent evidence, it must be upheld.

**1. The Jury Verdict is Supported by Sufficient Evidence that Plaintiff Engaged in a Protected Activity.**

The record is replete with evidence that Scott Thomas issued lawful complaints—to many people at many different times—about the anti-military comments and biases he was subjected to by Civilian Pilot Danielle Fuller. Plaintiff first engaged in a protected activity when he objected to Fuller's comments to her directly, in accordance with the traditional chain of command.

When Fuller made comments that "she knew better qualified civilian pilots," Plaintiff objected.[13] When Fuller called Plaintiff stupid and dumb, based in part on his lack of part 135 knowledge, Plaintiff objected.[14] When Fuller called Plaintiff incompetent and incapable of doing Part 135 missions, Plaintiff objected.[15] When Fuller denied Plaintiff time off to attend his VA appointment, Plaintiff objected.[16] Plaintiff's testimony is corroborated by both Larsen and McDonald.[17] By so doing, Plaintiff exercised a right afforded by USERRA, in an effort to enforce protections afforded by USERRA. *See* 38 U.S.C. 4311 (b)(1)(4).

When Plaintiff's complaints fell upon deaf ears, Plaintiff escalated his complaints to BSO employee Chief Smith.[18] As corroborated by McDonald—who joined Plaintiff in issuing the Complaint—Plaintiff specifically complained about Fuller's anti-military animus. Under oath, Smith recalled the complaint but purported it was about scheduling or an equally unrelated matter;

---

[13] Tr. Day 1 185:20-22, 186:12-14.
[14] *See* Tr. Day 1 181:9-20, 185, Trial Tr. Day 2 80:2-6. Trial Day 3 168:3-9
[15] *See* Tr. Day 1 181:9-20, 185, Trial Tr. Day 2 80:2-6. Trial Day 3 168:3-9
[16] *See* Tr. Day 1, 85:4-16; Trial Tr. Day 2 80:11-14
[17] *See* Tr. Day 2, 79:15-25, 81:2-6; Trial Day 3 171:2-14.
[18] *See* Tr. Day 1, 200:22-25, 201:14-20.

later, Chief admitted that his recollection was murky at best.[19]   While Nugent feigned being
unwaveringly certain that the complaint was "not about discrimination,"[20] the record is undisputed
that Nugent came to meet with the pilots the very next day.[21]   While logic dictates that a BSO
Chief would not need to publicly address a "scheduling" issue on an emergency basis, the record
is clear that Plaintiff again complained in this setting.   When Nugent met with the Pilots on
January 18, 2019, Plaintiff detailed the discriminatory conduct of Danielle Fuller, including her
refusal to allow him to attend his scheduled VA appointment.[22]   Even if Plaintiff's numerous
complaints to Fuller, and joint complaint to Smith, somehow fail to rise to the level of protected
activity, Plaintiff's Jan. 18th complaint irrefutably did; this complaint (and the one to Smith) not
only enforces a protection afforded by USERRA, it is clear participation in/assistance of an
investigation. *See* 38 U.S.C. 4311 (b)(1)(3).

Thomas, Larsen, and McDonald all testified that they believed Scott Thomas was
retaliated against for complaining about military discrimination by Daniele Fuller.[23]   In fact, both
Larsen and McDonald testified about fearing Fuller's retaliation in the context of their own
employment with BSO. McDonald resigned his employment with BSO, in large part due to
Danielle Fuller.[24]   He feared that telling BSO why would "burn bridges" so he chose not to.[25]
Larsen additionally testified, "I [came] to realize that Ms. Fuller would be retaliatory.   If she
didn't agree with you, she took it as a personal attack."[26]

---

[19]      Tr. Day 4, 16:8-12, 18:12-14.   The record is also clear that Smith suggested that Nugent meet with the team, following
Thomas and McDonald's complaint.   Tr. Day 3, 130:11-174–131:6-7.
[20]      Tr. Day 3, 149:19-21 ("I never heard the words discrimination"); *see also id*. at 151:4-7 ("I never heard the word
discrimination and as I said prior, that is a very serious accusation …"); *id*. at 152:7-9, 160:21-22.
[21]      *See* Tr. Day 1, 202:23-25
[22]      *See* Tr. Day 1, 204:5-9;  Tr. Day 2, 80:11-14, 82:23-25, 83:1-7.
[23]      *See* Tr. Day 2, 83:1-12; Tr. Day 3, 177:6-11.
[24]      *See* Tr. Day 3, 176:10-25–177:1-11. Brian McDonald testified that he resigned from employment with BSO, in part on
the actions of Fuller.  He specifically testified, "there's a lot of politics involved, and things were done in a biased way . . . I did
not feel comfortable in the conditions [after explaining aviation was a dangerous job] for fear of any type of persecution from Ms.
Fuller, specifically Ms. Fuller; so therefore, I resigned."  *Id*.
[25]      *Id*.
[26]      Tr. Day 2, 74:7-9.

