# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

July 21, 2023

Clerk - Southern District of Florida
U.S. District Court
400 N MIAMI AVE
MIAMI, FL 33128-1810

Appeal Number:  22-11322-AA
Case Style: Scott Thomas v. Broward County Sheriff's Office
District Court Docket No: 0:19-cv-61324-WPD

A copy of this letter, and the judgment form if noted above, but not a copy of the court's decision, is also being forwarded to counsel and pro se parties. A copy of the court's decision was previously forwarded to counsel and pro se parties on the date it was issued.

The enclosed copy of the judgment is hereby issued as mandate of the court. The court's opinion was previously provided on the date of issuance.

Clerk's Office Phone Numbers

| | | | |
|---|---|---|---|
| General Information: | 404-335-6100 | Attorney Admissions: | 404-335-6122 |
| Case Administration: | 404-335-6135 | Capital Cases: | 404-335-6200 |
| CM/ECF Help Desk: | 404-335-6125 | Cases Set for Oral Argument: | 404-335-6141 |

Enclosure(s)

MDT-1 Letter Issuing Mandate

In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————

No. 22-11322

————————————

SCOTT THOMAS,

Plaintiff-Appellee-Cross Appellant,

*versus*

BROWARD COUNTY SHERIFF'S OFFICE,

Defendant-Appellant-Cross Appellee.

————————————

Appeals from the United States District Court
for the Southern District of Florida
D.C. Docket No. 0:19-cv-61324-WPD

————————————

## JUDGMENT

It is hereby ordered, adjudged, and decreed that the opinion issued
on this date in this appeal is entered as the judgment of this Court.

2                                                          22-11322

Entered: June 22, 2023

For the Court: DAVID J. SMITH, Clerk of Court


ISSUED AS MANDATE: July 21, 2023

[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 22-11322

_____

SCOTT THOMAS,

> Plaintiff-Appellee-Cross Appellant,

*versus*

BROWARD COUNTY SHERIFF'S OFFICE,

> Defendant-Appellant-Cross Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 0:19-cv-61324-WPD

_____

Before WILLIAM PRYOR, Chief Judge, and LUCK and MARCUS, Circuit Judges.

WILLIAM PRYOR, Chief Judge:

We must decide whether a district judge who instructed a jury to decide an issue was required to accept the jury's finding under Federal Rule of Civil Procedure 39(c)(2). A jury determined that the Broward County Sheriff's Office discriminated and retaliated against helicopter pilot Scott Thomas in violation of the Uniformed Services Employment and Reemployment Rights Act and awarded Thomas $240,000 in lost wages. The verdict form also asked whether the sheriff's office "willfully violated the law," and the jury answered, "Yes." Based on a statutory provision that awards double damages for willful violations, Thomas moved to alter the judgment. But the district judge decided that the jury finding on willfulness was "advisory" and denied Thomas's motion. The district judge also denied the sheriff's office's motion for judgment as a matter of law or a new trial. Because there was sufficient evidence supporting the verdict against the sheriff's office, we affirm the denial of its motion for judgment as a matter of law or a new trial. But because the parties consented to have the jury decide the issue of willfulness, we reverse the denial of Thomas's motion to alter the judgment.

## I. BACKGROUND

Scott Thomas applied to work as a helicopter pilot for the Broward County Sheriff's Office's air rescue program. Because of his prior military service, Thomas had significant flight training and

experience. From 2004 to 2011, Thomas served as a helicopter pilot in the United States Army and flew nearly a thousand hours in combat over the course of three deployments to Iraq and Afghanistan. Thomas later flew helicopters as a civilian contractor for a Federal Bureau of Investigation hostage rescue team. The sheriff's office invited Thomas to interview twice in the summer of 2018 with Chief Tammy Nugent, the division chief of emergency medical services for the county's Department of Fire Rescue, and Deputy Brian Miller, the law enforcement aviation unit's chief pilot.

A potential problem with Thomas's logbook emerged during the interview process. Helicopter pilots maintain a logbook of all their flights to record details like the aircraft type, the flight location, and more. Thomas kept two logbooks: an official and a backup. His official logbook contained instructor endorsements and information on Thomas's flights with his flight school, the Army, and the Federal Bureau of Investigation. When Miller asked to see it during Thomas's second interview to verify Thomas's flight hours, Thomas told Miller he stored it in Virginia and would need FBI clearance to disclose its contents because information about his covert flights for the Bureau was protected by a non-disclosure agreement. Thomas instead offered Miller his backup logbook, recorded on a cell phone app and "created for personal use." The backup logbook contained nearly the same information with intentional alterations to obscure sensitive details, and its figures exceeded the requirements for the job. According to Thomas, Miller "was okay with [him] presenting the [backup] logbook" at the interview.

4                    Opinion of the Court                22-11322

The sheriff's office hired Thomas as an air rescue helicopter pilot in November 2018. It placed Thomas on a standard yearlong probation, during which he could be terminated for "any . . . non-discriminatory reason." At the same time, the sheriff's office hired four other air rescue helicopter pilots: Timothy Larsen, Jonathan Weiers, Brian McDonald, and Danielle Fuller. All but Fuller had trained as military pilots. In contrast, Fuller had over a decade of civilian pilot experience.

Fuller became the chief pilot for the unit. As chief pilot, she ensured conformity with Federal Aviation Administration regulations, maintained files, and conducted pilot proficiency checks. The chief pilot reported to the director of operations. Larsen first led the air rescue program as the director of operations, but after about two weeks Fuller replaced him to serve as interim director of operations too. That office reported to Chief Nugent.

Fuller's animosity toward the military pilots soon became apparent. She told the unit multiple times "that military pilots were incapable of doing the . . . missions, and that she knew plenty of other people in the industry or civilian pilots that were more . . . capable [than the military pilots of] doing the missions." She made "offensive," "insulting," and "discriminatory" comments to the military pilots—and "derogatory" comments to Thomas specifically—including that "military guys all think the same way," that they were "dumb," and that "in the real world" pilots do things differently. According to one of Thomas's colleagues, "her biggest complaint . . . was that she was always—what do you want to call

it?—jealous, envious, mad . . . that . . . military pilots . . . gained [their] flight experience in the military, and . . . didn't have to necessarily [pay] for it." Another colleague recalled that Fuller "[a]bsolutely" "treated military pilots differently than civilian pilots." It became clear to the military pilots that "she didn't like the way [they] thought."