The jury is supported be sufficient and competent evidence that Plaintiff engaged in a statutorily protected activity. These facts are sufficient to support the jury's verdict, "even if it is possible to draw a contrary conclusion from the same evidence." *E.g.*, *Johnson*, 251 F. 3d at 1222. Defendant amply disputed that Plaintiff engaged in a protected activity; in fact, two BSO managers purported that Plaintiff's complaints never took place. The jury, being in the best position to determine credibility and weigh convicting evidence, proved unconvinced by BSO's witnesses and recognized Plaintiff engaged in a protected activity.

**2. The jury verdict is supported by sufficient evidence that Scott Thomas suffered an adverse employment action**

As this element is not in dispute, and Defendant has not raised an argument as to this element, Plaintiff will reserve addressing same for the purposes of preserving space.

**3. The jury verdict is supported by sufficient evidence that there was a causal connection between the protected activity and the adverse employment action.**

As the Eleventh circuit has directly opined, "[i]n the context of [USERRA] employment retaliation cases, a plaintiff's burden to prove causation can be met by showing a close temporal proximity between the statutorily protected activity and adverse employment action." *Brown v. Houser*, 129 F. Supp. 3d 1357, 1379 (N.D. Ga. 2015). As further explained, "in the absence of close temporal proximity, [a Plaintiff] must 'offer additional evidence to demonstrate a causal connection, such as a pattern of antagonism or that the adverse action was the first opportunity for the employer to retaliate. *Id*. (citing *Thomas v. Cooper Lighting, Inc*., 506 F.3d 1361, 1364 (11th Cir.2007)). Lastly, the court explained, "A plaintiff can also meet the causation requirement by showing inconsistent reasons given by the employer for the adverse employment action. *Brown*, 129 F. Supp. 3d at1379; *Farrell v. Planters Co*., 206 F.3d 271, 280–81 (3d Cir. 2000); *Waddell v. Small Tube Prods., Inc*., 799 F. 2d 69, 73 (3d Cir. 1986). During Trial, Plaintiff satisfied the causal connection by proving all three.

24

First, Plaintiff proved a close proximity in time between his most direct complaint of discrimination and the adverse action taken against him; Plaintiff was given the choice to resign or be fired <u>within 10 days</u> of making his Jan. 18th public complaint of discrimination. *See Dale v. Wayne*, 497 F.Supp 2d 1337, 1346 (M.D. Ala. 2007) (finding a six week gap to be sufficient to show temporal proximity).   While Plaintiff concedes that "mere proximity, without more, must be 'very close,'" here, there *is* more, and temporal proximity *is* 'very close.'  *See, e.g., Thomas*, 506 F.3d at 1364 (citations omitted).  Thus, Plaintiff had no burden to produce evidence of a pattern of antagonism or inconsistencies, but provided the jury with ample evidence of same nonetheless. *See* Discussion *supra* Parts C (2) and (3).   Has been readily documented throughout this opposition—and supported by ample reference to the trial record—Fuller engaged in a pattern of antagonism after Plaintiff issued his first complaint, which included, but is not limited to: (1) calling Plaintiff stupid, dumb, and incompetent; (2) reviewing Plaintiff's records with a fine tooth comb; (3) failing to give Plaintiff reasonable, advance notice; (4) refusing to grant Plaintiff time off to attend a VA appointment; (5) recommending Plaintiff for termination based on discrepancies that were readily explainable and previously disclosed; and (6) reporting Plaintiff to the FAA. There is equal evidence of inconsistencies, as discussed at great length above.

Plaintiff's USERRA retaliation verdict is supported by sufficient and competent evidence that all three elements have been met and must be upheld.

**E.    CONCLUSION**

Plaintiff respectfully requests that this Honorable Court deny Defendant's Motion for Judgment as a matter of law in its entirety, deny Defendant's Motion for a New Trial, and uphold the jury verdict, for reasons consistent with the record evidence, 50(b) motion standard, applicable case law including recent Supreme Court precedent on this exact issue, for the reasons stated in full herein.

Respectfully submitted this 11th day of March 2022.

Respectfully submitted,
/s/ A. Andrew OBeidy
A.  ANDREW OBEIDY, ESQ. (FBN 0910341)
**OBEIDY & ASSOCIATES, P.A.**
2755 Oakland Park Blvd. Suite 225
Fort Lauderdale, FL 33305
Telephone: (305) 892-5454
andrew@obdlegal.com

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that on this 11th day of March 2022, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notice of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By:/s/ **Andrew Obeidy**
Andrew Obeidy, Esq.