Two further incidents confirmed Thomas's belief that Fuller discriminated against military pilots. At a visit to a fire station in December, Fuller told Thomas that she "knew better qualified pilots that she would rather have in the unit," which Thomas interpreted as a reference to civilian pilots, and Thomas complained to her that her treatment of the military pilots was uninformed and unfair. And when Thomas requested leave to see a Veterans' Affairs doctor, Fuller denied the request by saying that she was "a mother," that the rest of the pilots were "children," and that "children weren't allowed to question their parents." In mid-January, Thomas raised his concerns about Fuller to an instructor in the sheriff's office, who shared them with Chief Nugent.

Around this time, Fuller began to investigate the pilots' backgrounds. She had them complete pilot experience forms in early January. Thomas completed his form using the backup logbook on his cell phone, and the flight hour numbers differed from the rounded numbers on his resume. Fuller then asked the pilots to bring her their logbooks. All brought their official logbooks except Thomas, who testified that he brought his backup logbook because Fuller said that he did not need to bring his official logbook

and that she was "perfectly fine" with the backup logbook alone. The numbers on Thomas's backup logbook and form roughly—though not perfectly—matched those on the resume he submitted when he applied for the job. For instance, he stated on the form that he had 2,131 total flight hours, 1,431 pilot-in-command flight hours, and 531 night-vision-goggle flight hours, whereas he stated on his resume that he had 2,080 total flight hours, 1,500 pilot-in-command flight hours, and 530 night-vision-goggle flight hours.

Fuller recommended that Thomas be "release[d] . . . from service" due to "major discrepancies" in his flight experience paperwork. Fuller testified that she did so because the various figures "[did]n't add up" and constituted "falsification." Chief Nugent met with Fuller and another employee to review Thomas's records. Relying on their views that the discrepancies were material, Chief Nugent determined that Thomas's probationary employment should be terminated. On January 28, Chief Nugent gave Thomas the option of being fired or resigning. He resigned.

Thomas filed a two-count complaint against his former employer. He alleged that the sheriff's office violated the Uniformed Services Employment and Reemployment Rights Act of 1994, 38 U.S.C. § 4301 *et seq.*, by discriminating against him based on his military service, *see id.* § 4311(a). He also alleged that the sheriff's office violated the Act by retaliating against him by ending his employment when he complained about Fuller's discrimination. *Id.* § 4311(b). He sought lost wages and benefits. And he sought liquidated damages under the remedies provision of the Act, which

provides that the "court may require the employer to pay the person an amount equal to . . . [lost wages and benefits] as liquidated damages, if the court determines that the employer's failure to comply with the provisions of th[e] [Act] was willful." *Id.* § 4323(d)(1)(C).

At trial, the jury found in favor of Thomas on both counts. The sheriff's office moved for judgment as a matter of law or a new trial. The district court denied the motion. It determined that a reasonable jury could agree with Thomas on both the discrimination and retaliation counts in the light of inconsistencies in the sheriff's office's reasons for terminating Thomas, testimony about Fuller's animus towards military pilots, and an impression that Fuller was "not a very credible witness."

On the verdict form, the district judge submitted to the jury this question about both counts: "Do you find from a preponderance of the evidence . . . [t]hat [the sheriff's office] willfully violated the law?" The question came from a proposed special interrogatory form submitted by Thomas. The question also echoed a directive in the parties' joint proposed jury instructions that the jury "must decide whether [the sheriff's office] willfully violated the law." The jury answered, "Yes." It awarded Thomas $240,000 in damages for lost wages and benefits on the discrimination count and zero damages on the retaliation count.

Because of the jury's willfulness finding, Thomas moved for liquidated damages. But on review of that motion, the district court for the first time characterized the jury question as a "non-binding

special interrogatory." It wrote that although it "did request an advisory opinion from the jury," the district court "disagree[d] with the jury's advisory finding" and did "not find that [the sheriff's office's] failure to comply with the provisions of [the Act] was willful." So it denied Thomas's motion. The sheriff's office appealed, and Thomas cross-appealed the denial of his motion for liquidated damages.

## II. STANDARDS OF REVIEW

We review *de novo* the denial of a renewed motion for judgment as a matter of law. *Muñoz v. Oceanside Resorts, Inc.*, 223 F.3d 1340, 1344 (11th Cir. 2000). We review for abuse of discretion the denial of a motion for a new trial. *Chmielewski v. City of St. Pete Beach*, 890 F.3d 942, 951 (11th Cir. 2018). And "[a] decision [not] to alter or amend a judgment is reviewed for abuse of discretion, unless the ruling turns on a question of law. If that is the case, this Court reviews the question of law *de novo*." *U.S. Equal Emp. Opportunity Comm'n v. St. Joseph's Hosp., Inc.*, 842 F.3d 1333, 1343 (11th Cir. 2016).

## III. DISCUSSION

We divide our discussion into three parts. First, we explain that the sheriff's office was not entitled to judgment as a matter of law or a new trial because the evidence supported the jury verdict on the discrimination count. Second, we explain that we cannot review the denial of the motion as to the retaliation count because we lack jurisdiction. Third, we explain that the district court erred by not granting Thomas's motion to alter the judgment because

jury findings are presumptively binding under Rule 39(c)(2) when the parties have consented to a jury trial on an issue.

### A. *Sufficient Evidence Supported the Verdict on the Discrimination Claim.*

The sheriff's office argues that it was entitled to either judgment as a matter of law or a new trial. District courts seldom enter a judgment as a matter of law, for it "is appropriate only when there can be but one reasonable conclusion as to the verdict." *Pelletier v. Stuart-James Co.*, 863 F.2d 1550, 1554 (11th Cir. 1989). Likewise, district courts seldom grant new trials based on the weight of the evidence because doing so is appropriate only where "the verdict [is] contrary to the great, and not merely the greater, weight of the evidence." *Williams v. City of Valdosta*, 689 F.2d 964, 973 (11th Cir. 1982). The argument here falls well short of the threshold for either remedy.

Prohibited discrimination under the Act occurs when a "person who . . . has performed . . . service in a uniformed service" is "denied . . . retention in employment . . . by an employer on the basis of that . . . performance of service." 38 U.S.C. § 4311(a). An employee proves a violation by establishing that his "service . . . in the uniformed services [was] a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such . . . service." *Id.* § 4311(c)(1). A person's military service is a motivating factor if "it is one of the factors that 'a truthful employer would list if asked for the reasons for its decision.'" *Coffman v. Chugach Support Servs., Inc.*, 411 F.3d

1231, 1238 (11th Cir. 2005) (citations omitted), *superseded by statute in part on other grounds*, Pub. L. No. 111-275 § 702, 124 Stat. 2864, 2887–88. A wide range of evidence may prove that an employee's military status was a motivating factor in his termination, including "an employer's expressed hostility towards members protected by the statute together with knowledge of the employee's military activity" and "inconsistencies between the proffered reason and other actions of the employer." *Id.* (citation omitted). Thomas presented evidence in both categories.

Fuller expressed hostility towards military pilots. Three of the four pilots under Fuller's supervision testified that she made "insulting" or "offensive" remarks about military pilots as a class, with one pilot who said that she likened the military pilots to "children." Fuller derided the pilots with military experience by saying that "military guys all think the same way" and were "incapable" of the work required in her unit. Fuller said she knew "better qualified civilian pilots" whom she believed could "replace" the military pilots, which could reasonably be interpreted as a threat to Thomas's job. The jury could readily infer hostility from these comments. And Fuller was aware of Thomas's military service.

The evidence also revealed inconsistencies between the proffered reasons for terminating Thomas's employment and the sheriff's office's other actions. The sheriff's office insists that it justified Thomas's termination on the "consistent explanation" of the "unverified flight experience and discrepancies between his [p]ilot [e]xperience [f]orm, [r]esume, and personal backup logbook." But

we look to inconsistencies between the termination reasons and "other actions of the employer," not within the reasons given for termination. *Id.* (citation omitted). Thomas introduced evidence that the sheriff's office hired him with the full knowledge that his flight experience could not be verified by an official logbook—a fact inconsistent with its contention that the unverified experience disqualified Thomas from employment. Thomas testified that he informed the office of his dual logbook situation at his second interview. And Thomas testified that his interviewer, Miller, "was okay" with it and with slight deviations between his application materials and his logbook. Nothing about that situation changed between Thomas's hiring and firing. Thomas also testified that Fuller was "perfectly fine" with having access only to Thomas's backup logbook in early January, less than three weeks before Thomas was fired. So a reasonable jury could credit Thomas's testimony and find that the sheriff's office's actions were inconsistent with its proffered explanation.

The sheriff's office protests that even if Fuller's behavior was discriminatory, it cannot be held liable. It argues that Chief Nugent, not Fuller, decided to fire Thomas and did so only after she "fully reviewed the record . . . to ensure that the decision was entirely justified, apart from Fuller's recommendation." An employer is liable under the Act for the actions of an agent who is not the actual decisionmaker only if the agent's discriminatory animus was a proximate cause of the person's termination. *See Staub v. Proctor Hosp.*, 562 U.S. 411, 419 (2011). But a reasonable jury was not required to agree with the sheriff's office's view of the evidence.

Substantial evidence supports the finding that Fuller proximately caused Thomas's termination. Fuller launched the investigation into the military pilots' flight histories that led Chief Nugent to review Thomas's record. Fuller not only recommended Thomas's termination to Nugent but also consulted with Nugent about it after the recommendation. And Chief Nugent conceded that she "relied on" Fuller and another employee when she accepted the recommendation because she "wouldn't [have] know[n] what [she] was looking . . . for" in the flight records. The jury could have reasonably inferred that Chief Nugent's "exercise of judgment [was] *also* a proximate cause of the employment decision, but it is common for injuries to have multiple proximate causes." *See id.* at 420. Chief Nugent's decisionmaking alone cannot rescue the sheriff's office's case. Thomas presented sufficient evidence to underpin a finding of discrimination.

### B. The Sheriff's Office Lacks Standing to Appeal the Jury Verdict on the Retaliation Claim.

We cannot review the jury verdict with respect to the retaliation count. "Only a litigant who is aggrieved by the judgment or order may appeal." *Wolff v. Cash 4 Titles*, 351 F.3d 1348, 1354 (11th Cir. 2003) (citation and internal quotation marks omitted). As with the doctrine of trial standing, the doctrine of appellate standing requires that an appellant establish an injury in fact. *United States v. Pavlenko*, 921 F.3d 1286, 1289 (11th Cir. 2019). The sheriff's office cannot establish an injury in fact because the jury awarded Thomas no damages, nor any other relief, on the retaliation count. That is, the jury found that the sheriff's office retaliated against Thomas,

but the final judgment did not "affect the litigant's interests in an adverse way." *Id.* So the sheriff's office lacks standing to appeal that verdict because the verdict did not lead to an adverse judgment.

### C. The District Court Was Bound by the Jury Finding on Willfulness.

The Act provides that "[t]he court may require the employer to pay the person an amount equal to [lost wages and benefits] as liquidated damages, if the court determines that the employer's failure to comply with the provisions of th[e] [Act] was willful." 38 U.S.C. § 4323(d)(1)(C). The jury determined that the sheriff's office's violation of the Act was willful. Thomas argues that this finding bound the district court because the parties consented to a jury trial on the issue of willfulness. Alternatively, he argues that the jury's determination was conclusive because the statute itself gave him the right to have the jury decide the issue. We need not reach his second argument because his first argument is correct.

Even if an issue is "not triable of right by a jury," it may still be submitted to a jury in two circumstances. FED. R. CIV. P. 39(c). "[T]he court . . . (1) may try any issue with an advisory jury; or (2) may, with the parties' consent, try any issue by a jury whose verdict has the same effect as if a jury trial had been a matter of right . . . ." *Id.* The submission of the willfulness issue fell into the latter category.

Where the parties consent to a jury finding and the district court does not specify whether the finding will be non-binding under Rule 39(c)(1) or binding under Rule 39(c)(2), the jury finding is

binding by default. We draw this conclusion from our reading of *Whiting v. Jackson State University*, 616 F.2d 116 (5th Cir. 1980). There, the district court submitted a request for equitable relief to a jury without clarifying whether the judge sought an advisory or binding ruling, even though juries do not ordinarily rule on equitable relief. *See Whiting*, 616 F.2d at 123. Our predecessor court reasoned that the jury finding was binding because it was submitted to the jury. *See id.* That is, it applied a default rule that any issue sent to the jury with the consent of the parties is presumptively governed by Rule 39(c)(2) unless the district court specifies otherwise.

The text of Rule 39(c) confirms that interpretation. It allows a district court to try an issue in two ways: "with an advisory jury," Fed. R. Civ. P. 39(c)(1), or "by a jury whose verdict has [binding] effect," *id.* 39(c)(2). It does not allow a district judge to try an issue and then, after the verdict is in, decide whether the jury was advisory or not. The authority of the jury is fixed beforehand.

Basic considerations of fairness and due process require that the parties know to whom they are presenting their cases beforehand too. *See Pradier v. Elespuru*, 641 F.2d 808, 811 (9th Cir. 1981) ("The parties are entitled to know at the outset of the trial whether the decision will be made by the judge or the jury."). Where a district court does not give the parties notice that it will cast the jury in the atypical role of advisory commentator, we assume it will not. Were it otherwise, any litigant who received an unfavorable jury verdict on an issue not triable as of right would automatically get a

second bite at the apple, in that the district court could overwrite the jury finding whenever it disagreed. No such judicial veto power is hidden within Rule 39(c). *See Alcatel USA, Inc. v. DGI Techs., Inc.*, 166 F.3d 772, 796 (5th Cir. 1999). And, in articulating this default rule for Rule 39(c), we join the good company of our sister circuits who have done the same. *See Bereda v. Pickering Creek Indus. Park, Inc.*, 865 F.2d 49, 52 (3d Cir. 1989) ("Since . . . the subject of an advisory jury was never mentioned at any time during the proceedings, [the parties] must be deemed to have consented to a trial by a nonadvisory jury under Rule 39(c)."); *Alcatel*, 166 F.3d at 795 ("[O]nce the court submits [a] question to a nonadvisory jury, it relinquishes th[e] discretion [to disregard the jury's finding.]"); *Thompson v. Parkes*, 963 F.2d 885, 888 (6th Cir. 1992) ("No mention was made of an advisory jury during trial preparation. In such a case . . . the verdict of the jury must be treated as if the right [to a jury] had existed and it is beyond the power of the district court to set the verdict aside on the theory it was advisory."); *Pals v. Schepel Buick & GMC Truck, Inc.*, 220 F.3d 495, 501 (7th Cir. 2000) ("'If one party demands a jury, the other parties do not object, and the court orders trial to a jury, this will be regarded as jury trial by consent' under Rule 39(c). (quoting 9 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2333 (2d ed. 1994))).

The judgment should have been altered to reflect the jury finding. The parties satisfied the precondition to Rule 39(c)(2) by consenting to have the issue decided by the jury. The parties jointly submitted proposed jury instructions that said, "If you find in Scott Thomas's favor . . . you must decide whether [the sheriff's office]

willfully violated the law." Then, Thomas proposed a special inter-rogatory that asked the jury, "Do you find from a preponderance of the evidence . . . [t]hat [the sheriff's office] willfully violated the law?" The judge adopted all this language for the jury instructions and interrogatories. That the willfulness question was submitted by the parties evidences their consent. Moreover, when a district court submits a claim for relief to the jury, that submission "trig-ger[s] [Rule] 39(c)," at which point the parties' consent is presumed unless a party objects to that claim, *Whiting*, 616 F.2d at 123, and neither party objected here. Although the district court declared the jury finding "advisory" in its post-trial order, it gave no advance notice of that advisory status. So the default rule applies. The jury finding must be honored.

## IV. CONCLUSION

We **AFFIRM** the denial of the sheriff's office's motion for judgment as a matter of law or a new trial and **REVERSE** the denial of Thomas's motion for an altered judgment.

22-11322            MARCUS, J., concurring            1

MARCUS, Circuit Judge, concurring:

I join the judgment and careful reasoning of the majority opinion in full. I write separately to explain that, even if the parties had not consented to a jury trial on liquidated damages, Thomas was still entitled to one because it is "fairly possible" to read the Act as affording such a right, and we must adopt that reading to avoid a construction that would violate the Seventh Amendment.

The Seventh Amendment secures the right to a jury trial "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars." U.S. Const. amend. VII; *see also Waldrop v. S. Co. Servs., Inc.*, 24 F.3d 152, 156 (11th Cir. 1994). "The right of trial by jury is of ancient origin, characterized by Blackstone as 'the glory of the English law' and 'the most transcendent privilege which any subject can enjoy[.]'" *Dimick v. Schiedt*, 293 U.S. 474, 485 (1935) (citation omitted). "Maintenance of the jury as a fact-finding body is of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care." *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 501 (1959) (citation omitted). For this reason, "[s]ince the merger of the systems of law and equity, th[e] [Supreme] Court has carefully preserved the right to trial by jury where legal rights are at stake." *Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 565 (1990) (citation omitted).

"[T]he thrust of the [Seventh] Amendment was to preserve the right to jury trial as it existed in 1791," but it also applies "to

actions brought to enforce statutory rights that are analogous to common-law causes of action ordinarily decided in English law courts in the late 18th century, as opposed to those customarily heard by courts of equity or admiralty." *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 41–42 (1989) (quoting *Curtis v. Loether*, 415 U.S. 189, 193 (1974)). "Before inquiring into the applicability of the Seventh Amendment," though, "we must 'first ascertain whether a construction of the statute is fairly possible by which the [constitutional] question may be avoided.'" *Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 345 (1998) (alteration in original) (quoting *Tull v. United States*, 481 U.S. 412, 417 n.3) (1987)).

Congress enacted the Uniformed Services Employment and Reemployment Rights Act ("USERRA") to, among other things, "prohibit discrimination against persons because of their service in the uniformed services." 38 U.S.C. § 4301(a)(3); *see also Coffman v. Chugach Support Servs.*, 411 F.3d 1231, 1234 (11th Cir. 2005) ("Congress enacted USERRA to prohibit employment discrimination on the basis of military service."). When Congress introduced the Act, it replaced a prior version known as the Veterans' Reemployment Rights Act of 1974 ("VRRA"). The change was made "to clarify, simplify, and, where necessary, strengthen the existing veterans' employment and reemployment rights provisions." H.R. Rep. No. 103–65(*l*), at 18 (1993); *see also* S. Rep. No. 103-158, at 33 (1993) (noting that USERRA "would restructure, clarify, and improve" the VRRA. As part of its efforts to "strengthen" the rights of former servicemembers, the Act added a new remedy that was not available under the earlier statute: liquidated damages for willful

22-11322            Marcus, J., concurring            3

violations of its provisions.  This addition "materially altered" the Act's enforcement mechanisms to include a new legal remedy. *Middleton v. City of Chicago*, 578 F.3d 655, 660 (7th Cir. 2009).

USERRA does not expressly provide for a right to a jury trial. *See* 38 U.S.C. § 4323.  But the statute's silence is not dispositive.  *See Feltner*, 523 U.S. at 345; *see also City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 707 (1999).  We must still assess whether it is "fairly possible" to construe the statute to encompass a right to a jury trial, enabling us to avoid the Seventh Amendment question. *Feltner*, 523 U.S. at 345.  In this case, it is.

I begin with the text of the Act.  The remedies provision reads this way:

> (d) REMEDIES.--(1) In any action under this section, the court may award relief as follows:
>
> (A) The court may require the employer to comply with the provisions of this chapter.
>
> (B) The court may require the employer to compensate the person for any loss of wages or benefits suffered by reason of such employer's failure to comply with the provisions of this chapter.
>
> (C) The court may require the employer to pay the person an amount equal to the amount referred to in subparagraph (B) as liquidated damages, if the court determines that the employer's

4                    MARCUS, J., concurring                    22-11322

failure to comply with the provisions of this chap-
ter was willful.

38 U.S.C. § 4323(d).  By its text, the provision outlines three dif-
ferent remedies that are available to servicemembers and veter-
ans who succeed on a claim under the Act: injunctive relief (sub-
paragraph (A)); compensatory damages (subparagraph (B)); and
liquidated damages (subparagraph (C)).  And at the broadest level,
the Act dictates that "[t]he court" is responsible for awarding
these forms of relief.  The problem is that the Act never defines
"the court."  *See id*. § 4303.  The parties strongly disagree over the
proper interpretation of this term.

For his part, Thomas argues that "the court" must be read
to encompass both judge and jury.  He suggests that the fact that
USERRA added a new legal remedy distinct from any relief of-
fered by its predecessor statute -- the VRRA -- provides "strong
textual evidence that Congress intended to provide servicemem-
bers and veterans the right to a jury trial for their legal remedies."
He further observes that this Court has read "the court" to include
both judge and jury in the past to avoid interpreting a similar stat-
ute in a manner that would collide with the command of the Sev-
enth Amendment, and he urges us to follow that path here.

The sheriff's office, in turn, argues that the statute's use of
the phrase "[t]he court" in subparagraph (C) means that the judge
and not the jury must decide whether a litigant is entitled to liq-
uidated damages.  But at oral argument, the sheriff's office con-
ceded that Thomas had a right to have the jury determine

compensatory damages, despite the use of the same "the court" language found in subparagraph (B), and in subparagraph (C). And subparagraph (A) of the statute contemplates an award of injunctive relief -- relief that is equitable in nature and determined by a judge, not a jury. *Id.* § 4323(d); *see Terry*, 494 U.S. at 565. The upshot of this is that no matter how we slice it, there will be some inconsistency in how the term "the court" is understood in the different subparagraphs of the remedies section, even accepting the sheriff's office's position as correct. The only dispute here is on what side of that line the liquidated damages provision falls -- and, more precisely, about whether it is "fairly possible" to conclude that it falls where Thomas suggests it ought to. To put it differently, the question this case presents is whether it is "fairly possible" to read the liquidated damages provision of USERRA as encompassing a right to a jury trial. I am persuaded that it is, for a number of reasons.

For starters, both this Court and others have read "the court" to encompass both judge and jury in similar statutes. Thus, for example, in *Sibley v. Fulton DeKalb Collection Service*, a Fair Debt Collection Practices Act ("FDCPA") case, the employer argued that because the FDCPA provided for statutory damages "as the court may allow,"[1] Congress intended to assign the district

---

[1] The entirety of the provision at issue in *Sibley* provides:

> (a) Except as otherwise provided by this section, any debt collector who fails to comply with any provision of this

6                    MARCUS, J., concurring                    22-11322

court exclusively the role of assessing damages, eliminating any
right to trial by jury.  677 F.2d 830, 832–33 (11th Cir. 1982) (cita-
tion omitted).  If Congress wanted to create a right to a jury trial
under the FDCPA, the argument goes, it would have said as
much.  *Id.*  We were not convinced.  "The primary difficulty with
[the] argument is that legislative silence on the role of juries like
that evinced by Congress in the [FDCPA] seems to be the rule
rather than the exception."  *Id.*  We noted that "[i]t has been fre-
quently determined . . . that the word 'court' . . . encompasses

---

subchapter with respect to any person is liable to such person
in an amount equal to the sum of-

(1) any actual damage sustained by such failure;

(2)(A) in the case of any action by an individual, such ad-
ditional damages as the court may allow, but not exceed-
ing $1,000; or

(B) in the case of a class action, (i) such amount for each
named plaintiff as could be recovered under subparagraph
(A), and (ii) such amount as the court may allow for all
other class members, without regard to a minimum indi-
vidual recovery, not to exceed the lesser of $500,000 or 1
per centum of the net worth of the debt collector; and

(3) in the case of any successful action to enforce the fore-
going liability, the costs of the action, together with a rea-
sonable attorney's fee as determined by the court.  On a
finding by the court that an action under this section was
brought in bad faith and for the purpose of harassment,
the court may award to the defendant attorney's fees rea-
sonable in relation to the work expended and costs.

15 U.S.C. § 1692k(a).

22-11322          MARCUS, J., concurring          7

trial by both judge and jury rather than by judge alone." *Id.* And we reasoned that we were required to interpret the phrase in that manner "to avoid the serious constitutional questions that would be raised under the seventh amendment if we adopted a construction of the Act that prohibited trial by jury." *Id.* at 833.

Similarly, in *Pons v. Lorillard*, the Fourth Circuit found a statutory right to a jury trial in the Age Discrimination in Employment Act of 1967, which provided that "*the court* shall have jurisdiction to grant such legal or equitable relief as may be appropriate." 549 F.2d 950, 952 (4th Cir. 1977) (emphasis added) (quoting 29 U.S.C. § 626(b)), *aff'd*, 434 U.S. 575 (1978). Despite the statute's use of the phrase "the court," the Fourth Circuit concluded that because the relief sought was legal in nature, the statute could and should be read as including both a judge and a jury. *Id.* at 954. The Seventh Circuit did the same thing when it interpreted a provision of the Fair Housing Act that provides that "[t]he court may" award both injunctive relief and actual and punitive damages. *Rogers v. Loether*, 467 F.2d 1110, 1122–23 (7th Cir. 1972), *aff'd sub nom. Curtis*, 415 U.S. at 189. It explained that while "there are persuasive reasons" for interpreting "the court" to allow a judge and not a jury to award damages, the argument ultimately is not "compelling" because of the doctrine of constitutional avoidance. *Id.* at 1122.

Justice Scalia shared this view in a concurring opinion in *Feltner v. Columbia Pictures*, a case about whether there was a jury trial right under § 504(c) of the Copyright Act. That provision provides for statutory damages for copyright infringements in an amount

8                    Marcus, J., concurring                    22-11322

between $750 and $30,000 "as the court considers just" and for an increased award of $150,000 for willful violations "in [the court's] discretion." 17 U.S.C. § 504(c)(1)–(2). Justice Scalia explained that it was "fairly possible" to read "court" to have "a broader meaning, which includes both judge and jury." *Feltner*, 523 U.S. at 356 (Scalia, J., concurring). While perhaps not the "best" interpretation of the word, Justice Scalia found it necessary to read it this way because "there would be considerable doubt about the constitutionality of § 504(c) if it did not permit jury determination of the amount of statutory damages." *Id.* at 359. He explained that "[b]ecause an interpretation of § 504(c) that avoids the Seventh Amendment question is at least 'fairly possible,' [he] would adopt that interpretation, prevent the invalidation of th[e] statute, and reserve the constitutional issue for another day." *Id.*

In the second place, then, and more importantly, reading "the court" to include the jury is backed by the powerful doctrine of constitutional avoidance. "[W]hen one interpretation of a law raises serious constitutional problems, courts will construe the law to avoid those problems so long as the reading is not plainly contrary to legislative intent." *Pine v. City of West Palm Beach*, 762 F.3d 1262, 1270 (11th Cir. 2014); *see also Hooper v. California*, 155 U.S. 648, 657 (1895) ("The elementary rule is that every reasonable construction must be resorted to in order to save a statute from unconstitutionality."). "When faced with more than one plausible interpretation of a law, then, we apply 'the reasonable presumption that [the legislature] did not intend the alternative which raises serious constitutional doubts.'" *Pine*, 762 F.3d at 1270–71 (alteration in

original) (quoting *Clark v. Martinez*, 543 U.S. 371, 381 (2005)); *accord Rust v. Sullivan*, 500 U.S. 173, 190 (1991) ("[A]s between two possible interpretations of a statute, by one of which it would be unconstitutional and by the other valid, our plain duty is to adopt that which will save the Act." (citation omitted)). This doctrine "does not require that the problem-avoiding construction be the *preferable* one -- the one the Court would adopt in any event." *Feltner*, 523 U.S. at 358 (Scalia, J., concurring) (citation omitted). All that is required is that the statute-saving interpretation is "fairly possible." *Tull*, 481 U.S. at 417 n.3. Reading subparagraph (C) of the Act to include the jury plainly is not contrary to the legislative intent -- not when Congress rewrote the Act precisely in order to expand its scope and provide further protection for veterans and servicemembers who may suffer discrimination because of their status in employment. And insofar as Thomas would have a constitutional right to a jury trial on the issue of liquidated damages -- which I conclude he would have -- this canon strongly favors this interpretation to avoid requiring this Court to find a provision of the Act in conflict with the Seventh Amendment.

This is not to say that the sheriff's office's position has no appeal. At least two canons of statutory interpretation point that way. First, to the extent that "the court" is traditionally understood to refer to a judge, interpreting it the way Thomas suggests runs against the ordinary-meaning canon, "the most fundamental semantic rule of interpretation." Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 69 (2012). Under this canon, "our job is to interpret the words consistent

10                    MARCUS, J., concurring                    22-11322

with their ordinary meaning at the time Congress enacted the statute," *Wis. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2070 (2018) (alteration adopted) (quotation marks and citation omitted), "unless the context in which the word[s] appear[]" suggests some other meaning, *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 569 (2012).

To determine the ordinary meaning of a statutory term that is not defined, "we often look to dictionary definitions for guidance." *United Mine Workers of Am. Combined Benefit Fund v. Toffel (In re Walter Energy, Inc.)*, 911 F.3d 1121, 1143 (11th Cir. 2018). Black's Law Dictionary defines "court" as: (1) "A place where justice is judicially administered; the locale for legal proceedings"; (2) "The building where the judge or judges convene to adjudicate disputes and administer justice"; (3) "A tribunal constituted to administer justice; esp., a governmental body organized for public administration of justice at the time and place prescribed by law, usu. consisting of one or more judges who sit to adjudicate disputes"; (4) "The judge or judges who sit on such a tribunal"; or (5) "A legislative assembly." *Court*, Black's Law Dictionary (11th ed. 2019). While some of these definitions clearly include a judge, none include a jury. The same is true for Merriam-Webster's Dictionary. It defines "court," in relevant part, as (1) "an official assembly for the transaction of judicial business"; (2) "a session of such a court"; (3) "a place (such as a chamber) for the administration of justice"; or (4) "a judge or judges in session." *Court*, Merriam-Webster's Online Dictionary (last accessed June 12, 2023). "Jury" is defined in a quite different way. Black's

22-11322          MARCUS, J., concurring          11

defines it as "[a] group of persons selected according to law and given the power to decide questions of fact and return a verdict in the case submitted to them." *Jury*, Black's Law Dictionary (11th ed. 2019). It also provides that "[i]n certain contexts, *jury* embraces any fact-trier, including an arbitrator or a trial judge sitting in a nonjury proceeding." *Id.* Based on the ordinary meaning canon, then, "court" would not be read to include a jury.

Moreover, reading "court" to include a jury also runs afoul of the presumption of consistent usage, which is the general principle that a term ordinarily bears the same meaning each time it is used in a particular statute. Scalia & Garner, *supra*, at 170–73. This canon is implicated because, as already discussed, this interpretation would require us to read "the court" in subparagraphs (B) and (C) of the Act to mean something different than what it means in subparagraph (A). But "the presumption of consistent usage 'readily yields' to context." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 320 (2014) (citation omitted). And here, the context is a statute that provides for three distinct forms of relief -- one plainly equitable in nature and two undeniably legal in nature -- with differing consequences on a litigant's right to a jury trial. These contextual differences support reading "the court" consistently with the specific form of relief contemplated by the different subparagraphs of the Act.

Ultimately, while these canons offer some support for the sheriff's office's position, they fail to carry the day because, as suggested above, they run headlong into a Seventh Amendment

problem. We are required to employ a two-step test to determine whether a litigant has a right to a jury trial under the Seventh Amendment. *Terry*, 494 U.S. at 565. "First, we compare the statutory action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity." *Tull*, 481 U.S. at 417. Second, and far more importantly, we determine whether the remedy sought is legal or equitable in nature. *Terry*, 494 U.S. at 565.

Justice Story offered this classic statement drawing this distinction nearly two centuries ago in *Parsons v. Bedford*:

> It is well known, that in civil causes, in courts of equity and admiralty, juries do not intervene, and that courts of equity use the trial by jury only in extraordinary cases to inform the conscience of the court. When, therefore, we find that the amendment requires that the right of trial by jury shall be preserved in suits at common law, the natural conclusion is, that this distinction was present to the minds of the framers of the amendment. By *common law*, they meant what the constitution denominated in the third article 'law;' not merely suits, which the *common* law recognized among its old and settled proceedings, but suits in which *legal* rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognized, and equitable remedies were administered; or where, as in the admiralty, a

mixture of public law, and of maritime law and equity
was often found in the same suit.  Probably there
were few, if any, states in the union, in which some
new legal remedies differing from the old common
law forms were not in use; but in which, however,
the trial by jury intervened, and the general regula-
tions in other respects were according to the course
of the common law.  Proceedings in cases of partition,
and of foreign and domestic attachment, might be
cited as examples variously adopted and modified.  In
a just sense, the amendment then may well be con-
strued to embrace all suits which are not of equity and
admiralty jurisdiction, whatever may be the peculiar
form which they may assume to settle legal rights.

28 U.S. (3 Pet.) 433, 446–47 (1830) (emphasis in original).

I turn then to step one of the process -- which asks us to
compare the Act at issue with "18th-century actions brought in the
courts of England prior to the merger of the courts of law and eq-
uity." *Tull*, 481 U.S. at 417.  It is undeniable that an action for dis-
crimination based on prior military service did not exist in the 18th-
century common law. *Cf. Coffman*, 411 F.3d at 1235 (explaining that
veteran reemployment statutes date to the first peacetime draft law,
enacted in 1940).  But, at a broader level, a panel of this Court con-
sidered the 18th-century analogues of discrimination actions in
*Waldrop v. Southern Co., Services, Inc.*, a case examining whether
there exists a right to trial by jury under the Seventh Amendment

14                         Marcus, J., concurring                    22-11322

for the Rehabilitation Act of 1973.  There, we reasoned that "although there were no discrimination actions at common law," the "remedies appear comparable to actions brought before courts of law in 18th-century England," and this at least suggests that the right to a jury trial extends to suits brought under the Rehabilitation Act.  *Waldrop*, 24 F.3d at 156.

Similarly, in *Hill v. Winn-Dixie Stores, Inc.*, this Court considered whether the Jury System Improvements Act of 1978, which protects jurors from discrimination based on their jury service, includes an implicit jury trial right.  934 F.2d 1518, 1523–26 (11th Cir. 1991).  We held that it does.  In reaching this conclusion, we found that an action prohibiting discrimination against jury members is analogous to (1) tort actions to redress discrimination, (2) actions in debt to recover civil penalties, and (3) actions for breach of an employment contract, all of which existed at common law.  *Id.* at 1524.  These analogues, although not directly on point, were enough to support the finding of a right to a jury trial under the Seventh Amendment.  *Id.* at 1525–26; *cf. also Curtis*, 415 U.S. at 195 n.10 ("An action to redress racial discrimination may also be likened to an action for defamation or intentional infliction of mental distress.").

The reasoning of *Waldrop* and *Hill* extends to this case.  As in *Waldrop* and *Hill*, this employment discrimination action is analogous to "action[s] in tort to redress discrimination" that existed in English courts of law.  This factor weighs at least somewhat in favor of a Seventh Amendment right under the Act.

On to step two.  In this "more important" step, we ask whether the remedy sought is legal or equitable in nature.  We "liberally construe[]" whether a remedy is legal "to guard the right of trial by jury preserved by the Seventh Amendment." *Granfinanciera*, 492 U.S. at 48–49 (citation omitted).  In the operative complaint, Thomas sought two forms of monetary damages.  First, he asked for compensatory damages in the form of lost back pay, lost benefits, and lost front pay.  Second, he sought liquidated damages, as provided for by the Act for willful violations.  *See* 38 U.S.C. § 4323(d)(1)(C).  The sheriff's office challenges Thomas's right to a jury trial on only the latter.

Actions for monetary damages -- both actual damages and damages that are punitive in nature -- are "the traditional form of relief offered in the courts of law." *Curtis*, 415 U.S. at 196.  Accordingly, with a few exceptions not applicable in this case, monetary damages are a legal remedy.  As for the forms of monetary relief requested here, we have unambiguously held that back pay and liquidated damages are remedies at law, and that a jury trial right therefore naturally attaches.  *See, e.g.*, *Waldrop*, 24 F.3d at 157 ("[A] back pay award in a [Rehabilitation Act] action is legal in nature, thereby creating a Seventh Amendment jury trial right."); *see also Pfeiffer v. Essex Wire Corp.*, 682 F.2d 684, 687 (7th Cir. 1982) ("Because liquidated damages are in the nature of legal relief, it is manifest that a party is entitled to have the factual issues underlying such a claim decided by a jury." (citation omitted)); *Orenstein v. United States*, 191 F.2d 184, 190 (1st Cir. 1951) ("[I]t has been held that in an [FLSA § 16(b)] action . . . to recover overtime

16                    MARCUS, J., concurring                    22-11322

compensation and a like amount as liquidated damages, the parties are entitled as of right to a jury trial, though the statute itself is silent on the point.").   Although none of these cases arose in a USERRA action, the nature of the relief sought is the same.

The most noteworthy exception to the general rule is that monetary damages may be equitable in nature when "they are restitutionary, such as in 'actions for disgorgement of improper profits.'"  *Terry*, 494 U.S. at 570 (alteration adopted) (citation omitted). But this exception does not apply here.  The Supreme Court has held that, with regard to back pay resulting from an unlawful discriminatory termination, back pay is not restitutionary because it is not "money wrongfully held by the [employer], but wages and benefits [the employee] would have received" absent the employer's wrongful conduct.[2]  *Id.* at 570–71.  The other exception is that a monetary award may be equitable in nature if it is "incidental to or intertwined with injunctive relief."  *Id.* at 571 (quoting *Tull*, 481 U.S. at 424).  To be sure, Thomas also sought equitable relief in the operative complaint.  But when a "legal claim is joined with an equitable claim, the right to jury trial on the legal claim,

---

[2] Congress may, of course, choose to define back pay differently, and in doing so it could transform it from a legal remedy to an equitable one.  *See, e.g.*, 42 U.S.C. § 2000e–5(g) ("[T]he court may . . . order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay . . . , or any other equitable relief as the court deems appropriate."); *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 415–18 (1975).  But Congress has not done so here.  *Cf. Terry*, 494 U.S. at 572 (distinguishing *Albemarle*).

22-11322                MARCUS, J., concurring                17

including all issues common to both claims, remains intact.  The right cannot be abridged by characterizing the legal claim as 'incidental' to the equitable relief sought."  *Curtis*, 415 U.S. at 196 n.11.  And in any event, the Final Judgment awarded Thomas only monetary damages.  The monetary award was not incidental to any injunctive relief.  Thus, neither exception applies.

I note that one of our sister circuits has reached the same conclusion in the USERRA context.  In *Middleton v. City of Chicago*, the Seventh Circuit wrote:

> Among other improvements, if an employer engaged in willful discrimination, USERRA permitted a plaintiff to seek liquidated damages, a form of relief unavailable under the VRRA.  *See* USERRA sec. 2, § 4324(c)(1)(A)(iii).  With that new provision, Congress converted what had been an equitable claim into a legal one, which brought along the corresponding right to a jury trial.

578 F.3d at 659.  It stood by this determination more recently.  *See DeLee v. City of Plymouth*, 773 F.3d 172, 174 n.1 (7th Cir. 2014) ("A plaintiff is entitled to a jury trial on a liquidated damages claim under USERRA.").

Put simply, the relief Thomas sought -- compensatory and liquidated damages that are punitive in nature -- is decidedly legal in nature, not equitable.  Inasmuch as actions seeking legal remedies, with limited exceptions not applicable here, afford a litigant that foundational right to trial by jury, Thomas would be entitled

18                    Marcus, J., concurring                    22-11322

to exercise that right in this case. Because it is "fairly possible" to interpret the statute in a way that, consistent with the Seventh Amendment, confers a jury trial right on a USERRA litigant seeking compensatory and liquidated damages, "our duty is to adopt" that interpretation, avoid the constitutional question, and the consequential requirement that we find that USERRA violates the Seventh Amendment to the extent it barred the right to a trial by jury on the matter of liquidated damages. *United States ex rel. Att'y Gen. v. Del. & Hudson Co.*, 213 U.S. 366, 408 (1909). Thus, Thomas had a statutory right to have a jury determine whether to award him compensatory and liquidated damages, even if the parties had not consented.

## UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

June 22, 2023

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number:  22-11322-AA
Case Style:  Scott Thomas v. Broward County Sheriff's Office
District Court Docket No:  0:19-cv-61324-WPD

All counsel must file documents electronically using the Electronic Case Files ("ECF") system, unless exempted for good cause. Although not required, non-incarcerated pro se parties are permitted to use the ECF system by registering for an account at www.pacer.gov. Information and training materials related to electronic filing are available on the Court's website. Enclosed is a copy of the court's decision filed today in this appeal. Judgment has this day been entered pursuant to FRAP 36. The court's mandate will issue at a later date in accordance with FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate filings, a petition for rehearing or for rehearing en banc is timely only if received in the clerk's office within the time specified in the rules. Costs are governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a motion for attorney's fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested Persons a complete list of all persons and entities listed on all certificates previously filed by any party in the appeal. See 11th Cir. R. 26.1-1. In addition, a copy of the opinion sought to be reheard must be included in any petition for rehearing or petition for rehearing en banc. See 11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation for time spent on the appeal no later than 60 days after either issuance of mandate or filing with the U.S. Supreme Court of a petition for writ of certiorari (whichever is later) via the eVoucher system. Please contact the CJA Team at (404) 335-6167 or cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

Pursuant to Fed.R.App.P. 39, costs taxed against the defendant-appellant-cross appellee.

Please use the most recent version of the Bill of Costs form available on the court's website at www.ca11.uscourts.gov.

<u>Clerk's Office Phone Numbers</u>

| | | | |
|---|---|---|---|
| General Information: | 404-335-6100 | Attorney Admissions: | 404-335-6122 |
| Case Administration: | 404-335-6135 | Capital Cases: | 404-335-6200 |
| CM/ECF Help Desk: | 404-335-6125 | Cases Set for Oral Argument: | 404-335-6141 |

OPIN-1A Issuance of Opinion With Costs

**UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT**
**Bill of Costs**

Court of Appeals Docket No. __22-11322__

Scott Thomas _____ vs. Broward County Sheriff's Office _____

A Bill of Costs should only be filed when the Clerk's Office has advised a party that the party is entitled to costs. FRAP 39 and 11th Cir. R. 39-1 govern costs taxable in this court and the time for filing the Bill of Costs. A motion for leave to file out of time is required for a Bill of Costs not timely received.

**INSTRUCTIONS**

The appellate docketing fee is set in the fee schedule issued pursuant to 28 U.S.C. § 1913. However, the $5 fee for filing a notice of appeal is recoverable as a cost in the district court. In the grid below, multiply the number of original pages of each document by the total number of documents reproduced to calculate the total number of copies reproduced. Multiply this number by the cost per copy ($.15 per copy for "In-House", up to $.25 per copy for commercial reproduction, supported by receipts) showing the product as costs requested.

| | Repro. Method (Mark One) In-House | Comm* | No. of Original Pages | Total No. Documents Reproduced | Total No. of Copies | COSTS REQUESTED | CT. USE ONLY COSTS ALLOWED |
|---|---|---|---|---|---|---|---|
| Appellate Docketing Fee | — | — | — | — | — | $505.00 | $500.00 |
| Appellant's Brief | | | | | | | |
| Appendix | X | | 862 | 5 | 4310 | $646.50 | $646.50 |
| Appellee's Brief | X | | 84 | 9 | 756 | $113.40 | $113.40 |
| Reply Brief | | | | | | | |
| Cross-Reply Brief | X | | 33 | 9 | 297 | $44.55 | $44.55 |
| | | | | | | | |
| *Note: If reproduction was done commercially, receipt(s) must be attached. | | | | **TOTAL** 5363 | | $ $1,309.45 REQUESTED | $ 1,304.45 ALLOWED |

I hereby swear or affirm that the costs claimed were actually and necessarily incurred in this appeal and that I have served this Bill of Costs on counsel/parties of record.

Signature: _Brandon K. Breslow_

Attorney Name: Brandon K. Breslow
(Type or print your name)

E-mail: bbreslow@kmf-law.com

Street Address/City/State/Zip: P.O. Box 3396, Tampa, FL 33601

Date Signed: 6/30/23

Attorney for: Scott Thomas
(Type or print name of client)

Phone: 813-229-1118

**FOR COURT USE ONLY**

Costs are hereby taxed in the amount of $ 1,304.45 against defendant-appellant-cross Appellee

and are payable directly to plaintiff appellee-cross Appellant

David J. Smith, Clerk of Court

Issued on: _____ ISSUED AS MANDATE: July 21, 2023 _____ By: /S/ Tresa A. Raines _____ DATE: 7/6/2023
Deputy Clerk

BOC Rev.: 6/17